

**PROVIDENT LAW**

Christopher J. Charles, SBN 023148
Timothy J. Watson, SBN 018685
16100 N. 71st Street, Suite 350
Scottsdale, AZ 85254
Telephone: (480) 388-3343
Facsimile: (602) 753-1270
For E-Service and Court Use Only: fileclerk@providentlawyers.com

Ann-Marie White René*
Virginia Bar License No. 91166
Center for Law & Religious Freedom
8001 Braddock Road, Ste 302
Springfield, VA 22151
Office: 703-642-1070, Ext: 404
Email: Arene@clsnet.org
(*_Pro Hac Vice Application Pending_)

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA
### PHOENIX DIVISION

| | |
|---|---|
| ST. HERMAN'S TABLE, an Arizona nonprofit corporation; and LANCE BRACE, <br><br> Plaintiffs, <br><br> vs. <br><br> CITY OF PHOENIX, <br><br> Defendant. | Case No. _____ <br><br> **COMPLAINT** |

Comes now the Plaintiffs, St. Herman's Table and Lance Brace, by counsel and for their Complaint against the Defendant, plead as follows:

## INTRODUCTION

Christian Orthodoxy requires almsgiving. Almsgiving is the "third pillar" of virtue alongside prayer and fasting. It involves voluntary, sacrificial giving—money, time, or goods—to the needy in Christ's name. The purpose of almsgiving is to assist one's neighbor, to demonstrate Christ-like love, and to combat one's own greed. Similarly, the Orthodox Church teaches that its followers are called to preach the Gospel and proclaim the Good News of Jesus Christ.

To fulfill his obligation of almsgiving and evangelism, Lance Brace ("Mr. Brace") founded St. Herman's Table ("St. Herman's"), a ministry of Exaltation of the Holy Cross Orthodox Church. Every Thursday, St. Herman's ministers to the homeless at Cave Creek Park at Cactus ("Cave Creek Park") in the City of Phoenix ("the City"). St. Herman's provides a meal, water, Bibles, and small hygiene products to the homeless at no cost to them. Ultimately, St. Herman's goal is to introduce Jesus Christ to the people it serves.

But now, Mr. Brace and St. Herman's face criminalization for their evangelism. On May 6, 2026, the City Council passed the *Medical Treatment and Food Distribution in Parks Ordinance* ("the Ordinance"). The Ordinance makes it a Class 1 Misdemeanor for any individual or organization with a "charitable or similar humanitarian purpose[]" to distribute food without a permit. And the Ordinance prohibits the issuance of more than two permits

per month per eligible park. Similarly, the Ordinance's implementing rules make it impossible for St. Herman's to continue its ministry as is. The Ordinance and its regulations force Mr. Brace and St. Herman's to cease its ministry at Cave Creek Park or face criminal prosecution.

Strikingly, however, the Ordinance exempts "family events such as celebrations, weddings, meals, or reunions or informal gatherings of family or family friends" from its permit requirements and criminalization altogether. But as the U.S. Supreme Court has declared, under the Free Exercise Clause, *governments cannot treat secular activity more favorably than religious exercise.* As such, the City has violated the First Amendment and the Arizona Free Exercise of Religion Act ("FERA") in this case.

Moreover, a permitting requirement in a public forum is a presumptively unconstitutional prior restraint. And, although St. Herman's currently operates under the assumption that it must seek a permit for its ministry under the Ordinance because it is likely qualifies as having a "charitable or similar humanitarian purpose[]"—these terms, and others, are not defined in the Ordinance. The Ordinance does not define what organizations and activities are included or exempt from it and provides no standards by which law enforcement may enforce it in a non-discriminatory manner, rendering it unconstitutionally vague.

For any or all of these reasons, the Plaintiffs respectfully seek declaratory and injunctive relief from this Court allowing them to continue their ministry at Cave Creek Park without the threat of criminal prosecution.

3

**JURISDICTION AND VENUE**

1.     This Court has subject matter jurisdiction over the Plaintiff's constitutional claims pursuant to 28 U.S.C. §§ 1331 and 1343, as this action arises under 42 U.S.C. § 1983 and other federal laws to redress the deprivation of rights guaranteed by the First Amendment to the United States Constitution under color of State law, custom or usage.

2.     This Court has supplemental jurisdiction over the Plaintiffs' state law claims under 28 U.S. Code § 1367.

3.     This Court has personal jurisdiction over the Defendant because it resides and transacts business in the State of Arizona and in the City of Phoenix.

4.     The declaratory and injunctive relief sought is authorized by 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure.

5.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because events giving rise to Plaintiff's claims occurred in this judicial district.

**PARTIES**

6.     Plaintiff, St. Herman's Table (hereinafter, "St. Herman's"), is an Arizona nonprofit corporation with its principal place of business located at 12020 N. 35th Ave., Suite 107, Phoenix, AZ 85029.

