

# PROVIDENT LAW

# Exhibit 4

**PROVIDENT LAW**

16100 N. 71st Street, Suite 350
Scottsdale, Arizona 85254
480.388.3343
www.providentlawyers.com

**Christopher J. Charles**
Managing Partner
Direct: 480.388.3348
chris@providentlawyers.com



May 1, 2026

**<u>Via Fax and First-Class Mail:</u>**
Mr. Deryck R. Lavelle
City Attorney's Office
Phoenix City Hall
200 W. Washington St., 13th Floor
Phoenix, AZ 85003
602-732-2768

Dear Mr. Lavelle:

Please be advised that St. Herman's Table ("St. Herman's"), a religious ministry of Exaltation of the Holy Cross Orthodox Church, has retained Provident Law® and the Christian Legal Society's Center for Law & Religious Freedom ("the Center") to represent it in relation to the City of Phoenix's Medical Treatment and Food Distribution in Parks Ordinance (the "proposed ordinance"). It is our understanding that this proposed ordinance is to be voted upon by the Phoenix City Council on May 6, 2026. We are writing to raise our concerns with the constitutionality of the proposed ordinance and any application of it to St. Herman's and its volunteers. We hope that the ordinance can be brought into alignment with the First Amendment and Arizona's Free Exercise of Religion Act ("FERA") before adoption, so that a federal judge need not do so.

As the City of Phoenix ("the City") is aware, St. Herman's is a Christian religious ministry whose services include providing food, Bibles, and small hygiene products to unhoused residents at Cave Creek Park at Cactus in Phoenix.[1] St. Herman's ministers to the homeless every Thursday of the week, serving between 12 and 25 persons per visit.

---

[1] St. Herman's President, Lance Brace, spoke at the Sunnyslope Community Meeting on April 8, 2026, informing the City of St. Herman's ministry and outlining the substantial burden that the proposed ordinance places upon it and his ability to carry out his religious calling of

Under the City's proposed ordinance, it will become illegal for St. Herman's to distribute food to the homeless without a permit. Further, the proposed ordinance limits the City to issuing only two permits per month per eligible park. From our understanding, the permits are to be limited to a single day. Therefore, even in the unlikely scenario that St. Herman's would be granted the two monthly permits allowed under the ordinance for Cave Creek Park, it still would be prohibited from fulfilling its once-a-week ministry. Moreover, because St. Herman's will undoubtedly not be the only permit applicant per month, St. Herman's will be unable to even plan for its regular religious activity, which includes the coordination of volunteers and food that is part of its ministry. Prohibiting St. Herman's from engaging in its weekly ministry substantially burdens St. Herman's free exercise of religion, as it would impede St. Herman's ability to partake in its required almsgiving and to share the love of God with the homeless individuals with whom St. Herman's has formed relationships. In short, the proposed ordinance will make St. Herman's ministry impossible.

But St. Herman's is not without sound legal recourse. As explained herein, St. Herman's is shielded by Arizona's FERA[2] and the Free Exercise and Free Speech Clauses of the First Amendment.

## I.    Application of the proposed ordinance to St. Herman's would violate FERA

Arizona law directly protects the ministry of St. Herman's and its volunteers in their religious exercise of feeding and serving the homeless in the City's parks. This basis alone is sufficient to fully shield St. Herman's from enforcement of the proposed ordinance.

As the City is undoubtedly aware, the Arizona legislature passed FERA "to protect Arizona citizens' right to exercise their religious beliefs free from undue governmental interference." *State v. Hardesty*, 222 Ariz. 363, 365 (2009) (*en banc*). FERA prohibits the City from substantially burdening an exercise of religion unless the burden is "[i]n furtherance of a compelling governmental interest [and] [t]he least restrictive means of furthering that compelling governmental interest." A.R.S. § 41-1493.01(C). A substantial burden on religion exists when a government's action threatens to penalize or punish an individual's or institution's exercise of its religious beliefs. *See Holt v. Hobbs*, 574 U.S. 352, 362 (2015).

---

almsgiving. Thereafter, Mr. Brace electronically mailed a copy of his comments to Deputy City Manager Cythnia Aguilar at her request. A copy of his comments is included with this letter as Exhibit 1.

[2] A.R.S. §§ 41-1493 *et seq.*

Here, the City would substantially burden our client if the City passes the proposed ordinance as is and applies it to prevent St. Herman's from engaging in its ministry each week. Similarly, a substantial burden would exist if those ministering to the homeless through St. Herman's were criminally charged and/or prosecuted under the ordinance for engaging in religious exercise without a permit. To justify these substantial burdens, the City would have to demonstrate that denying St. Herman's the ability to serve the homeless is the least restrictive means of furthering a *compelling* government interest. A.R.S. § 41-1493.01(C) (emphasis added.).

