**PERKINS COIE LLP**
Jean-Jacques Cabou (#022835)
Margo R. Casselman (#034963)
2525 E. Camelback Road, Suite 500
Phoenix, Arizona 85016-4227
Telephone: +1.602.351.8000
JCabou@perkinscoie.com
MCasselman@perkinscoie.com
DocketPHX@perkinscoie.com

Jonathan P. Hawley (WA#56297)*
1301 Second Avenue, Suite 4200
Seattle, Washington 98101-3804
Telephone: +1.206.359.8000
JHawley@perkinscoie.com
*Pro Hac Vice Forthcoming

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| St. Herman's Table et al., <br><br> Plaintiffs, <br><br> v. <br><br> City of Phoenix, <br><br> Defendant. | No. CV-26-03882-PHX-KML <br><br> **DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS' EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION** |

**INTRODUCTION**

The City of Phoenix (the "City") is committed to reducing homelessness and supporting residents who find themselves unsheltered. Among other tangible signs of that commitment, the City Council recently adopted a Strategic Plan to Address Homelessness, which outlines sustainable, long-term strategies to prevent and reduce homelessness by 2029. Over the past year, the number of unsheltered people in Phoenix decreased by 12.6%, from 3,541 people in 2025 to 3,093 people in 2026. In conjunction with community leaders, subject-matter experts, residents, and other stakeholders, the City— and specifically its Office of Homeless Solutions—is working hard to address what the U.S. Supreme Court has acknowledged is a "homelessness crisis" across the "American West." *City of Grants Pass v. Johnson*, 603 U.S. 520, 525 (2024). To do that, "policymakers need access to the full panoply of tools in the policy toolbox to tackle the complicated issues of housing and homelessness." *Id.* at 533 (citation modified).

Adding to its "policy toolbox," the City enacted Ordinance G-7514 (the "Ordinance"). The Ordinance "align[s] with the [C]ity's overall aspiration to provide supportive care to vulnerable populations that frequently take place in parks" while also recognizing that "these activities can [] strain the parks and [C]ity resources." Pls.' Emergency Appl. for TRO & Mot. for Prelim. Inj. ("Motion" or "Mot.") Ex. 1 ("Ordinance"), at 1. Balancing these and other competing concerns, the Ordinance is a content-neutral regulation limiting the public distribution of food that leaves private events unaffected. This new permitting requirement applies to *all* public events—secular and nonsecular alike. And it leaves open myriad other opportunities for charitable groups to serve their communities and exercise their rights of expression and assembly.

Plaintiffs seek a temporary restraining order ("TRO") based on conduct that is not constitutionally protected and speech that the Ordinance nowhere prohibits. Their request for emergency relief is premised on the suggestion that the Ordinance discriminates

against religious practices while offering favored treatment to secular activities. Wrong. The Ordinance distinguishes only between *public and private* events. Because the Ordinance (at worst) incidentally burdens Plaintiffs' religious undertakings in a neutral manner—and certainly does not treat religious and secular activities differently—their free-exercise claim necessarily fails.

Plaintiffs' free-speech claim fares no better. They have not met their burden of showing the distribution of food is protected expressive conduct. Even if it were, the Ordinance is a valid content-neutral restriction that limits official discretion, is tailored to a substantial interest, and provides ample alternatives for Plaintiffs' expression.

Plaintiffs' Motion should be denied.

## BACKGROUND

For several years, the City has received regular complaints from residents, employees, and other stakeholders about the negative impacts of food-distribution events on parks and their users. *See* Declaration of Councilwoman D. Stark ("Stark Decl.") ¶ 6, attached as Ex. 1; Declaration of Interim Parks and Recreation Director M. Whitfield ("Whitfield Decl.") ¶¶ 10, 25–29, attached as Ex. 2. Among other concerns, "well-intentioned groups trying to feed unsheltered people in City parks are displacing other park users through their food distribution events," resulting in the accumulation of trash and discarded food, conflicts with other scheduled park activities, and disruptive and unsafe behavior such as open drug use, damage to City property, crowds, and noise. Whitfield Decl. ¶¶ 10, 25–29; *see also id.* Ex. A (photographs of food-distribution event at Cave Creek Park); *id.* Ex. B (City staff presentation explaining and depicting concerns Ordinance is designed to address); Stark Decl. ¶¶ 6, 11–13; *id.* Ex. A (photographs of March 2025 food-distribution event at Cave Creek Park); *id.* Ex. B (photographs from August 2024 event). As explained by Councilwoman Stark, parks located in Council District 3—including Cave Creek Park—"have been among the most frequently used for

