**Exhibit 2**

**Martin Whitfield Declaration**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

St. Herman's Table, an Arizona nonprofit corporation; and Lance Brace,

Plaintiffs,

v.

City of Phoenix,

Defendant.

No. CV-26-03882-PHX-KML

**DECLARATION OF MARTIN WHITFIELD IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION**

I, Martin Whitfield, declare as follows:

1.      I am over the age of 18, have personal knowledge of the facts stated in this declaration and, if called as a witness, I could and would testify competently to them.

2.      I am a native Phoenician and I have worked for the City of Phoenix since 2002. I began my career as a Human Resources Aide and I am now the Interim Parks and Recreation Director for the City.

3.      Among other roles with the City, I have served as Assistant Director in the Parks and Recreation Department, Deputy Director in the Public Works Department, a Management Services Administrator with the Phoenix Public Library, a Special Projects

Administrator in the City Manager's Office, and held various positions at Phoenix Sky Harbor International Airport. I have also served two Phoenix City Council offices, supporting important community initiatives.

4. In my current role as the head of the Parks and Recreation Department, I oversee operation of the City's Parks. The mission of our Department is to build "healthy communities through parks, programs and partnerships; and make[] the city a better place to live, visit and play." Using the "Power of Parks," the Department promotes health, wellness, conservation and social equity by providing the community with opportunities to improve quality of life through access to local parks, recreation and cultural facilities, sports programming and open spaces.

5. The Department and I try to ensure that all Phoenix residents have access to vibrant, beautiful, welcoming spaces that foster connection, health and community pride.

6. Our parks are shared spaces, and my colleagues and I work very hard to ensure that potentially conflicting park uses, and users, can share the parks.

7. For example, the City has only a limited number of athletic fields, and we have far more requests to use those fields than we can accommodate. Therefore, we have implemented a structured process of applications for, and allocations of, the City's athletic fields. All applicants meeting the criteria are approved for their requests on an equal basis. In other words, as long as there is space available and the applicant submits a properly completed application, they get the allocation.

8. When space is not available, or when applicants do not submit properly completed applications for sports field allocations, we provide a written response explaining why they didn't get their preferred allocation. To the greatest extent possible, if the application was properly completed, we also engage the applicant in a conversation aimed at finding them an alternative allocation, for example, on a different date or at another nearby park.

9.    This system allows us to manage those potentially competing and conflicting requests for sports fields in a fair way.

10.    Recently, departments across the City, including my Department, have received complaints, photographs and other information from residents demonstrating that well-intentioned groups trying to feed unsheltered people in City parks are displacing other park users through their food distribution events.  These events can bring large crowds, generate excessive trash, disrupt other park uses, and exclude other park users.

11.    Put another way, one group's desire to use a park at a particular time and in a particular way is excluding others from using the same parks at those times.  This is akin to what would happen if we didn't have a process to allocate athletic fields.

12.    And so, once the City adopted the Service in Parks Ordinance (G-7514) (the "Ordinance"), we used our process to allocate athletic fields among competing uses and users as a model to design our process for the Parks Services Permit.

13.    In evaluating applications for the Parks Services Permits, the City looks only at the criteria set forth in the Parks Services Permit application and its accompanying instructions and attachments, including the existing Parks Code of Conduct ("Permit Application").

14.    The Permit Application is posted on the City of Phoenix website, at https://www.phoenix.gov/administration/departments/parks/rentals-permits/parks-services-permits.html. The Permit Application for Summer 2026, for example, can be found at the following link: https://www.phoenix.gov/administration/departments/parks/rentals-permits/parks-services-permits.html.

15.    Just like for sports fields, and as explained in the Permit Application, all applicants who submit a properly completed application that comports with the Parks Code of Conduct will get a permit, with few exceptions.

-3-

16. These exceptions are: (a) there are competing requests for the same park at the same time, (b) there are already two Services Permits approved for the requested park in a single month, or (c) the requested date is one of the four dates each year where park usage is so high that the City doesn't grant any permits on those dates.

17. To reiterate, in awarding Services Permits, the Department makes no judgments about, and extends no preferences or priority to, applicants based on their identity, affiliation, or the content of any speech in which they might engage during their food distribution event. Our goal is to accommodate all applicants, consistent with the Ordinance and process described herein.

18. There are 105 parks in the City where food distribution events can be held. That means that, if there were sufficient applicants interested in conducting them, food distribution events could be held every day, except for the four citywide blackout dates.

