**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| St. Herman's Table, et al., | No. CV-26-03882-PHX-KML |
| Plaintiffs, | **ORDER** |
| v. | |
| City of Phoenix, et al., | |
| Defendant. | |

The City of Phoenix ("Phoenix") recently passed an ordinance implementing a permit system for certain food distribution events in Phoenix parks. Permits—of which a very limited number are available—are now required for events in which food is distributed to the general public for charitable or similar humanitarian purposes. St. Herman's Table, a ministry and nonprofit corporation, and Lance Brace, its founder, allege the new ordinance violates their right to practice their religion by providing meals, water, and Bibles to homeless people in Phoenix's Cave Creek Park. They seek an emergency injunction prohibiting enforcement of the ordinance and claim they need relief by June 11, 2026, the first day their activities will be affected by the ordinance's enforcement. (Doc. 2 at 1.) Because plaintiffs have established the ordinance likely infringes their First Amendment rights and will cause them irreparable injury, a temporary restraining order is granted.

## I.    Factual Background

Lance Brace, an "Orthodox Christian," founded St. Herman's Table ("St.

Herman's"), a ministry and nonprofit corporation that provides meals, water, small hygiene products, and Bibles to homeless individuals in Cave Creek Park. (Doc. 2-2 at 1, 4.) St. Herman's "purpose" in providing this charitable service is "almsgiving," a mandatory practice of the Orthodox Church involving "voluntary, sacrificial giving" of "money, time, or goods . . . to the needy in Christ's name." (Doc. 2-2 at 3.) Brace fulfills his almsgiving duties by "feeding the hungry in Jesus'[s] name[,]" sincerely believing that doing so "is in obedience to the commission of our Lord in Scripture." (Doc. 2-2 at 3.)

St. Herman's performs this almsgiving in Cave Creek Park for one-and-a-half to two hours every Thursday. (Doc. 2-2 at 3-4.) In addition to volunteers providing food, water, hygiene products, and Bibles, the almsgiving includes open prayer and sharing information about the Orthodox church and certain saints. (Doc. 2-2 at 4.) Brace and St. Herman's volunteers "have formed relationships and friendships with many of the homeless individuals that they first met at Cave Creek Park," including some who indicate the distributed food is the only complete meal they eat during a week. (Doc. 2-2 at 6-7.)

St. Herman's serves between 12-25 people every week, and never more than 30. (Doc. 2-2 at 5.) It has never been cited or the subject of a complaint. (Doc. 2-2 at 6.) It does not block sidewalks or leave trash behind, and there is "never a long line or crowd of people" during events. (Doc. 2-2 at 5-6.)

During the past few years, Phoenix has "received regular complaints . . . about the deleterious impacts on [its] parks . . . caused by well-intentioned food distribution events, like those run by St. Herman's Table." (Doc. 13-1 at 5.) In March 2025, one member of the City Council received "complaints and numerous photographs of a food distribution event in [Cave Creek Park]." (Doc. 13-1 at 5.) The photos allegedly depicted "large groups of people taking over park amenities," as well as one "attendee of the food distribution event sitting on the ground while smoking drugs openly." (Doc. 13-1 at 6.) In March 2026, at a different park, a "Movies in the Park" event was planned on the same night as a "feeding event." (Doc. 13-1 at 6.) A conflict between the organizers of the two events ensued and the organizers of the Movies in the Park event "were forced to clean up . . .

detritus" left behind by the "feeding event." (Doc. 13-1 at 6.)

Based on these repeated complaints (*see* Doc. 31-1 at 2), the Phoenix City Council passed an ordinance making it a Class 1 misdemeanor for individuals and organizations to conduct a "food distribution event" in a public park without a permit.[1] (Doc. 2-1 at 1-7.) The ordinance defines "food distribution event" as "a gathering conducted by a private individual or organization, for charitable or similar humanitarian purposes, at a park, that is planned, organized, or conducted to distribute food to any member of the general public at no cost or for a nominal charge." (Doc. 2-1 at 3.) The ordinance explicitly exempts from the permit requirement "family events such as celebrations, weddings, meals, or reunions or informal gatherings of family or family friends," and "events that are not open to the general public." (Doc. 2-1 at 7.)