7.     Plaintiff, Lance Brace (hereinafter, "Mr. Brace"), is a private citizen and a resident of Arizona.

4

8. Defendant, City of Phoenix is a municipal corporation in Arizona. Its principal place of business is 200 W. Washington St., Phoenix, AZ 85003. The City is sued in its official capacity.

## ALLEGATIONS

9. Mr. Brace founded St. Herman's, a ministry of Exaltation of the Holy Cross Orthodox Church. It has no paid employees and acts solely through volunteers.

10. St. Herman's is a registered domestic nonprofit corporation with the State of Arizona. Mr. Brace currently serves as its President and a member of its Board of Directors.

11. Mr. Brace chose to name St. Herman's after St. Herman of Alaska, a Russian Orthodox monk of the 18th Century who ministered to people in the Kodiak region of Alaska, so that the ministry would be aided by the saint's intercession as they share the love of Christ by feeding the needy.

12. The Orthodox Church and Mr. Brace sincerely believe that almsgiving is a mandatory act of love. Almsgiving is considered the "third pillar" of virtue alongside prayer and fasting.

13. Almsgiving involves voluntary, sacrificial giving—of money, time, or goods—to the needy in Christ's name, aiming to demonstrate Christ-like love, to assist one's neighbor, and to combat one's own greed.

14.     St. Herman's purpose is to do almsgiving. It provides food, water, Bibles, and small hygiene products—shampoos, soaps, toothpaste, and the like—to the less fortunate, including the homeless, and seeks their conversion to the Gospel of Christ.

15.     St. Herman's does not provide medical supplies or medications. St. Herman's does not provide any type of needles to those it serves.

16.     St. Herman's mission statement is: "We serve the hungry in the name of Jesus Christ, offering food, prayer, and kindness, trusting God to supply what we lack."

17.     To fulfill their obligation of almsgiving and evangelization, St. Herman's and Mr. Brace go to Cave Creek Park, a City-owned and maintained park open to the public, to feed and minister to the homeless every Thursday evening.

18.     St. Herman's typically spends about an hour-and-a-half to two-hours every Thursday in the park.

19.     Before St. Herman's serves its meal to the homeless, every Thursday, St. Herman's offers a prayer in which its volunteers invite anyone who wishes to participate to be a part of. Several of the homeless individuals at Cave Creek Park join in this prayer. During St. Herman's time in the park, Mr. Brace and its volunteers offer to pray with anyone who engages with them.

20.     Mr. Brace personally brings an icon of an Orthodox saint from his personal collection to Cave Creek Park every Thursday. For example, on May 14, 2026, Mr. Bace brought an icon of St. Porphyrios of Kafsokalyvia. On May 7, 2026, Mr. Brace brought an



6

icon of St. Moses the Black. St. Herman's also gives out 4x6 inch prints of an icon of St. Herman that has their Church information on the back.

21.    St. Herman's volunteers all wear crosses, most of them being the Russian Orthodox Cross. The Russian three bar cross is different enough that Mr. Brace often gets questions about it and it leads to a conversation about Christ. Mr. Brace personally wears his Orthodox Cross outside of my shirt and wears black shirts with the cross imprinted on his shirt to encourage conversation about the cross.

22.    St. Herman's typically serves between 12 to 25 people during their time at Cave Creek Park. It rarely, if ever, serves more than 25 people. From the best of Mr. Brace's recollection, St. Herman's has never served more than 30.

23.    The number of St. Herman's volunteers who attend each Thursday to serve the homeless varies by week. The five Board members are St. Herman's primary volunteers, but not all are able to attend every week. Sometimes St. Herman's also has other Parishioners volunteer.

24.    All of St. Herman's current volunteers are either baptized members of the Orthodox Church or Catechumens (someone who is preparing to enter the Church).

25.    Mr. Brace and the other St. Herman's volunteers clean up before and after St. Herman's feeds the homeless in the park every week.

26.    St. Herman's does not leave trash or litter behind.

27. Mr. Brace has never encountered a needle during his time at Cave Creek Park. If he saw any needle, he would immediately alert those around him to avoid the area until he could carefully dispose of it while wearing gloves, or he would alert someone who could safely dispose of the needle, such as a city employee.

28. St. Herman's has never had a large crowd congregate by its table at Cave Creek Park when they are serving their Thursday meal. St. Herman's table operates as "buffet-style." That is, someone takes a plate and walks down the table collecting the food and small hygiene items that he or she needs. That individual then finds a spot nearby to eat. There is never a long line or crowd of people at St. Herman's table, and the sidewalk is always passable.

29. To its knowledge, St. Herman's has never been the subject of a complaint to the City.

30. Neither Mr. Brace nor St. Herman's have ever been cited under any littering, trash, noise, or crowd ordinance by the City.

31. Through consistent contact each week, Mr. Brace and St. Herman's volunteers have formed relationships and friendships with many of the homeless individuals that they first met at Cave Creek Park.

32. For example, there is a disabled individual who routinely meets St. Herman's at Cave Creek Park on Thursday. He has informed Mr. Brace that sometimes the meal that St. Herman's provides is the only complete meal he has received that week.