According to the proposed ordinance, the City asserts that the ordinance is necessary so as not to "strain the parks and city resources" because meal and medical supply distribution "frequently create[es] large crowds, increased noise, obstruction of public spaces, litter, and the accumulation of trash, debris, and food waste." Reducing litter in parks is hardly a compelling interest in the context of religious exercise. *See e.g.*, *Wisconsin v Yoder,* 406 U.S. 205 (1972) (state interest in compulsory education for teenagers is not sufficiently compelling as it is not "an interest of the highest order."). And even the City's asserted interest is undercut by the City's exemptions in the proposed ordinance for secular activity that create the same issues of crowds, noise, litter, and trash. That is, the proposed ordinance would exempt from criminalization private weddings, birthday parties, and other social gatherings that also result in noise and litter. The City cannot meet the compelling interest or least restrictive means test under FERA when it exempts secular activity but not religious exercise from the proposed ordinance's enforcement. *See, e.g.*, *Fulton v. City of Philadelphia*, 593 U.S. 522, 542 (2021) (explaining "[t]he creation of a system of exceptions" to a government interest alone fails to meet strict scrutiny); *see also Tandon v. Newsom*, 593 U.S. 61, 62 (2021).

Further still, FERA specifically requires equal treatment for religious organizations in the land use context. Specifically, FERA provides that "[g]overnment shall not impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution, regardless of a compelling governmental interest." A.R.S. § 41-1493.03(B).

The City's proposed ordinance glaringly violates FERA under the statute's equal terms provision for the same reasons that it fails to meet the compelling interest/least restrictive means test. The City cannot treat secular activity—weddings, parties, and social gatherings—more favorably than St. Herman's religious exercise of ministering to the homeless, regardless of any compelling City interest. Pursuant to FERA, St. Herman's must be treated on equal terms as private entities and individuals under the proposed ordinance. Accordingly, St. Herman's is fully protected under Arizona law from enforcement of the proposed ordinance against it.

**II.    The proposed ordinance would unconstitutionally infringe upon the free exercise of religion both on its face and as applied to St. Herman's**

Not only would St. Herman's rights under Arizona's FERA be violated by the proposed ordinance, but the proposed ordinance, if enacted, would also violate the U.S. Supreme Court's free exercise jurisprudence both on its face and if it were applied against St. Herman's.

The Free Exercise Clause of the First Amendment, applicable to the States under the Fourteenth Amendment, provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. In *Fulton v. City of Philadelphia*, the Supreme Court explained that "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." 593 U.S. at 533 (citation omitted). The Court further explained that a law is *not* generally applicable—and thus strict scrutiny applies—if the government has "in place a system of individual exemptions." In such a situation, it may not refuse to extend that system to cases of 'religious hardship[.]'" *Id*. at 534 (citations omitted). Since *Fulton*, the Supreme Court has further clarified when a law is not generally applicable or religiously neutral.

In *Tandon v. Newsom*, the Court rejected California's COVID-19 regulations that allowed for secular activities to bring together three or more households but prohibited religious in-home services of the same number. 593 U.S. 61, 63. The Court outlined two specific principles for determining when such a law is not neutral and generally applicable for purposes of determining a free exercise claim and thus when strict scrutiny apples. *Id*. at 62. First, "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Id*. (emphasis in original). Second, "whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id*.

*Fulton* and *Tandon* make clear that the City's ordinance as currently proposed would violate the Free Exercise Clause. It would allow for private entities and persons (potentially scores of littering party-goers) to gather for food and drink without a permit but would prohibit religious organizations from feeding 12 to 25 desperate human beings once a week. In fact, the proposed ordinance is strikingly similar to *Tandon*'s fact-pattern. Here, the City is allowing secular gatherings but prohibiting St. Herman's from gathering in free exercise of its religion. As the Court in *Tandon* made clear, where a regulatory scheme allows favorable treatment of secular activity, the scheme is subject to strict scrutiny. *Tandon*, 593 U.S. at 62. *See Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993). And here, like in *Fulton*, the City's proposed ordinance fails such scrutiny. *See, e.g.*, *Fulton*, 593 U.S. at 542.