food distribution events." Stark Decl. ¶ 7. And until recently, the "City lacked a specific, effective tool to regulate and manage the growing competition in [its] parks … between food distribution events and other, more traditional park uses, like children's play, youth sports, adult recreation, and family outings." *Id.* ¶ 10; *see also* Whitfield Decl. ¶ 30. "Put another way, one group's desire to use a park at a particular time and in a particular way is excluding others from using the same parks at those times." Whitfield Decl. ¶ 11.

In May 2026, following extensive public hearings and stakeholder engagement, Whitfield Decl. Ex. B, at 14, the City Council adopted the Ordinance, in part to address these concerns. *See* Ordinance 1. The Ordinance requires permits from the Director of Parks and Recreation (the "Director") for "food distribution event[s]"—defined as "gathering[s] conducted by a private individual or organization, for charitable or similar humanitarian purposes, at a park, … to distribute food to any member of the general public at no cost or for a nominal charge." *Id.* §§ B(6), D. Private events not open to the general public are *not* food-distribution events. *Id.* §§ B(6)(i), G(3). The Ordinance authorizes the Director to "adopt rules and procedures for the issuance of permits" subject to specified guidelines, including that the Director may "not issue more than two (2) permits" for any of the City's 100-plus eligible parks "in any calendar month" and must "require that permittees … provide adequate indemnification and insurance." *Id.* § E; *see also* Whitfield Decl. ¶ 18. Consistent with these directives, the Director adopted detailed implementing rules governing the permitting process, modeled after the City's existing process for allocating athletic fields among competing users. *See* Whitfield Decl. ¶¶ 12–14; Mot. Ex. 2 ("Brace Decl."), Attach. 4. Applicants meeting the specified criteria receive a permit (subject only to limited exceptions). Whitfield Decl. ¶¶ 15–17. No one has been denied a permit under the Ordinance. *Id.* ¶¶ 20, 24.

Plaintiffs have known about the Ordinance for months and were present when it was passed on May 6, 2026. Brace Decl. ¶¶ 34–38. Just days before the Ordinance took

-3-

effect, Plaintiffs filed this suit seeking "emergency" preliminary relief "prohibiting the City from applying the Ordinance" to them. Mot. 1, 17.

**ARGUMENT**

A TRO is an "extraordinary remedy" that requires a plaintiff to establish: (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008); *see also Bowyer v. Ducey*, 506 F. Supp. 3d 699, 724 (D. Ariz. 2020).

Plaintiffs fail to satisfy these requirements and their request should be denied.

**I.      Plaintiffs are not likely to succeed on the merits.**

**A.      Plaintiffs' free-exercise claim is a nonstarter.**

As Plaintiffs acknowledge, "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton v. City of Philadelphia*, 593 U.S. 522, 523 (2021). The Ordinance satisfies this standard.

*First*, at worst, the Ordinance imposes only an incidental burden on Plaintiffs' religious activities. "Though [Plaintiffs'] desire to perform acts that contravene [the Ordinance] is motivated in part by religious belief," nothing in the Ordinance (or elsewhere) "prohibit[s Plaintiffs] from expressing [their] religious beliefs." *Olympus Spa v. Armstrong*, 169 F.4th 817, 832 (9th Cir. 2026). Plaintiffs remain free to exercise their religious beliefs apart from the Ordinance's limited restrictions. Indeed, their declaration acknowledges myriad other ecclesiastical undertakings—including providing "water, Bibles, and small hygiene products[]" and "offer[ing] to pray" and "engage[] in conversation with the homeless about God," Brace Decl. ¶¶ 14, 16—that are not regulated

*at all* (much less prohibited) by the Ordinance.[1]