19. The number of City parks eligible to host these events also means that, even when two groups request the same park on the same day, or even if a particular park has already been awarded two permits in a requested month, we can and would always offer a permit for *another* park to all qualified applicants.

20. In the first allocation period described below, all applicants were approved for the dates they requested, except for two applicants who requested July 4, which is one of the four annual citywide dates on which the Parks Department does not grant any permits.

21. Our first allocation period for Parks Services Permits opened on May 7, 2026 and closed on May 22, 2026. This allocation period considered applications for permit dates between June 7, 2026 and August 31, 2026.

    a. Importantly, as stated in the Permit Application, the fact that the allocation window has ended **does not mean that people cannot still apply for permits during the dates governed by that period.**

-4-

This has always been the case, including for the sports field allocation process on which the Parks Services Permit is modeled. Anyone with questions about this could contact my Department at any time and get this question answered.

b. So, for example, if someone applied today, using a properly completed application, for a permit on June 18, 2026 at Coronado Park, they would be granted a permit because there are no other permits at that park on that day, there is only one other permit at that park in June, and because June 18 is not one of the four blackout dates applicable to all parks.

22. Several individuals and their organizations have applied for Parks Services Permits in eligible parks since the Ordinance went into effect. Neither Mr. Brace nor St. Herman's Table applied for a permit nor did they contact the Department with questions or seeking assistance regarding seeking a permit.

23. During the first allocation period discussed above, the City granted the following permits:

| Park Location | Time Slot | Approved Dates |
|---|---|---|
| Cave Creek - Sweetwater | 6 PM - 9 PM | June 13, July 11, August 8 |
| Cave Creek - Larkspur | 6 PM - 9 PM | June 20, July 18, August 15 |
| Cave Creek - Cactus | 6 PM - 9 PM | 22-Aug |
| Cave Creek - Sweetwater | 12:30 PM - 3:30 PM | June 20, July 18, August 1 |
| Cave Creek - Larkspur | 12:30 PM - 3:30 PM | 22-Aug |
| University Park | 10:30 AM - 1:30 PM | June 20, July 18 |
| Margaret T. Hance Park | 5 PM - 7PM | July 8, July 22, August 5, August 19 |
| Coronado Park | 12:30 PM - 3 PM | 19-Jun |
| Los Olivos Park | 9:30 AM - 12: 30 PM | 10-Jul |
| Cielito Park | 12:30 PM - 3PM | 31-Jul |

24. No applicant was denied a permit in the first allocation period; any conflicts were resolved through offering different dates or sites. If an applicant is denied in the future, we will send them a written communication explaining why they did not get a

Services Permit.

25. I have read Mr. Brace's Declaration filed in this action. And, among other things, I took from it an attempt to show that food distribution events do not have negative impacts like large crowds, excess trash, and displacement of other park users, on City Parks and, specifically, on Cave Creek Park.

26. Mr. Brace's limited perspective is not consistent with information I have received and observed about Cave Creek Park. Nor is it consistent with information I have received about other parks in the City.

27. Attached to this declaration as Exhibit A are photographs from food distribution events at Cave Creek Park. These pictures are true and correct copies of photographs the City has received depicting food distribution events held at Cave Creek Park. Among other things, they depict: a complete takeover of certain parking and amenity areas of the park by such an event, trash, discarded food left on the ground, and discarded food left on picnic tables.

28. I participated in City staff's preparation for the May 6, 2026 City Council meeting where this Ordinance was adopted; I was traveling on that date, so I watched it online. Attached here as Exhibit B is a true and correct copy of the PowerPoint presentation City staff presented during that meeting, regarding this Ordinance.

29. Several of the pictures contained in Exhibit A are also in the presentation (Exhibit B), including one on Slide 12 of Exhibit B, which is of a large food distribution event at Cave Creek Park.

30. Prior to the enactment of the Ordinance, the City did not have a specific or effective means by which to regulate and mitigate the serious impacts of food distribution events on our parks.

31. The Parks and Recreation Department is dedicated to doing its utmost to ensure that Phoenix's parks can be enjoyed by all residents and, when residents have

-6-

conflicting demands on our parks, to finding solutions to fairly share the parks.

32.    Where park uses like food distribution events disrupt and prevent other uses, we have implemented, and will continue to implement, measures aimed at minimizing disruption to other park uses, ensuring the safety of park guests, and maintaining parks in a clean and sanitary condition.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 6th day of June 2026.