The ordinance limits permits for covered "food distribution events" to two per park per month. (Doc. 2-2- at 23.)[2] The ordinance itself does not limit permitted food distribution events to the parks' parking lots (Doc. 2-1 at 5-6), but it appears Phoenix will only approve permit applications confined to those locations or "other hardscape areas designated by the Department" (Doc. 2-2 at 23). The Parks and Recreation Department Director has significant discretion in issuing permits, but the application process as written requires individuals or organizations distributing food for charitable purposes to apply for a park's two available monthly permits during three defined windows per year. (Doc. 2-2 at 23.) The application must identify each volunteer for each date, and provide proof those volunteers have food handling certificates and the organization has a $2 million insurance policy. (Doc. 2-2 at 23-24, 27.)

Plaintiffs allege the ordinance will "make it impossible" for St. Herman's to apply for permits and fulfill its ministry as it currently exists. (Doc. 2-2 at 9.) At best, the ordinance would cut St. Herman's activities in half even if it receives both of Cave Creek

---

[1] The ordinance also requires permits for medical treatment activities, but those are not relevant to plaintiffs' motion.
[2] The court takes judicial notice of Phoenix's permit application forms. City of Phoenix, Medical Treatment and Food Distribution Parks Services Permit, https://perma.cc/N63P-E5PN.

Park's monthly permits after "compet[ing] with other charitable, humanitarian, and medical individuals and organizations" for them. (Doc. 2 at 4.) But St. Herman's cannot identify volunteers far enough in advance to satisfy the permitting requirements and does not yet have $2 million in liability insurance. (Doc. 2-2 at 9-11.) Plaintiffs also allege that given the heat in Arizona, the shade-less parking lot limitation will make events unsafe during summer months. (Doc. 2-2 at 9-11.)

St. Herman's and Brace intend to continue their weekly ministry even after the ordinance's effective date of June 5, 2026, though Brace's wife and children will stop accompanying him so the children do not witness Brace's potential citation or arrest. (Doc. 2-2 at 11-12.) Plaintiffs request the court issue a temporary restraining order and preliminary injunction prohibiting the City of Phoenix from enforcing this ordinance. (Doc. 2-4 at 2.) They request this relief by June 11, the first Thursday plaintiffs would be affected by the ordinance. (Doc. 2 at 2.)

## II.    Legal Standard

Generally, a court analyzes a request for a temporary restraining order under two slightly-different tests. First, it may evaluate if there is a likelihood of success on the merits, if there is a likelihood of irreparable harm, whether the balance of equities tips in plaintiff's favor, and whether an injunction would be in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Alternatively, the court may assess whether "serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor" in addition to showing "a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

## III.    Analysis

At the outset, the court addresses the urgency of plaintiffs' motion. Phoenix argues plaintiffs are not facing a true emergency because they "dawdle[d]" after sending Phoenix a demand letter requesting an exemption from the ordinance last month, waiting to file this motion until just nine days before they would be affected by its enforcement. (Doc. 13 at

- 4 -

17.) The cases Phoenix cites, and others, indicate a delay usually weighs against the moving party when the alleged harm was ongoing while the party delayed, or when the other party is prejudiced. *See Perez v. City of Petaluma*, No. 21-CV-06190-JST, 2021 WL 3934327, at *1 (N.D. Cal. Aug. 13, 2021); *Richardson v. Robison*, No. 08CV902 WQH (BLM), 2008 WL 2338611, at *4 (S.D. Cal. June 5, 2008).