33. There is another individual who regularly meets Mr. Brace and St. Herman's at Cave Creek Park on Thursday. This individual did not easily warm up to St. Herman's volunteers. It took considerable time for this person to trust that St. Herman's is there to assist him without judgment.

34. It is clear that these two individuals reside somewhere close to Cave Creek Park and do not have reliable transportation to travel to other parks.

35. Ultimately, St. Herman's goal is to be used by God to bring His love to these individuals and the others whom St. Herman's serves, and to see them embrace the Gospel as taught by the Orthodox Church.

36. Prior to the passage of the City's Ordinance, Mr. Brace attended the April 8, 2026 Community Meeting about the Ordinance at the Sunnyslope Community Center. This meeting was held before Deputy City Manager Cynthia Aguilar. Mr. Brace testified at the meeting.

37. Specifically, Mr. Brace testified that the Ordinance would prohibit him and St. Herman's from fulfilling their religious obligation and mission. His statement is attached as Exhibit 1 and is incorporated herein.

38. Deputy City Manager Cynthia Aguilar asked Mr. Brace to e-mail his comments to her after the meeting. Mr. Brace did so, but he did not receive any reply by email or otherwise.

39. Mr. Brace also attended the City Council meeting on May 6, 2026.

40. Mr. Brace again testified at the May 6th meeting a second time that the Ordinance would prohibit him and St. Herman's from being able to fulfill its almsgiving and evangelization. His statement is attached as Exhibit 2 and is incorporated herein.

41. Mayor Kate Gallego, Councilwoman Betty Guardado, Councilwoman Ann O'Brien, Councilwoman Debra Stark, Councilman Kevin Robinson, and Councilwoman Kesha Hodge-Washington were all present at the May 6th meeting.

42. At the May 6, 2026 City Council Meeting, Mayor Kate Gallego, Councilwoman Betty Guardado, Councilwoman Ann O'Brien, Councilwoman Debra Stark, Councilman Kevin Robinson, and Councilwoman Kesha Hodge-Washington all voted in favor of the Ordinance. The Ordinance passed at that meeting.

43. The Ordinance is set to take effect on June 5, 2026. Attached as Exhibit 3 is the Ordinance and it is incorporated herein.

44. In subsection B.6. of the Ordinance, "Food Distribution Event" is defined as:

"a gathering conducted by a private individual or organization, for charitable or similar humanitarian purposes, at a park, that is planned, organized, or conducted to distribute food to any member of the general public at no cost or for a nominal charge.

i. Private events, not open to the general public, where food is served such as family gatherings, picnics, social organization events, or sporting

10

events where food is served only for participants of those events are not food distribution events."

Ex. 3.

45.    Subsection D of the Ordinance, titled "Food Distribution in Parks" prohibits "any person, group, or organization to conduct a food distribution event at a park without obtaining a permit from the Director [of the City of Phoenix Parks and Recreation Department] prior to the event." Ex. 3.

46.    In Subsection G of the Ordinance, titled "Exceptions", Section 4 states:

"For avoidance of doubt, subsection D of this section does not apply to any event that was not planned or intended to serve or distribute food to the general public. This includes *but is not limited to*:

"i. Family events such as celebrations, weddings, *meals*, or reunions or informal gatherings of family *or* family friends; and

"ii. Events that are not open to the general public or events to which the general public is not invited."

Ex. 3 (emphasis supplied).

47.    Subsection H of the Ordinance thus makes it a Class 1 Misdemeanor for any individual or organization to provide food for "charitable or similar humanitarian purposes" to any member of the general public without a permit. Ex. 3.

11

48.    Subsection E of the Ordinance details in full the discretion of the Director of the Phoenix Parks and Recreation Department ("the Director"). It states that the Director: "[i]s authorized to adopt rules and procedures for the issuance of permits for such services, *including, but not limited to*, rules and procedures to minimize disruption to other park uses, ensure the safety of park guests, and maintain parks in a clean and sanitary condition." Ex. 1 (emphasis added).  The entirety of Subsection E is incorporated into this paragraph.

3.    The Ordinance's implementing rules and permit application require that a that an individual or organization distributing food for "charitable or similar humanitarian purposes" must apply for the two available permits per month per park on a tri-annual basis. For example, the Fall 2026 applications open June 1-June 19, 2026 for permits in September-December 2026. The permit application requires that at the time of application, the organization seeking the permit must identify who will attend and provide Food Handler Certificates for each of those individuals. St. Herman's does not know months in advance which of its volunteers will be available.

4.    Exempted individuals and organizations are not subject to any such advance scheduling or notification.

12

5. The Ordinance's implementing rules and permit application require that an individual or organization distributing food for "charitable or similar humanitarian purposes" must submit proof of a $2 million liability insurance policy at the time of application.[1]

6. Exempted individuals and organizations are not subject to any insurance policy requirement.

7. The Ordinance's implementing rules and permit application require that any individual or organization seeking to distribute food for "charitable or similar humanitarian purposes" must submit proof that every person handling food has a Food Handlers Certificate at the time of application.