## III.    The Free Speech Clause of the First Amendment likewise shields St. Herman's

Aside from the Free Exercise Clause, the proposed ordinance also violates St. Herman's right to free speech under the First Amendment. As explained herein, St. Herman's volunteers distribute Bibles to the homeless at Cave Creek Park in addition to food. These volunteers spread

the Gospel of Christ throughout their time in the park by speaking with the individuals they serve about Jesus and exemplifying Christ-like love by providing food and small hygiene products to the homeless. These expressive activities have a long history of constitutional protection in our country.

The Free Speech Clause's protection of "expressive religious activities," *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523 (2022), extends to various modes of communication: "leafletting, sign displays, and oral communications are protected by the First Amendment." *Hill v. Colorado*, 530 U.S. 703, 715 (2000). Public parks are a traditional public forum. *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009) (citations omitted). And as such, the government may impose reasonable restrictions on the time, place, or manner of protected speech. *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984) (citations omitted). But, to determine the level of scrutiny that applies to the constitutionality of an ordinance, a court must assess whether the restriction is content-based. "A regulation of speech is facially content based under the First Amendment if it 'target[s] speech based on its communicative content'—that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (citation omitted). Some laws clearly regulate speech "by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both . . . are subject to strict scrutiny." *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015).

The proposed ordinance is the "subtle" type of law that would regulate speech by its function or purpose. *Id*. It would require no permit nor limit the number of events in which food, birthday cake and bags of party favors are handed out to a dozen children, but it would require a permit and ban weekly distribution of food, toiletries, and Bibles. It would leave unimpeded social conversation but impede religious encouragement and counsel. It would exempt from criminalization secular social gatherings but outlaw gatherings rooted in religious expression. Therefore, the proposed ordinance is subject to strict scrutiny under the Free Speech Clause. For all of the same reasons detailed above, the City's proposed ordinance does not survive such scrutiny. Prohibiting the religious expression of St. Herman's is a constitutionally impermissible restriction.

Further still, even if the proposed ordinance were subject to a lower level of scrutiny, it would still fail that inquiry. In *Santa Monica Food Not Bombs v. City of Santa Monica*, the Ninth Circuit considered a number of different ordinances enacted by the City of Santa Monica, including an events ordinance not unlike the one being proposed by the City of Phoenix. 450 F.3d 1022, 1037 (9th Cir. 2006). The Court ultimately concluded that the City of Santa Monica's ordinance, which required a permit for group activity that "may impede, obstruct, impair or interfere" with the free flow of traffic, was subject to intermediate scrutiny.[3] Nonetheless, the Court still found

---

[3] In making the determination that the City of Santa Monica's events ordinance is subject to intermediate scrutiny, the Court relied upon the standard outlined in *Thomas v. Chicago Park District,* 534 U.S. 316 (2002) that: (1) "[n]one of the grounds for denying a permit has anything to

that the ordinance violated that scrutiny because it was not narrowly tailored. *Id*. at 1038-40. The Court explained that:

> Without a provision limiting the permitting requirements to larger groups, or some other provision tailoring the regulation to events that realistically present *serious* traffic, safety, and competing use concerns, significantly beyond those presented on a daily basis by ordinary use of the streets and sidewalks, a permitting ordinance is insufficiently narrowly tailored to withstand time, place, and manner scrutiny.

*Id*. at 1039.  The Court declared: "a narrowly tailored permit requirement must maintain a close relationship between the size of the event and its likelihood of implicating government interests." *Id*. at 1040.

The Ninth Circuit has clearly identified that for a permitting ordinance to pass intermediate scrutiny, it must demonstrate a "close" relationship between the regulated conduct and the asserted government interest. *Id*. Here, it is difficult to imagine how the proposed ordinance meets the Ninth Circuit's rule because it excludes from enforcement secular social conduct. Rather, the proposed ordinance allows social groups to meet, eat, and drink together impeding the City's interests of park orderliness, but prohibits St. Herman's from engaging in its religious expression. The proposed ordinance is not narrowly tailored, even under an intermediate level of scrutiny.

## IV.    Less restrictive means are available

Underlying all of the legal infirmities detailed herein is the fact that the City has less restrictive means of achieving its goals. The City can cite park users for littering and can enforce any noise ordinance, but it cannot burden religious exercise or restrict content or viewpoint of speech. The proposed ordinance would serve relatively minor government interests by taking a sledgehammer to the First Amendment rights of residents whose religion requires them to demonstrate Christ's kindness. The City should consider lauding St. Herman's rather than shutting them down.