*Second*, the Ordinance "is neutral because its object, text, legislative history, and real-world operation are neutral with respect to religious exercise. Nothing in the statute prohibits religious conduct while permitting secular conduct." *Olympus Spa*, 169 F.4th at 832 (citation modified). The "Ordinance does not target religious activity on its face … and the statutory language does not use religiously significant or loaded language." *St. Mark Roman Cath. Par. Phx. v. City of Phoenix*, No. CV 09-1830-PHX, 2010 WL 11519169, at *9 (D. Ariz. Mar. 3, 2010). Plaintiffs dispute this, insisting "[t]he Ordinance requires religious individuals and organizations to seek a permit under it to feed their neighbors and friends or otherwise be prosecuted but does not require the same of secular individuals or groups." Mot. 8. But *nothing* in the Ordinance draws a line between secular and religious activity. Instead, the Ordinance exempts *private* (as opposed to *public*) gatherings where food is served—a content-neutral distinction that applies equally to both secular and religious undertakings. A church-affiliated picnic where food is served to parishioners and not "to any member of the general public," Ordinance § B(6), would no more require a food-distribution permit than any other private gathering, be it a sporting event, child's birthday party, or family reunion.[2] Likewise, an event where food is freely distributed to the general public requires a permit whether hosted by a church or a secular organization. The Ordinance does not prohibit religious organizations from engaging in private conduct, nor does it allow public events hosted by secular groups while banning analogous conduct when religiously motivated.

*Tandon v. Newsom*, 593 U.S. 61 (2021) (per curiam), on which Plaintiffs place great weight, actually supports the City's effort to balance competing uses of its parks.

---

[1] Plaintiffs do not seem to contest that the Ordinance imposes only an incidental burden, focusing instead on whether it is neutral and generally applicable. *See* Mot. 6–10.

[2] Worth noting is that the Ordinance's illustrative list of exempted private activities includes "weddings," Ordinance § G(3)(ii)—which are, of course, often religious affairs.

*Tandon* emphasized that "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any comparable* secular activity more favorably than religious exercise." *Id.* at 62 (second emphasis added). Here, no *comparable* secular activities are treated differently from religious activities; *all* public food-distribution events are subject to the same rules. As the Court noted, "whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue. Comparability is concerned with the risks various activities pose, not the reasons why people gather." *Id.* (citation omitted). And while "[s]ometimes finding the right secular analogue may raise hard questions," *id.* at 65 (Kagan, J., dissenting), such difficulty is not present here: The Ordinance's interest is regulating events open to the *public*. And no secularly organized public events are treated differently from Plaintiffs' desired activities. The Ordinance is therefore neutral.

*Third*, the Ordinance is generally applicable. Plaintiffs disagree because, they note, "[t]he Ordinance here has exemptions for other park users." Mot. 6. But as Plaintiffs themselves acknowledge, general applicability fails "if the government has 'in place a system of *individual* exemptions.'" *Id.* (emphasis added) (quoting *Fulton*, 593 U.S. at 534). The exemptions here, in contrast, apply to a *class* of events, not individual activities. *See* Ordinance § G(3) (permitting requirement "does not apply to *any* event that was not planned or intended to serve or distribute food to the general public" (emphasis added)). Because the Ordinance does not contain "a mechanism for individualized exemptions," *Fulton*, 593 U.S. at 533 (citation modified), it is generally applicable.[3]

"[E]ven in a charitable reading, [the Ordinance] imposes only incidental burdens

---

[3] Nor does the Ordinance "prohibit[] religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 534. Again, *all* public events, religious and secular alike, are held to the same permitting requirement. *See Olympus Spa*, 169 F.4th at 832–33.

on religious expression and is neutral and generally applicable;" it "is subject to rational basis review and will be upheld if it is rationally related to a legitimate government purpose"—review that "is highly deferential to the government." *Olympus Spa*, 169 F.4th at 833 (citation modified). Combatting the issues the Ordinance seeks to remedy—"large crowds, increased noise, obstruction of public spaces, litter, and the accumulation of trash, debris, and food waste," Ordinance 1—is a legitimate interest served by regulating food distribution events. *See, e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 797 (1989) ("The city enjoys a substantial interest in ensuring the ability of its citizens to enjoy whatever benefits the city parks have to offer[.]"); *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale* ("*FLFNB*"), 11 F.4th 1266, 1293 (11th Cir. 2021) (similar); Order at 13, *Thornton v. Bullhead City*, No. CV-22-08195 (D. Ariz. Sept. 23, 2024) (similar).