By:_____

Martin Whitfield

-7-

# Exhibit 2-A

# Martin Whitfield Declaration









# Exhibit 2-B

# Martin Whitfield Declaration

# Medical Treatment and Food Distribution in City Parks Ordinance

**Phoenix City Council Formal Meeting**

**May 6, 2026**



# Medical Treatment and Food Distribution in City Parks Ordinance – City Team

- Ginger Spencer, Assistant City Manager
- Lori Bays, Assistant City Manager
- ***Lead: Cynthia Aguilar, Deputy City Manager***
- Gina Montes, Deputy City Manager
- Marty Whitfield, Parks and Recreation, Interim Director
- Rachel Milne, Office of Homeless Solutions, Director
- Yanitza Soto, Public Health Advisor
- Ray Ochoa, Phoenix Fire, Assistant Fire Chief
- DC Ernst, Phoenix Fire
- Lisa Huggins-Hubbard, Neighborhood Services

2



# Why do we need a Medical Treatment and Food Distribution in City Parks Ordinance?

 These activities are already taking place in city parks

 Parks are protected spaces under the 1st Amendment

 Currently there is no park rule or city ordinance to address these services in parks

 Concerns from residents regarding the lack of regulation and impact of these services on parks



3





















# Medical Treatment and Food Distribution in City Parks Ordinance

- Safety concerns for public and City staff
  - High frequency of encounters with sharps

- Needlestick injuries

- Training and protocols related to sharps
  - Sharps safety
  - Bloodborne pathogen

13

# Medical Treatment and Food Distribution in City Parks Ordinance

- Dec. 17, 2025, City Council approval of Safe Medical Care in City Parks Ordinance, delayed effective date Mar. 30, 2026

- Mar. 6, 2026, City Council approval to delay effective date to June 1

- Direction to add food distribution

- Mar. 27, 2026, revised proposed ordinance posted

- Mar. 27-Apr. 27, 2026, additional stakeholder engagement



14

# Medical Treatment and Food Distribution in City Parks Ordinance

Prohibits:
- Needle exchange/distribution

- Distribution of needle/intramuscular naloxone

Requires a permit for:
- Medical treatment and food distribution activities

15

# Medical Treatment and Food Distribution in City Parks Ordinance

Medical treatment activities:

- Maximum number of permits issued for services is twice, per month, per eligible park **(two total, not two food and two medical permits)**

- Eligible parks include neighborhood parks with parking lots, community parks and regional parks (excluding sports complexes)

- Must take place in an enclosed tent or mobile medical vehicle in the parking lot or other hardscape area that is not an athletic court

16

# Medical Treatment and Food Distribution in City Parks Ordinance

Medical treatment activities:

- Must be performed under supervision of a licensed professional operating under the scope of their licensure

- Requires permittees agree to provide indemnification and insurance

17

# Medical Treatment and Food Distribution in City Parks Ordinance

Medical Treatment Exceptions:

- First responders, including firefighters, law enforcement officers, paramedics, emergency medical technicians, or other individuals (including an employee of a legally organized and recognized volunteer organization, whether compensated or not), who, in the course of their professional duties, respond to law enforcement, fire, medical, hazardous material, or other similar emergencies.

- Any person rendering aid to another person experiencing a sudden injury or emergency.

18

# Medical Treatment and Food Distribution in City Parks Ordinance

Medical Treatment Exceptions:

- Licensed professionals acting within the scope of their licenses and at an otherwise city-permitted event (for example, a sporting competition, tournament, fun run, or special activity).

- The distribution of intranasal naloxone in nonemergency or emergency situations.

19

# Medical Treatment and Food Distribution in City Parks Ordinance

Food Distribution:

- Food distribution event is defined as a gathering for charitable or humanitarian purposes, planned organized or conducted to distribute food to any member of the general public at no cost or for nominal charge

- Maximum number of permits issued for services is twice, per month, per eligible park **(two total, not two food and two medical permits)**

# Medical Treatment & Food Distribution in City Parks Ordinance

Food Distribution Exceptions
- Does not apply to any event that was not planned or intended to serve or distribute food to the general public. This includes but is not limited to:

- Family events such as celebrations, weddings, meals, or reunions, or informal gatherings of family or family friends; and

- Events that are not open to the general public or events to which the general public is not invited.

21

# Medical Treatment & Food Distribution in City Parks Ordinance

Allowable without a permit:

- Outreach and education

- Connection and transportation to services

- Distribution of water and electrolyte beverages

# Medical Treatment and Food Distribution in City Parks Ordinance

**Phoenix City Council Formal Meeting**

**May 6, 2026**



23