Here, plaintiffs sought relief before Phoenix planned to begin enforcing the ordinance and Phoenix has not claimed prejudice. Plaintiffs also should not be discouraged from attempting non-litigation resolutions before filing suit. And regardless, "courts are loath to withhold relief solely" on grounds of alleged delay. *Arc of California v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014) (simplified). Plaintiffs' delay here does not weigh against emergency relief.

### A. Likelihood of Success

The first step of the traditional *Winter* analysis requires plaintiffs make a "clear showing" they are likely to succeed on the merits of at least one claim. *Apartment Ass'n of Los Angeles Cnty., Inc. v. City of Los Angeles*, 10 F.4th 905, 911 (9th Cir. 2021); *see Pop-A-Shot Enter. LLC v. EastPoint Sports Ltd., LLC*, No. 2:23-CV-08841-HDV-PDX, 2023 WL 8170796, at *5 (C.D. Cal. Nov. 6, 2023). Based on the present record and arguments, plaintiffs have established they are likely to succeed on their First Amendment Free Exercise claim.

Ordinances "incidentally burdening religion" are not subject to strict scrutiny "so long as they are neutral and generally applicable." *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 533 (2021). Though considered separately, the tests for neutrality and general applicability are interrelated and the "failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1076 (9th Cir. 2015) (simplified). Beginning with neutrality, a law must be both "facially neutral" and "operationally neutral." *Id.* In general, a law will be deemed neutral if it "proscribe[s] the same conduct for all, regardless of motivation." *Id.* at 1077. This holds true even if a religiously-motivated group is "more likely to engage

in the proscribed conduct." *Id*. at 1076-77.

As for general applicability, an ordinance might fail this requirement in two ways. *Tingley v. Ferguson*, 47 F.4th 1055, 1088 (9th Cir. 2022), *abrogated on other grounds by Chiles v. Salazar*, 146 S. Ct. 1010 (2026). A law is not generally applicable "if there is a formal mechanism for granting exceptions that invite[s] the government to consider the particular reasons for a person's conduct," or "if the law prohibits religious conduct while permitting secular conduct that also works against the government's interest in enacting the law." *Id.* (simplified); *see also Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (laws are not generally applicable or neutral "whenever they treat *any* comparable secular activity more favorably than religious exercise").

The ordinance at issue appears neither neutral nor generally applicable. Neutrality requires conduct be proscribed "regardless of motivation." *Stormans, Inc*., 794 F.3d at 1078. But the ordinance plainly categorizes food distribution with specific regard to motivation, requiring a permit only for those events undertaken for "charitable or similar humanitarian purposes." (Doc. 1-4 at 7.) Although subtle, charitable purposes certainly correlate with religious ones. *See Masterpiece Cakeshop v. Colorado C.R. Comm'n*, 584 U.S. 617, 638 (2018) (finding even "subtle departures" from religious neutrality are impermissible); *Stormans, Inc*., 794 F.3d at 1076-77. To illustrate, the text of the ordinance would seem to allow a restaurant to conduct a food distribution event just like St. Herman's for the general public if the "purpose" of that event was drumming up future business instead of charity. Phoenix appears to disagree with the plain text, claiming "an event where food is freely distributed to the general public requires a permit whether hosted by a church or a secular organization." (Doc. 13 at 6.) But this argument reads the motivation clause out of the ordinance. The ordinance leaves a secular organization motivated by something other than "charitable or similar humanitarian purposes" free to conduct food distribution events without a permit.

Similarly, the ordinance is not generally applicable because it permits secular activities that "undermine[] the government's asserted interest in a similar way." *Fulton*,

593 U.S. at 533. Phoenix describes its interest in preventing "strain" on park resources, including noise, obstruction, and crowds. (Doc. 13 at 14.) But organizations are permitted to distribute food when it is not for public consumption or not for charitable or humanitarian purposes (Doc. 1-4 at 7), even when their events are equally large, noisy, and trash-producing. Phoenix provides no evidence or meaningful argument explaining why a birthday party providing cake to twenty select two-year-olds is any less likely to strain park resources with noise or mess than a religiously-motivated gathering open to twenty members of the public. That the ordinance requires permits based on motivation rather than crowd size or trash output undermines Phoenix's asserted interest for enacting it. *Tandon*, 593 U.S. at 62. The ordinance is not generally applicable.