8. Exempted individuals and organizations are not subject to any Food Handlers Certificate requirement.

9. The Ordinance's implementing rules make clear that only permits for use in the eligible parks' parking lots will be issued.

10. Exempted individuals and organizations are not subject to any limitations on where they can host their event.

11. The Ordinance declares that these requirements are necessary because "providing services needed to vulnerable populations . . . can [] strain the parks and city

---

[1] Plaintiffs respectfully request that the Court take judicial notice of the City's rules for the issuance of a summer permit and the permitting application. *See* CITY OF PHOENIX, *Medical Treatment/Food Distribution Services Permit Application*, *available at* https://www.phoenix.gov/content/dam/phoenix/parkssite/documents/safemedicaltreatment/Summer%20Open%20Application..pdf (last visited May 20, 2026).

13

resources, frequently creating large crowds, increased noise, obstruction of public spaces, litter, and the accumulation of trash, debris, and food waste."

12.     But when asked at the May 6th City Council meeting for data to support the Ordinance's interest, Deputy City Manager Cynthia Aguilar responded that the City does not have any such data.

13.     Specifically, Deputy City Manager Aguilar was asked, "what empirical evidence do[es the City] have that restricting care distribution will result in measurable cleaner parks?"

14.     Deputy City Manager Aguilar responded that the City "do[es] not have data that is specific to that on park property."

15.     The Ordinance will prevent St. Herman's from continuing to feed, befriend, and evangelize at Cave Creek Park each week.

16.     The Ordinance and its implementing rules impacts the number of beneficiaries and volunteers, and St. Herman's mission, by its requirement that they be confined to an asphalted parking lot.

17.     The Ordinance and its implementing rules prevent St. Herman's from applying for permits because it cannot schedule and identify volunteers for a particular day months in advance.

14

18.     The Ordinance damages the essential trust and friendships between St. Herman's and those they serve because the ordinance will prevent regular, reliable and weekly meals and ministry.

19.     The purpose and effect of the Ordinance is to substantially burden St. Herman's exercise of its legal rights.

20.     Both Mr. Brace and St. Herman's intend to peaceably continue their weekly ministry at Cave Creek Park despite the threat of prosecution by the City under the Ordinance. St. Herman's intends to continue to feed and minister to the homeless at Cave Creek Park once the Ordinance goes into effect on June 5, 2026.

21.     Mr. Brace has a wife and three children who often volunteer at St. Herman's Thursday ministry at Cave Creek Park with him. As an Orthodox Christian, he believes that he must set a Godly example for his children. Mr. Brace and his wife therefore take their children to the park when they are volunteering with St. Herman's so that they may witness feeding and ministering to those in need and seeking their spiritual renewal.

22.     However, due to the Ordinance, Mr. Brace and his wife have decided that once the Ordinance goes into effect, she and their children will no longer attend St. Herman's weekly ministry at Cave Creek Park.

23.     They have made this decision in case Mr. Brace is cited or arrested while fulfilling his almsgiving, so that their children will not be a witness to that, and so that his wife will be able to care for their children in case he is unable to immediately return home.

15

24.    Prior to filing this lawsuit and before the City Council adopted the Ordinance, St. Herman's sent the Phoenix City Attorney a letter detailing in-depth Mr. Brace's and St. Herman's' objections to the Ordinance and explaining why it violates the First Amendment. The letter is attached hereto at Exhibit 4 and is incorporated herein.

25.    Neither the City Attorney nor the City Council responded to the letter. Instead, the Ordinance was passed on May 6, 2026. It is Mr. Brace's and St. Herman's understanding that the City intends to fully enforce the Ordinance beginning on its effective date of June 5, 2026.

### CLAIMS

**Count I (42 U.S.C. § 1983)**
**First Amendment**
**Free Exercise of Religion Clause**
**Not Neutral or Generally Applicable**
**Facially and As Applied to St. Herman's and Mr. Brace**

26.    Plaintiffs incorporate by reference all the preceding factual paragraphs.

27.    The Free Exercise Clause of the First Amendment protects against "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Carson v. Makin*, 596 U.S. 767, 778 (2022) (internal citations omitted).

28.    Government practices that burden religious exercise are subject to strict scrutiny if they are not neutral and generally applicable. *Fulton v. City of Philadelphia*, 593 U.S. 522, 542 (2021).

29.    "[T]he minimum requirement of neutrality is that a law not discriminate on its face." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993).

30.    Government policies are not neutral and generally applicable "whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (emphasis in original).

31.    The Ordinance criminalizes religious persons and organizations practicing ministerial service if performed more than once or twice a month.

32.    The Ordinance on its face prevents any religious organization from freely exercising its religious acts of service at Cave Creek Park on a weekly basis.

33.    By adopting the Ordinance, the City has criminalized St. Herman's and Mr. Brace's weekly almsgiving and evangelism at Cave Creek Park because only two permits may be issued for the park in a month.

34.    By criminalizing St. Herman's and Mr. Brace's almsgiving and evangelism, the Ordinance burdens their free exercise of religion.