---

do with what a speaker might say"; (2) "the ordinance (unlike the classic censorship scheme) is not even directed to communicative activity as such, but rather to *all* activity conducted in a public park"; and (3) the object of the permitting scheme was "to coordinate multiple uses of limited space, to assure preservation of the park facilities, to prevent uses that are dangerous, unlawful, or impermissible under the Park District's rules, and to assure financial accountability for damage caused by the event" rather than to exclude expression based on any particular content*. Santa Monica Food Not Bombs*, 450 F.3d at 1036 (citations omitted). Significantly, here, the City's proposed ordinance does *not* treat all activity the same—as outlined herein—because it treats secular social gatherings more favorably.

## V.    Conclusion

For the reasons detailed herein, St. Herman's ministry is legally entitled to engage in its religious exercise and expression of serving the homeless in Phoenix's city parks under FERA and the First Amendment despite the proposed ordinance's threats of criminalization. Accordingly, St. Herman's respectfully requests a substantive response to this letter, confirming that the City of Phoenix will: (1) decline to adopt the proposed ordinance; (2) amend the ordinance to publicly exempt from enforcement of the ordinance all religious organizations;[4] or (3) agree to exempt from enforcement of the proposed ordinance St. Herman's via a consent decree or permanent injunction.

Due to the impending vote upon the legally-flawed proposed ordinance, St. Herman's respectfully requests that the vote by the City Council be delayed to give the City Attorney time to reply to the undersigned by **May 15, 2026**.  Otherwise, should the City decline to respond to this letter before the ordinance as currently worded is adopted, St. Herman's intends to file a lawsuit raising its FERA and First Amendment rights under 42 U.S.C. § 1983 seeking declaratory and injunctive relief and requesting reimbursement of attorneys' fees under 42 U.S.C. § 1988.

Should you have any questions or concerns, please don't hesitate to contact undersigned counsel. Thank you for your time and attention to this matter.

Sincerely,
**PROVIDENT LAW**

Christopher J. Charles
Managing Partner

---

[4] We respectfully suggest that the City avoid violation of the Establishment Clause as well as the Free Exercise and Free Speech Clauses by exempting all religious organizations from the proposed ordinance.  *See, e.g.*, *Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry Review Commission*, 605 U.S. 238, 249 (2025) (holding that a regulatory scheme violates the Establishment Clause when it imposes a "denominational preference" by differentiating between religious organizations based on their theological practices).

City Attorney's Office
Phoenix City Hall
May 1, 2026
Page 8



/s/ Ann-Marie René
Litigation Counsel
Center for Law & Religious Freedom
8001 Braddock Rd, Ste 302
Springfield, VA 22151
703-642-1070, Ext: 404
Arene@clsnet.org

/s/ Steve McFarland
Director
Center for Law & Religious Freedom
8001 Braddock Rd, Ste 302
Springfield, VA 22151

# EXHIBIT 1

Hello. My name is Lance Brace. I am an Orthodox Christian, and I run an organization called St. Herman's Table.

In Orthodox Christianity, we have three primary spiritual disciplines: prayer, fasting, and almsgiving. Almsgiving is not optional. It is a required and essential practice of the Christian life, most often expressed by feeding the hungry.

As I read this proposal, I asked a simple question: what exactly does this ordinance prohibit St. Herman's Table from doing?

It does not prohibit being in the park.
It does not prohibit the homeless being in the park.
It does not prohibit speaking with the homeless.
It does not prohibit gathering.
It prohibits one thing: the act of handing a hungry person something to eat.

That act is called almsgiving. It is a religious practice.

This ordinance therefore imposes a direct burden on the free exercise of religion. It conditions the ability to practice that religion on obtaining government permission, subject to limited permits, discretionary approval, and requirements (such as insurance) that many small, volunteer ministries cannot meet.

I want to be clear: I am not here to argue against order, safety, or cleanliness in our parks. Those are legitimate concerns. But those concerns can be addressed without prohibiting or effectively prohibiting acts of charity. For example, the city can enforce existing littering laws, require groups to clean up all trash after distributing food, and ensure walkways and park access remain unobstructed, without limiting service to two permits per month or imposing requirements that make participation realistically impossible for small, volunteer groups.

For two thousand years, the Church has fed the hungry as a core part of its life and witness. That practice will continue.

No Christian can be required to seek Caesar's permission to fulfill a religious obligation such as feeding the hungry. The role of government is not to stand between a person and their duty to love their neighbor.

As a matter of conscience and faith, I cannot/will not refrain from almsgiving, and I cannot accept a system in which that obligation requires prior permission from the government.

If this ordinance passes, it will not end acts of charity. It will only place those acts in conflict with the law.

I urge you to reconsider this proposal.

Thank you.