### B.    Plaintiffs cannot succeed on their free-speech claim.

Plaintiffs' free-speech claim fails both because (1) Plaintiffs' distribution of food is not protected expression and (2) even if it were, the Ordinance is a valid time, place, and manner restriction.

### 1.    Plaintiffs fail to show that their distribution of food—the only conduct regulated by the Ordinance—is expressive conduct.

Plaintiffs' entire claim rests on their conclusory statement that "[f]ood distribution is an expressive activity protected by the First Amendment." Mot. 10. But "[w]hether food distribution can be [protected] expressive activity …" is a case-specific inquiry, and "'it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies.'" *Santa Monica Food Not Bombs v. City of Santa Monica* ("*SMFNB*"), 450 F.3d 1022, 1032 (9th Cir. 2006) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984)). Plaintiffs have failed to satisfy this burden.

"Conduct intending to express an idea is constitutionally protected only if it is

sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Imperial Sovereign Ct. of Mont. v. Knudsen*, 170 F.4th 820, 846 (9th Cir. 2026) (citation modified). To qualify for the rarified protections of the First Amendment, conduct must generally be "so inherently expressive that it warrants protection." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.* ("*FAIR*"), 547 U.S. 47, 66 (2006). The Ninth Circuit has made clear that there must be "an intent to convey a particularized message" and "the likelihood [must be] great that the message will be understood by those who view it." *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1058 (9th Cir. 2010) (citation modified). Common "[e]xamples of expressive conduct include burning the American flag, burning a draft card, affixing a peace sign to the American flag, and wearing a military medal." *Imperial Sovereign Ct.*, 170 F.4th at 847 (citations omitted).

Where, as here, the conduct in question is not "inherently expressive" and less obviously communicates a particular, well-understood message, plaintiffs bear a heavy burden to secure preliminary relief. *FAIR*, 547 U.S. at 66; *see also, e.g.*, *Knox v. Brnovich*, 907 F.3d 1167, 1181 (9th Cir. 2018) (denying preliminary relief on claim that ballot collection was expressive conduct and explaining that "individuals claiming the protection of the First Amendment must carry the burden of demonstrating that their nonverbal conduct meets the applicable standard"); *Edge v. City of Everett*, 929 F.3d 657, 669 (9th Cir. 2019) (vacating injunction related to expressive conduct where "plaintiffs have not demonstrated a 'great likelihood' that their intended messages … will be understood").

Plaintiffs fail to satisfy this "applicable standard." They neither identify the "particularized message" they allegedly communicate by passing out food nor even attempt to show that this message "will be understood" by those receiving the food. Instead, Plaintiffs describe numerous *other* activities that are unquestionably expressive: prayer, wearing religious insignia, passing out of pictures of saints, and so on. *See* Brace

-8-

Decl. ¶¶ 13–18. But nowhere do they argue, much less demonstrate for purposes of extraordinary relief, that the only conduct regulated by the Ordinance—food distribution—both conveys a particular message and that the message is understood by their intended audience. Indeed, that the distribution of food is simply a prelude for the ultimate message Plaintiffs seek to convey, *see id.* ¶ 16 ("We tend to engage in these prayers towards the end of the evening once everyone has eaten and there are more conversations happening."), confirms the food itself is not expression. Plaintiffs "wish to continue to feed the needy … as a religious offering and out of Christian love for our neighbor." *Id.* ¶ 53. Plaintiffs' distribution of food is an act of faith personal to them, not itself the communication of a message to an outside audience.[4]

To be sure, sometimes, for example when food sharing is done by a group whose name is "food not bombs" and done to communicate the stated message that "society can end hunger and poverty if we redirect our collective resources from the military and war," *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240–42 (11th Cir. 2018), such food sharing *can* become protected expressive conduct. But even Plaintiffs don't claim any such messaging is present here. And no court, including in *FLFNB*, has categorically held that passing out food is per se expressive activity. This Court should not be the first to do so.

**2.        Even if expressive conduct were implicated, the Ordinance is a valid time, place, and manner regulation.**

It is well established that "[r]egulations of the use of a public forum that ensure the safety and convenience of the people are not inconsistent with civil liberties but are one of the means of safeguarding the good order upon which civil liberties ultimately depend."