Because it is neither neutral nor generally applicable, the ordinance is subject to strict scrutiny. "A government policy can survive strict scrutiny only if it advances 'interests of the highest order' and is narrowly tailored to achieve those interests." *Fulton*, 593 U.S. at 541 (simplified). "In order to withstand strict scrutiny, the law must advance a compelling state interest by the least restrictive means available." *Bernal v. Fainter*, 467 U.S. 216, 219 (1984). Laws "[o]nly rarely" survive strict scrutiny. *Id*. at n.6. Phoenix makes no effort to show the ordinance can survive strict scrutiny (Doc. 13), thereby conceding the point, and the court has no obligation to "manufacture arguments" on behalf of a party. *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994); *see Stichting Pensioenfonds ABP v. Countrywide Fin. Corp*., 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011) ("failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue" (simplified)). But even if Phoenix had identified compelling government interests, it seems likely those interests could be furthered by less-restrictive or more narrowly-tailored means, for instance requiring permits based on an event's size, trash levels, or noise levels.

Because plaintiffs have shown they are likely to succeed on their First Amendment Free Exercise claim, the remaining *Winters* factors must be analyzed.

### B.  Irreparable Harm

To establish irreparable harm, a party "need only demonstrate the existence of a colorable First Amendment claim." *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022) (simplified); *see Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (simplified). Because plaintiffs have done so, they have shown irreparable harm.

### C.  Balance of Equities and Public Interest

The third and fourth factors of the preliminary injunction test examine the balance of equities, which weighs the burden to each party if an injunction is ordered, and the public interest, which weighs the injunction's impact on nonparties. *Porretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021). These factors "merge into one inquiry when the government opposes a preliminary injunction." *Id*.

Phoenix will face hardship if it is prevented from enforcing its new ordinance. More food distribution events will undoubtedly take place in certain Phoenix parks than without the injunction. But that merely continues the status quo that existed before the ordinance took effect, whereas plaintiffs would be prevented from expressing their religion and taking part in a religious activity. As is the case whenever a party shows a likelihood of success or serious questions on a First Amendment claim, "the balance of hardships tips sharply in [their] favor." *X Corp. v. Bonta*, 116 F.4th 888, 904 (9th Cir. 2024) (simplified).

Similarly, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). Accordingly, the public interest factor also weighs in plaintiffs' favor.

### D.  Security

Plaintiffs argue there does not appear to be any legitimate financial harm to defendants, so no security should be required under Fed. R. Civ. P. 65(c). (Doc. 2-6 at 3.) Defendants do not contest this assertion (Doc. 13), so no security will be ordered.

Accordingly,

**IT IS ORDERED** the Motion for a Temporary Restraining Order (Doc. 2) is **GRANTED** and enforcement of Ordinance G-7514 against plaintiffs St. Herman's Table and Lance Brace is prohibited for fourteen days from the date of this order. The TRO will expire at 4:00 p.m. on June 24, 2026.

**IT IS FURTHER ORDERED** that because only legal questions appear to be at issue, no later than June 15, 2026, the parties shall confer and file a joint statement outlining their positions on consolidating preliminary injunction briefing with the merits of the case. The joint statement also must propose a briefing schedule for the preliminary injunction. In setting forth the briefing schedule, Phoenix must indicate whether it consents to extending the temporary restraining order beyond the presumptive limit to allow for briefing and resolution of the motion for preliminary injunction.

Dated this 10th day of June, 2026.

_____
**Honorable Krissa M. Lanham**
**United States District Judge**