35.    Moreover, the Ordinance's implementing rules subject religious organizations, St. Herman's, and Mr. Brace to additional regulations—such as insurance, scheduling, notification, and food safety training requirements—that secular individuals and organizations are not required to adhere to.

36.    The Ordinance is not neutral or generally applicable because on its face it penalizes food distribution "conducted by a private individual or organization, for charitable

17

or similar humanitarian purposes," which necessarily includes religious purposes, but does not penalize food distribution conducted for other purposes.

37.    The Ordinance is not facially neutral or generally applicable because it penalizes St. Herman's and Mr. Brace as they are a "private individual or organization, for charitable or similar humanitarian purposes."

38.    The Ordinance is not facially neutral or generally applicable because on its face the Ordinance treats secular conduct more favorably than religious conduct. It exempts the same food distribution conduct when performed for a secular reason but not when performed for a religious reason by exempting the following events that serve food: (1) picnics (subsection 6.i); (2) social organization events (subsection 6.i); (3) sporting events (subsection 6.i); (4) family gatherings (subsection 6.i); (5) family celebrations (subsection I.4.i.); (6) family weddings (subsection I.4.i.); (7) family meals (subsection I.4.i.); (8) family reunions (subsection I.4.i.); (9) informal gatherings of family (subsection I.4.i.); (10) informal gatherings of family friends (subsection I.4.i.); (11) events that are not open to the general public (subsection I.4.ii); (12) events to which the general public is not invited (subsection I.4.ii); (13) gatherings that are conducted by *public* individual or organizations (subsection B.6.); (14) gatherings that are not conducted for charitable or similar humanitarian purposes (subsection B.6.); (15) gatherings that make food available for more than free or a nominal charge (subsection B.6.). The Ordinance's text makes clear that other unenumerated gatherings are also included through its use of "such as" in subsection B.6. and "includes but

is not limited to" in subsection I.4. The 15 enumerated categories are therefore merely examples of exemptions and not a finite list of exemptions.

39.     The Ordinance is not neutral and generally applicable because it creates on its face a system of exemptions from enforcement.  *Tandon*, 593 U.S. at 63.

40.     The Ordinance is not neutral or generally applicable because the Ordinance's text ("such as" in subsection B.6. and "includes but is not limited to" in subsection I.4) allows the Director of the Phoenix Parks and Recreation Department to exercise discretion to grant additional individualized exemptions beyond the 15 examples enumerated in the Ordinance, as described in the above paragraph above. *Fulton*, 593 U.S. at 535.

41.     Because the Ordinance is not neutral and generally applicable, it is subject to strict scrutiny.

42.     The Ordinance fails strict scrutiny because it does not serve a compelling government interest.

43.     The Ordinance also fails strict scrutiny because it creates exemptions on its face that undermine any alleged interest of the City.

44.     The Ordinance also fails strict scrutiny because the City has admitted that it does not have evidence to support the Ordinance's alleged interest and "speculation is insufficient to satisfy strict scrutiny." *Fulton*, 593 U.S. at 542.

45.    The Ordinance also fails strict scrutiny because less restrictive means are available to address the City's trash, litter, crowding, noise, and safety concerns. *Tandon*, 593 U.S. at 62.

46.    Therefore, the Ordinance is unconstitutional on both its face and as applied to St. Herman's and Mr. Brace under the Free Exercise Clause of the First Amendment.

**Count II (42 U.S.C. § 1983)**
**First Amendment**
**Free Speech Clause**
**Prior Restraint – Unconstitutional Permitting Scheme**
**Facially and As Applied to St. Herman's and Mr. Brace**

47.    The Plaintiffs incorporate by reference all the preceding factual paragraphs.

48.    "A permitting requirement is a prior restraint on speech and therefore bears a heavy presumption against its constitutionality." *Berger v. City of Seattle*, 569 F.3d 1029, 1037 (9th Cir. 2009) (*en banc*) (citations and internal quotations omitted).

49.    The U.S. Court of Appeals for the Ninth Circuit has "refused to uphold registration requirements that apply to individual speakers or small groups in a public forum." *Id*. at 1039.

50.    Food distribution is an expressive activity protected by the First Amendment. *See Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1032 (9th Cir. 2006) (citing *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1243 (11th Cir. 2018); *Food Not Bombs Houston v. City of Houston, Texas*, No. 4:24-CV-0338, 2024 WL 623913, at *4 (S.D. Tex. Feb. 14, 2024)).

20

51.     For a permitting scheme to be valid under the First Amendment, it "(1) must not delegate overly broad discretion to a government official; (2) must not be based on the content of the message; (3) must be narrowly tailored to serve a significant governmental interest; and (4) must leave open ample alternatives for communication." *Santa Monica Food Not Bombs*, 450 F.3d at 1037.

52.     "[A] law cannot condition the free exercise of First Amendment rights on the unbridled discretion of government officials." *Desert Outdoor Adver. v. City of Moreno Valley*, 103 F.3d 814, 818 (9th Cir. 1996) (internal quotation marks omitted).