---

[4] Relatedly, conduct does not gain constitutional protection because of its temporal or physical proximity to protected speech, like prayer. *See FAIR*, 547 U.S. at 66 (where accompanying "explanatory speech is necessary" to give rise to "expressive component of" conduct, this "is strong evidence" that conduct is unprotected).

*Thomas v. Chi. Park Dist.*, 534 U.S. 316, 323 (2002) (citation modified). Such "time, place, and manner" restrictions are constitutional so long as they (1) do "not delegate overly broad discretion to a government official," (2) are not "based on the content of the message," (3) are "narrowly tailored to serve a significant governmental interest," and (4) "leave open ample alternatives for communication." *SMFNB*, 450 F.3d at 1037.

Here, the Ordinance satisfies each of these requirements as applied to Plaintiffs, and their Motion does not seriously attempt to show otherwise.[5]

**No Unbridled Discretion.** The Ordinance and the accompanying permitting rules promulgated by the Director "contain adequate standards to guide the [Director's] decision and render it subject to effective judicial review." *Thomas*, 534 U.S. at 323. The Ordinance empowers the Director to "adopt rules and procedures for the issuance of permits" and specifically guides that such rules be designed "to minimize disruption to other park uses, ensure the safety of park guests, and maintain parks in a clean and sanitary condition." Ordinance § E(2). The Ordinance further specifies the number of permits the Director may issue (up to two per park in any calendar month), the specific parks for which permits may be issued, and that the Director must require adequate indemnification and insurance, among other requirements. *See id.* § E(3).

The Director, in turn, has done as directed and adopted a detailed set of rules governing the permit process, designed to implement the Council's instruction to minimize disruption, ensure the safety of park users, and maintain clean parks. *See generally* Whitfield Decl. Those rules are publicly available and specify in detail the circumstances under which the Director will issue a permit. *See id.* ¶¶ 12–16; Brace Decl.,

---

[5] Plaintiffs have not tried to obtain a food-distribution permit. *See* Whitfield Decl. ¶ 22; Brace Decl. ¶ 42. At at least one court found that failing to seek a permit under similar circumstances cut against the merits and the issuance of preliminary relief. *Occupy Tucson v. City of Tucson*, No. CV-11-699-TUC, 2012 WL 13027046, at *3 & n.3 (D. Ariz. May 4, 2012).

Attach. 4. Importantly, and consistent with the Ordinance, "the [Parks] Department makes no judgments about, and extends no preferences or priority to, applicants based on their identity, affiliation, or the content of any speech in which they might engage during their food distribution event." Whitfield Decl. ¶ 17. The Ordinance is thus "limited by its terms, [and] by nondiscriminatory practice, to considerations of public safety and the like." *Thomas*, 534 U.S. at 322–23 (citation modified). And the Ordinance and its implementing rules more than adequately cabin official discretion. *See SMFNB*, 450 F.3d at 1035 (reviewing ordinance "in light of" rules adopted by city manager because such rules were "properly viewed as [the city's] authoritative interpretation of the … [o]rdinance").

Under the rules, "all applicants who submit a properly completed application that comports with the Parks Code of Conduct will get a permit, with few exceptions." Whitfield Decl. ¶ 15. The criteria are specific, objective, and readily available. Any person or group—irrespective of their viewpoint, religion, or anything else—*will* be issued such a permit if their request complies with the Ordinance and the Director's objective, publicly posted rules. *See id.* And if a permit is denied, the person or group will be told why and be "offer[ed] an alternative time, place, or manner if one is available." *United States v. Linick*, 195 F.3d 538, 543 (9th Cir. 1999); *see also* Whitfield Decl. ¶¶ 17–19. "These limits objectively constrain the governing body's discretion …," foreclosing any argument that an official possesses "unbridled discretion" to grant or deny a food-distribution permit. *S. Or. Barter Fair v. Jackson County*, 372 F.3d 1128, 1140 (9th Cir. 2004).

Nevertheless, Plaintiffs point to three features of the Ordinance that they say give "unbridled discretion [to] government officials." Mot. 11. Each argument fails.