53.     "Regulations must contain narrow, objective, and definite standards to guide the licensing authority and must require the official to provide an explanation for his decision." *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1025 (9th Cir. 2009) (internal quotation marks, citations, and alterations omitted).

54.     Unbridled discretion is found if an ordinance does not provide any requirement that a government official explain his or her reasons for denying or qualifying a permit and fails to provide a forum for appealing the official's decision. *See Seattle Affiliate of the Oct. 22nd Coalition to Stop Police Brutality v. City of Seattle*, 550 F.3d 788, 791 (9th Cir. 2008).

55.     "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

56. The Ordinance grants unbridled discretion to the Director on three counts.

57. First, the Ordinance provides no basis by which the Director is to determine which individual(s) or organization(s) are to receive the two permits per park per month.

58. Second, the Ordinance requires no explanation from the Director for his decision to favor one individual or organization over another.

59. Third, the Ordinance provides no mechanism by which to appeal the Director's decision.

60. Further still, the Ordinance is content-based as its permitting and criminalization provisions only apply to individual speakers and small groups who wish to express religious, charitable, and/or humanitarian purposes in a public forum.

61. The Ordinance allows some groups that serve food to have access on an unlimited basis to a public park (family groups, social organizations, sports groups), while prohibiting the same activity by groups who have a charitable or similar humanitarian purpose. Therefore, the Ordinance is not content-neutral and is unconstitutional viewpoint discrimination.

62. The Ordinance does not serve a compelling government interest.

63. The Ordinance is not narrowly tailored because it exempts social and secular conduct from its permitting and criminalization provisions.

64. The Ordinance is not narrowly tailored because the City has admitted that it does not have evidence to support the Ordinance's alleged interest.

22

65.     The Ordinance is not narrowly tailored because less restrictive means are available to address the City's trash, litter, crowding, noise, and safety concerns. *Tandon*, 593 U.S. at 62.

66.     As such, the Ordinance is a facial prior restraint and unconstitutional as applied to St. Herman's and Mr. Brace.

**Count III (42 U.S.C. § 1983)**
**Violation of the First Amendment**
**Free Speech and Exercise Clauses**
**Equal Access**
**Facially and As Applied to St. Herman's and Mr. Brace**

67.     The Plaintiffs incorporate by reference all the preceding factual paragraphs.

68.     The Free Speech Clause protects "expressive religious activities." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523 (2022).

69.     The First Amendment protects equal access for religious speakers and religious speech, including religious expressive activities, to public fora, including traditional, limited, and nonpublic fora. *See, e.g., Widmar v. Vincent*, 454 U.S. 263 (1981); *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819 (1995); *Good News Club v. Milford Sch. Dist.*, 533 U.S. 98 (2001); *Shurtleff v. Boston*, 596 U.S. 767 (2022).

70.     Public parks are a traditional public forum in which religious speakers and religious speech are protected. *See, e.g., Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009) (citations omitted); *Cantwell v. Connecticut*, 310 U.S. 296 (1940) (street public

forum); *Niemotko v. Maryland*, 340 U.S. 268 (1951); *Fowler v. Rhode Island*. 345 U.S. 67 (1953).

71.    The Ordinance on its face and as applied denies equal access to a public park for religious speakers and religious speech.

72.    The Ordinance is not a time, place, or manner restriction because it is not content-neutral. *Ward. v. Rock Against Racism*, 491 U.S. 781 (1989). It excludes food distribution only for groups doing it for charitable or similar humanitarian purposes. That means its terms require the government to consider the motivation for a group's speech, associational and expressive activity.

73.    The Ordinance is not a reasonable time, place, or manner restriction because it does not restrict all gatherings in the park based on the time of the activity (allowing some types of food distribution to occur at any time the park is open), or the place of the activity (allowing some food distribution to take place all over the park).

74.    The Ordinance is not a reasonable time, place, or manner restriction because it is not adequately narrow. It does not leave open ample, alternative ways for groups to communicate through their expressive acts of service. *Ward,* 491 U.S. 781.

75.    The Ordinance allows some groups that serve food to have access on an unlimited basis to a public park (family groups, social organizations, sports groups), while prohibiting the same activity by groups who have a charitable or similar humanitarian

24

purpose. Therefore, the Ordinance is not content-neutral and is unconstitutional viewpoint discrimination.

76. The Ordinance on its face and as applied denies religious organizations, Mr. Brace, and St. Herman's equal access for their expressive religious activities of almsgiving and evangelism through feeding persons in need, while allowing nonreligious expressive and associational activities that involve food distribution to take place in public parks, which violates the Free Speech Clause.

77. The Ordinance discriminates against Mr. Brace's and St. Herman's based on the content and viewpoint of their expressive religious activities and religious speech.

78. As enacted, the Ordinance leaves unimpeded social conversation but impedes religious conversation, encouragement and counsel.

79. As enacted, the Ordinance exempts from criminalization secular social gatherings but bans gatherings rooted in religious expression.