*First*, Plaintiffs claim "the Ordinance *requires* the Director to subjectively decide which individuals and organizations … are granted the limited permits." *Id.* at 13. That claim is unmoored from reality. Both the Ordinance itself and the Director's rules specify when the Director will issue a permit. The mere fact that the Director ultimately has *some*

level of discretion does not render the Ordinance unconstitutionally discretionary. *See S. Or. Barter Fair*, 372 F.3d at 1140 (distinguishing between "some discretion" and "discretion … so broad that" it does not satisfy First Amendment); *Ward*, 491 U.S. at 794 ("[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.").

*Second*, Plaintiffs suggest the Ordinance "requires no explanation from the Director for his decision to favor one individual or organization over another." Mot. 13–14. But such a provision is not strictly required. *See Seattle Affiliate of Oct. 22nd Coal. to Stop Police Brutality, Repression & Criminalization of a Generation v. City of Seattle*, 550 F.3d 788, 799 (9th Cir. 2008) (explaining that "[n]one of these factors is itself necessarily determinative of whether a statute confers excess discretion"). And even if it were, the requirement is satisfied here: If an applicant were denied a permit, then the Director would provide a written explanation. *See* Whitfield Decl. ¶ 24.

*Third*, Plaintiffs state without explanation that "the Ordinance provides no mechanism by which to appeal the Director's decision." Mot. 14. But for a content-neutral restriction like the Ordinance, there is no requirement for "procedural safeguards;" those safeguards, including appeal provisions, are only required for "explicit censorship schemes," which the Ordinance is not. *S. Or. Barter Fair*, 372 F.3d at 1138; *see also Griffin v. Sec'y of Veterans Affairs*, 288 F.3d 1309, 1328 (Fed. Cir. 2002) (procedural safeguards requirement limited to "explicit censorship scheme[s]" that "by definition [are] not content-neutral").

**Content Neutrality.** Contrary to Plaintiffs' mischaracterizations, the Ordinance is plainly content neutral. It "does not distinguish *among* [] expressive events based on their content"—as discussed above, it applies equally to *all* public food-distribution events, secular and nonsecular alike—"and therefore satisfies the content-neutrality requirement for valid, time, place, and manner regulations." *SMFNB*, 450 F.3d at 1037; *see also, e.g.*,

-12-

*United States v. Baugh*, 187 F.3d 1037, 1043 (9th Cir. 1999) (restriction was content neutral where it "did not stem from the underlying content of [the] message").

**Narrow Tailoring.** The Ordinance furthers substantial government interests and is narrowly tailored to those interests. "The requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *SMFNB*, 450 F.3d at 1038 (citation modified). And it is well established that, even when it comes to "traditional public fora," "local governments can exercise their substantial interest in regulating competing uses … by imposing permitting requirements for certain uses." *Id.*

Here, the face of the Ordinance identifies several substantial government interests unrelated to the suppression of free expression. The Ordinance balances the City's interest in "provid[ing] supportive care to vulnerable populations that frequently take place in parks" against concerns that "these activities … strain the parks and [C]ity resources, frequently creating large crowds, increased noise, obstruction of public spaces, litter, and the accumulation of trash, debris, and food waste"; "damage public property"; and "limit others' ability to access, share, and enjoy the parks." Ordinance 1. These interests are real and uniquely associated with food-distribution (and medical-treatment) events. *See* Stark Decl. ¶¶ 6–7, 10–14; Whitfield Decl. ¶¶ 10–11, 25–30. And they are indisputably substantial and well within the City's regulatory power. *See, e.g.*, *Clark*, 468 U.S. at 296; *SMFNB*, 450 F.3d at 1038; *FLFNB*, 11 F.4th at 1293. The Motion effectively concedes this; Plaintiffs' entire argument on this point is one conclusory sentence. *See* Mot. 14.

The Ordinance also "promotes" the City's substantial interests, which "would be achieved less effectively absent the" Ordinance. *SMFNB*, 450 F.3d at 1038 (citation omitted); *see also* Stark Decl. ¶¶ 10, 14. For example, by requiring permits for food-distribution events and limiting the number of such events per month at each park, the Ordinance furthers the City's interests in ensuring that other users can also access, share,

and enjoy the parks; reducing strain on City resources; and controlling noise, crowds, obstruction, and the accumulation of trash and waste. *See generally* Stark Decl. And by requiring insurance, the Ordinance furthers the City's "commonsense" interest in safeguarding against municipal liability. *SMFNB*, 450 F.3d at 1057–58 (Kleinfeld, J., concurring in part) (majority opinion upholding insurance and hold-harmless requirements as "commonsense protections against municipal liability" "with no discretion for administrators to discriminate by expressive content or viewpoint"). The Ordinance does not "burden substantially more speech than necessary to achieve [the permitting] scheme's important goals." *Id.* at 1038. Indeed, the Ordinance does not burden Plaintiffs' speech or expression *at all*. *See supra* pp. 7–9.