80. Therefore, the Ordinance on its face and as applied is subject to strict scrutiny under the Free Speech Clause.

81. The Ordinance does not survive strict scrutiny because it does not serve a compelling government interest.

82. The Ordinance also fails strict scrutiny because it creates exemptions on its face that undermine any alleged interest of the City.

83.    The Ordinance also fails strict scrutiny because the City has admitted that it does not have evidence to support the Ordinance's alleged interest and "speculation is insufficient to satisfy strict scrutiny." *Fulton*, 593 U.S. at 542.

84.    The Ordinance also fails strict scrutiny because less restrictive means are available to address the City's trash, litter, crowding, noise, and safety concerns. *Tandon*, 593 U.S. at 62.

85.    Therefore, the Ordinance denies equal access to religious organizations, St. Herman's, and Mr. Brace and is unconstitutional under the Free Speech and Exercise Clauses.

**Count IV (42 U.S.C. § 1983)**
**First Amendment**
**Expressive Association**
**Violation of the First Amendment Free Speech and Assembly Clauses**
**Facially and As Applied to St. Herman's and Lance Brace**

86.    The Plaintiffs incorporate by reference all the preceding factual paragraphs.

87.    "Implicit in the right to engage in activities protected by the First Amendment is a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) (cleaned up).

88.    By enacting the Ordinance, the City has denied the Plaintiffs their ability to engage in gathering and associating with others at Cave Creek Park.

89.    St. Herman's was formed so that an association of religiously motivated people could come together and have a bigger impact in living out their faith in word and deed by

26

working together. This is evident from St. Herman's purpose, method of gathering volunteers, and its plan of outreach through food service.

90.    The Plaintiffs' association has a communicative purpose—to convey by deed and word the love and Gospel of Jesus Christ. St. Herman's and Mr. Brace communicate this purpose by praying with the homeless, speaking with them about the Gospel, providing Bibles and small cards of St. Herman to the homeless, and displaying crosses and icons of saints.

91.    The City's Ordinance unconstitutionally prohibits St. Herman's and Mr. Brace from expressively associating with those they seek to meet with and minister to once a week at Cave Creek Park.

92.    Therefore, the Ordinance substantially burdens the Plaintiffs' freedom of expressive association, subjecting both to strict scrutiny.

93.    To survive strict scrutiny, the Ordinance must achieve a compelling state interest, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedom. *Dale*. 530 U.S. at 649.

94.    The Ordinance as applied to St. Herman's and Mr. Brace does not survive strict scrutiny because it does not further a compelling state interest unrelated to the suppression of ideas.

95.    The Ordinance as applied to St. Herman's and Mr. Brace does not survive strict scrutiny because, even if it served a compelling state interest unrelated to the suppression of

ideas, it does not achieve that interest through means significantly less restrictive of associational freedom.

96.    The Ordinance therefore violates St. Herman's and Mr. Brace's First Amendment right of expressive association.

**Count V (42 U.S.C. § 1983)**
**First and Fourteenth Amendments**
**Unconstitutional Vagueness**
**Facially and As Applied to St. Herman's and Mr. Brace**

97.    The Plaintiffs incorporate by reference all the preceding factual paragraphs.

98.    To avoid unconstitutional vagueness, an ordinance must: (1) define the offense with sufficient definiteness that ordinary people can understand what conduct is prohibited; and (2) establish standards to permit police to enforce the law in a non-arbitrary, non-discriminatory manner. *Kolender v. Lawson,* 461 U.S. 352, 357 (1983).

99.    In a facial vagueness challenge, the ordinance need not be vague in all applications if it reaches a "substantial amount of constitutionally protected conduct." *Id.* at 359 n.8 (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494 (1982)).

100.    A statute is unconstitutionally vague if it "specifie[s]" . . . "no standard of conduct at all." *United States v. Lucero*, 989 F.3d 1088, 1101 (9th Cir. 2021)

101.    The need for definiteness is greater when the ordinance imposes criminal penalties on individual behavior or implicates constitutionally protected rights than when it regulates the economic behavior of businesses. *Hoffman Estates,* 455 U.S. at 498–99.

28

102.    Here, the Ordinance's language as to what activities are exempted from criminalization is unconstitutionally vague. The Ordinance does not define "private events", "general public", "family gatherings", "picnics", "social organization events", "sporting events", "celebrations", "meals", or "informal gathering of family or friends."

103.    As detailed herein, St. Herman's has formed relationships and friendships with many of the homeless individuals at Cave Creek Park.  Under the plain language of the ordinance, it is unclear whether a gathering between St. Herman's volunteers, Mr. Brace, and these individuals on a Thursday night would qualify as a "picnic", "meal", "private "informal gathering of . . . friends", or "social organization events."

104.    The Ordinance on its face does not define any of the terms in the above paragraphs.

105.    The Ordinance does not define or explain how or how not St. Herman's Thursday meals qualify as any of the terms in the above paragraph.