**Ample Alternatives.** Lastly, the Ordinance leaves open ample alternative opportunities for food distribution and attendant expression—both generally and as applied to Plaintiffs especially. "[I]n the 'ample alternatives' context, the Supreme Court has made clear that the First Amendment requires only that the government refrain from denying a 'reasonable opportunity' for communication." *SMFNB*, 450 F.3d at 1045 (citation omitted); *see also, e.g.*, *Edwards v. City of Coeur d'Alene*, 262 F.3d 856, 866 (9th Cir. 2001) ("If an ordinance effectively *prevents* a speaker from reaching his intended audience, it fails to leave open ample alternative means of communication." (emphasis added)). Far from preventing Plaintiffs from performing their almsgiving and evangelism, the Ordinance leaves open the opportunity to do so at *other* parks. The City has 105 parks where public food-distribution events can be held, and permits are still available at *each* of these parks in the coming months. Whitfield Decl. ¶¶ 18, 21–24. Even where a permit cannot be issued at a particular time for a particular park, the Director "can and would always offer a permit for another park to all qualified applicants." *Id.* ¶ 19; *see also, e.g.*, *Josephine Havlak Photographer, Inc. v. Vill. of Twin Oaks*, 195 F. Supp. 3d 1065, 1078–79 (E.D. Mo. 2016) (availability of "other public parks" for expressive activity satisfied

alternative-channel requirement (citing *Kaahumanu v. Hawaii*, 682 F.3d 789, 805 (9th Cir. 2012))), *aff'd*, 864 F.3d 905 (8th Cir. 2017).

Plaintiffs might *prefer* to continue their ministry at Cave Creek Park, but "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981). "An alternative channel is one that is adequate to provide a reasonable means for … communicat[ion]"; it "need not be a perfect substitute for the means of communication that were foreclosed by the regulation." *Muhlrad v. City of San Marino*, No. LA CV21-05491 JAK (JPRx), 2024 WL 5349935, at *2 (C.D. Cal. Jan. 3, 2024). After all, "[t]he First Amendment … does not guarantee [] access to every or even the best channels or locations for [] expression," *Carew-Reid v. Metro. Transp. Auth.*, 903 F.2d 914, 919 (2d Cir. 1990), nor does it "imply that alternative channels must be perfect substitutes for those channels denied to plaintiffs by the regulation at hand," *Mastrovincenzo v. City of New York*, 435 F.3d 78, 101 (2d Cir. 2006).

Moreover, Plaintiffs themselves identify alternative means of almsgiving wholly unaffected by the Ordinance, *see* Brace Decl. ¶¶ 14–18—which they can continue *at Cave Creek Park*. Distributing items other than food, engaging in prayer and meaningful conversation, and displaying religious symbols and icons are not regulated by the Ordinance in any way. As Mr. Brace acknowledges, "St. Herman's purpose is ultimately to see God work within those with whom we come into contact [] and to welcome them to our Church." *Id.* ¶ 28. That ultimate purpose is not regulated by the Ordinance and can be achieved through alternative means, in terms of both activities and locations. *Cf. Otyang v. City & County of San Francisco*, No. C 12-00577, 2013 WL 843565, at *4 (N.D. Cal. Mar. 6, 2013) ("While [challenged regulation] requires an individual to obtain a permit to set up a table in a San Francisco park, it does not prevent or impede an individual from conveying information."), *aff'd*, 608 F. App'x 541 (9th Cir. 2015).