106.    The Ordinance does not provide any standards by which law enforcement may determine in a non-discriminatory way if a religious organization or St. Herman's is engaged in any of the terms in the above paragraphs.

107.    As such, the Ordinance is unconstitutionally vague on its face and as applied to St. Herman's and Mr. Brace.

**Count VI**
**(42 U.S.C. § 1983, under this Court's Supplemental Jurisdiction)**
**Violation of the Arizona Free Exercise of Religion Act ("FERA")**

**As applied to St. Herman's and Lance Brace**

108.    The Plaintiffs incorporate by reference all the preceding factual paragraphs.

109.    The Arizona Legislature passed FERA "to protect Arizona citizens' right to exercise their religious beliefs free from undue governmental interference." *State v. Hardesty*, 222 Ariz. 363, 365 (2009) (*en banc*).

110.    FERA prohibits the City from substantially burdening an exercise of religion unless the burden is "[i]n furtherance of a compelling governmental interest [and] [t]he least restrictive means of furthering that compelling governmental interest." A.R.S. §41-1493.01(C).

111.    A substantial burden is found when a government "forces individuals to choose between following the precepts of [their] religion and receiving a government benefit" or "compels them, under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs." *Brush & Nib Studio, LC v. City of Phoenix*, 247 Ariz. 269, 298, 448 P.3d 890, 919 (2019) (internal quotations omitted) (citations omitted).

112.    The Ordinance substantially burdens Mr. Brace and St. Herman's to either follow the precepts of their religion—engage in consistent almsgiving and evangelization—or forgo that obligation and receive, perhaps once a month, a permit for such activities to avoid prosecution.

113.    The Ordinance substantially burdens St. Herman's and Mr. Brace's religious exercise because it criminalizes their weekly free exercise of almsgiving and evangelism.

114. The City does not have a compelling interest in prohibiting Mr. Brace and St. Herman's from engaging in their religious exercise. If the City were truly committed to addressing park orderliness and cleanliness, it would not exempt birthday parties, weddings, and social gatherings from the Ordinance.

115. Likewise, the City has less restrictive means by which to further any interest related to keeping the City's parks clean and orderly.

116. As such, the Ordinance violates St. Herman's and Mr. Brace's rights under FERA.

### PRAYER FOR RELIEF

117. Plaintiffs ask this Honorable Court to:

a. Declare that the Ordinance facially violates the First Amendment.

b. Declare that the Ordinance violates the First Amendment as applied to Mr. Brace and St. Herman's.

c. Declare that the City's Ordinance caused the City of Phoenix to violate the First Amendment.

d. Declare that the City may not penalize protected First Amendment activity—in any way—including by enforcement of the Ordinance against Mr. Brace, St. Herman's, or any volunteer or associate of St. Herman's.

e. Declare that the City may not cite, arrest, charge, or prosecute Mr. Brace, St. Herman's, or any volunteer or associate of St. Herman's under the Ordinance.

31

f.  Declare that the application or enforcement of the Ordinance, its implementing rules, and the permit process to Mr. Brace, St. Herman's, and any volunteer or associate of St. Herman's is an unconstitutional violation of the First Amendment's Free Exercise Clause;

g.  Declare that the application or enforcement of the Ordinance, its implementing rules, and the permit process to Mr. Brace, St. Herman's, and any volunteer or associate of St. Herman's is an unconstitutional violation of the First Amendment's Free Speech Clause;

h.  Declare that the application or enforcement of the ordinance, its implementing rules, and the permit process to Mr. Brace, St. Herman's, and any volunteer or associate of St. Herman's is a violation of the Arizona Free Exercise of Religion Act;

118.  Enter a temporary restraining order, preliminary injunctive relief, and permanent injunctive relief enforcing the above declaratory relief;

119.  Enter injunctive relief:

a.  Prohibiting the City from enforcing the Ordinance, its implementing rules, and/or the permitting process against Mr. Brace, St. Herman's, and all of its volunteers and associates when they are almsgiving and evangelizing by serving food to persons in need on a weekly basis in City parks;

32

b. Ordering the City to preserve the status quo regarding Mr. Brace's and St. Herman's religious exercise by allowing Mr. Brace, St. Herman's, and all of its volunteers and associates to continue to almsgiving and evangelize through serving food to persons in need on a weekly basis at Cave Creek Park every Thursday without any permit; and,

c. Prohibiting the City from applying or enforcing the Ordinance, its implementing rules, and/or the permitting process against Mr. Brace, St. Herman's, and any volunteer or associate of St. Herman's.

120. Award the Plaintiffs their reasonable attorneys' fees, costs, and any equitable or other relief that is just and proper, including under 42 U.S.C. § 1988.

**RESPECTFULLY SUBMITTED ON** this 2nd day of June 2026.

**PROVIDENT LAW®**

Christopher J. Charles, Esq.
Timothy J. Watson, Esq.

*Ann-Marie White René*

Ann-Marie White René, Esq.
*Pro Hac Vice\**
Virginia Bar License No. 91166
(*Pro Hac Vice Application Pending)

Alana Maaele