**II.    The remaining factors weigh against injunctive relief.**

**A.    Plaintiffs delayed unreasonably in seeking judicial relief.**

Plaintiffs style their Motion as an "emergency." But where plaintiffs dawdle and *create* that emergency, their "delay and lack of diligence … prejudice[s the d]efendants' ability to defend" and should result in denial of a TRO. *Richardson v. Robison*, No. 08CV902, 2008 WL 2338611, at *4 (S.D. Cal. June 5, 2008). "[A] party may not be the cause of a claimed emergency through its lack of diligence." *Brown v. Wells Fargo Bank, N.A.*, No. SA CV15-01770, 2015 WL 13915991, at *1 (C.D. Cal. Oct. 30, 2015).

There is no question that Plaintiffs had a challenge to the Ordinance at the ready since *at least* May 1, 2026, when their "attorney sent a demand letter … requesting an exemption … from the Ordinance[]." Mot. 2; *see also* Brace Decl., Attach. 5. And yet Plaintiffs waited until late in the evening on June 2—three days before the effective date of the Ordinance—to seek judicial relief. In doing so, Plaintiffs all but necessitated adoption of an incredibly aggressive briefing schedule that required the City to respond in less than five days. While "such delay may not warrant the denial of ultimate relief, it may, standing alone, preclude the granting of preliminary injunctive relief." *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) (citation modified).

**B.    The public interest favors enforcing the Ordinance overwhelmingly passed by the City's elected officials.**

Governments have a "substantial interest" in maintaining their parks "in an attractive and intact condition, readily available to … people who wish to see and enjoy them by their presence." *Clark*, 468 U.S. at 296; *see also Thomas*, 534 U.S. at 322 (affirming city's need to "coordinate multiple uses of limited space [and] to assure preservation of the park facilities"); *SMFNB*, 450 F.3d at 1043 (similar). It is equally clear that "the public interest necessarily weighs against enjoining a duly enacted statute." *Priorities USA v. Nessel*, 860 F. App'x 419, 423 (6th Cir. 2021); *see also, e.g., K.C. v.*

*Individual Members of Med. Licensing Bd. of Ind.*, 121 F.4th 604, 633 (7th Cir. 2024) ("substantial interest" in enforcement of laws enacted by elected representatives).

The Ordinance does exactly what the law permits; what the Parks Department, the majority of the City Council, and others confirm is sorely needed; and what Plaintiffs nowhere acknowledge must be done: "coordinate multiple uses of limited space." *Thomas*, 534 U.S. at 322. The public interest favors allowing the Ordinance to be enforced.

**C.     Plaintiffs will not be irreparably harmed if the TRO is denied.**

Plaintiffs' two arguments regarding irreparable harm fail. They first claim irreparable harm arising from deprivation of their First Amendment rights. Mot. 15. But Plaintiffs are unlikely to succeed on the merits of those claims as set forth above. Plaintiffs also assert that, "[u]nless this Court intervenes," they will "face criminal prosecution" under the Ordinance "for engaging in their constitutionally protected weekly ministry and speech." Mot. 15. This is clear overstatement: Only the distribution of food and medical treatment is regulated under the Ordinance, which says nothing about speech or ministry. Plaintiffs remain free to minister to the homeless in Cave Creek Park however else they see fit, without any need for extraordinary injunctive relief from this Court. All that has changed is that Plaintiffs must obtain a permit if they wish to distribute food to the public in a City park. The mere inconvenience of a permit to engage in non-speech activity is not irreparable harm. *See Montoya v. City of San Diego*, No. 19cv0054, 2021 WL 1056594, at *6 (S.D. Cal. Mar. 19, 2021) ("potential inconveniences" are not irreparable harm). And any potential harm is speculative at this stage because Plaintiffs have not even attempted to obtain a permit. *See Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016).

**CONCLUSION**

The Motion should be denied.

Dated:  June 6, 2026                    **PERKINS COIE LLP**


By: */s/ Jean-Jacques Cabou*
      Jean-Jacques Cabou (#022835)
      Margo R. Casselman (#034963)
      2525 E. Camelback Road, Suite 500
      Phoenix, Arizona 85016-4227
      JCabou@perkinscoie.com
      MCasselman@perkinscoie.com

      Jonathan P. Hawley (WA#56297)*
      1301 Second Avenue, Suite 4200
      Seattle, Washington 98101-3804
      JHawley@perkinscoie.com
      *Pro Hac Vice Forthcoming

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2026, I electronically transmitted the attached documents to the Clerk's Office using the CM/ECF System for filing.


_/s Lauren Harper_