PROVIDENT LAW

# Exhibit 4

**In the Matter of:**

*St. Herman's Table*

*vs*

***City of Phoenix***

---

*Martin Whitfield*

*August 31, 2026*

---

GRIFFIN GROUP
INTERNATIONAL
3200 East Camelback Road, Suite 177
Phoenix, Arizona 85018

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
PHOENIX DIVISION

| | |
|---|---|
| St. Herman's Table, an Arizona nonprofit corporation; and Lance Brace, Plaintiffs, | |
| vs. | No. 2:26-cv-03882-KML |
| City of Phoenix, Defendant. | |

* * * * * * * * * * * * * * * * *

VIDEOCONFERENCE DEPOSITION OF
MARTIN WHITFIELD
August 31, 2026
9:00 a.m. Pacific Standard Time
(Reported Remotely)

* * * * * * * * * * * * * * * * *

REPORTED BY:
RACHELLE FORD, CSR, RPR
Certified Court Reporter
Certificate No. 4003

PREPARED FOR:
UNITED STATES DISTRICT COURT

(Original)

INDEX


| WITNESS | PAGE |
|---|---|
| MARTIN WHITFIELD | |
| Examination by Ms. Rene | 5 |
| Signature Page | 138 |
| Reporter's Certification | 139 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Ordinance G-7514, (7 pages) | 36 |
| Exhibit 2 | Medical Treatment and Food Distribution in Parks Ordinance PowerPoint Employee Training, COP003249-003273 (25 pages) | 133 |
| Exhibit 3 | Rules and Procedures for the Issuance of Medical Treatment and Food Distribution Parks Services Permits (11 pages) | 21 |
| Exhibit 7 | E-mail string from Brandie Barrett dated 5/27/2026, COP001700-001702 (3 pages) | 81 |
| Exhibit 11 | E-mail string dated June 1, 2026 from Martin Whitfield, COP001916-001918 (3 pages) | 88 |
| Exhibit 12 | City of Phoenix Food Distribution Permit Issued to Billy's Way Home, COP002206-002208 (3 pages) | 96 |
| Exhibit 13 | E-mail string dated July 13, 2026 from Martin Whitfield, COP000867-000868 (2 pages) | 113 |




EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 14 | Letter addressed to the Divas of Da Desert dated July 14, 2026, COP000884-000885 (2 pages) | 92 |




ORAL VIDEOCONFERENCE DEPOSITION OF MARTIN WHITFIELD, was taken on August 31, 2026, commencing at 9:00 a.m. Pacific Standard Time, held remotely, before RACHELLE FORD, a Certified Shorthand Reporter.

COUNSEL APPEARING (VIA TELECONFERENCE):

FOR THE PLAINTIFFS:

ANN-MARIE WHITE RENE, ESQ.
STEVE McFARLAND, ESQ.
Center for Law & Religious Freedom
8001 Braddock Road, Suite 302
Springfield, Virginia 22151
Arene@clsnet.org
(703)642-1070

FOR THE DEFENDANT:

JEAN-JACQUES "J" CABOU, ESQ.
MARGO CASSELMAN, ESQ.
Ashurt Perkins Coie
2525 East Camelback Road, Suite 500
Phoenix, Arizona 85016
J.cabou@ashurtperkins.com
Margo.casselmanm@ashurstperkins.com
(602)351-8000



P R O C E E D I N G S

* * * * *

THE COURT REPORTER: We are now on the record. Today is August 31st, 2026. The time is 9:00 a.m.

Counsel, state your appearances for the record.

MS. RENE: Ann-Marie Rene on behalf of the plaintiffs in this case. And I'm with the Christian Legal Society.

MR. MCFARLAND: Steve McFarland, same.

MR. CABOU: J Cabou and Margo Casselman of Ashurt Perkins Coie on behalf of the defendants and on behalf of the witness.

MARTIN WHITFIELD,

a witness herein, was first duly sworn to speak the truth, the whole truth and nothing but the truth, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. RENE:

Q. Good morning, Mr. Whitfield. How are you?

**A. Good. Just call me Marty. I'm fine, thank you.**

Q. Marty, thank you. I appreciate that. Marty, hello. My name is Ann-Marie Rene. Please call me

Ann-Marie. It's nice to meet you. Thank you for taking the time to be here on Zoom this morning. I'm actually on the East Coast, so I've already had lunch. I know it's morning where you are, but I'm on the East Coast. So if you need a break before lunch your time, please let me know, but I'm hoping to start moving through this deposition fairly quickly. I'd like to make it to lunch if possible before we break, but if you need a break before then, please let me know. Feel free to let me know and we'll take a quick 10- or 15-minute break.

**A. Okay.**

Q. So I'm just going to start with a few background rules. I know you've spoken with others in preparation for this deposition, but I just have a few introductory questions and some ground rules I'd like to run through quickly first if that works for you.

**A. (Nods head.)**

Q. First, Mr. Whitfield, have you been deposed before?

**A. I have not.**

Q. Okay. Cool. Well, it's your lucky day. So, as I'm sure you heard from counsel, your counsel, giving testimony in a deposition is just like giving



testimony in an open court. So you took the oath administered by our court reporter here today.

Is there anything that would prevent you from giving truthful testimony here today?

**A. No, ma'am.**

Q. All right. Awesome. I tend to speak a little fast as I'm sure you've already heard. I'm usually pretty loud, but if you can't understand me for any reason, please let me know. Please ask me to slow down or repeat a question that I ask you, or if you don't understand it, please let me know. I want to make sure we're communicating clearly here specifically on the record.

So I'd ask that you please don't shake your head yes or no to answer questions. Say yes or no, please, so the court reporter can get that down if that's one of your answers.

So I'm sure, as your attorney told you, he'll probably make some objections. There will probably be some objections on the record today.

MR. CABOU: Counsel, I'm sorry to interrupt, but if we could just not speculate about what he did or didn't discuss with his counsel because I would like him not to volunteer answers that may or may not be covered by the attorney-client



privilege, I would appreciate that.

MS. RENE: Okay. Sure.

MR. CABOU: Thank you.

BY MS. RENE:

Q. Well, if counsel makes any objections here today, Mr. Whitfield, I ask that you please still answer the question.

I'm going to use the term "ordinance" quite a bit here in our conversation today. And by that, I mean the Medical Treatment and Food Distribution in Parks Ordinance. I believe that's also the parks services permitting -- the permit created by that ordinance.

Does that make sense?

**A. Yes, it does.**

Q. So when I use the term, "the Ordinance," you know what I'm referring to?

**A. I do.**

Q. Okay, great. Cool. With that I'm just going to kind of hop into it.

So Mr. -- so, Marty, I believe you are the interim parks director at the Phoenix Parks and Recreation Department; is that correct?

**A. Actually, I was named permanent on July 6th.**

Q. Okay, great. Congratulations.



**A. Thank you.**

Q. So can you give me a little bit of information about what that role entails and what your day-to-day responsibilities are in that role?

**A. Yeah, the Parks and Recreation Director for the City of Phoenix, I'm responsible for a team of about 1,900 folks that delivers programs and services to our community.**

Q. Awesome. So how long have you been with the Parks and Recreation Department?

**A. Since November 1st of 2021.**

Q. What have your various positions with the Parks and Recreation Department since then have been?

**A. Yeah, just two positions. I was hired as an Assistant Director for the Parks and Recreation Department on that date I just mentioned. And then you did mention interim, Interim Parks Director from January 19, 2026, and then permanent July 6th, 2026.**

Q. Who was the Parks Director before you? Do you know?

**A. I certainly do. Cynthia Aguilar.**

Q. Okay. Do you know why she left her position with the Parks and Rec. Department?

**A. She was promoted to a Deputy City Manager.**

Q. All right. And who is kind of your boss?

Who do you report to as the Director?
**A. My current boss is Dave Mathews. He's also a Deputy City Manager.**
Q. Not the band?
**A. Not the band. Just one T in his name, yes.**
Q. One T. Thank you. I'm sorry, you said Deputy City Manager?
**A. That is correct.**
Q. And who is he under? Do you know?
**A. I do. He reports to Lori Bays, B-A-Y-S, who is an Assistant City Manager.**
Q. Can you give me a quick rundown of the structure of the Parks and Rec. Department?
**A. Yeah, certainly. So Director, that's me; I have two Assistant Directors. They each have four Deputy Directors.**
Q. Then are there further employees below the Deputy Directors?
**A. Oh, yes. Again, there's 1,900 employees underneath me, so each Deputy Director has a certain amount of employees that help run their particular division.**
Q. What are those divisions?
**A. Yeah, certainly. So there's four geographical divisions: Northeast Division,**



**Northwest Division, Downtown Division and South Division. Ann-Marie, those four geographical divisions primarily do the same thing. They're responsible for programs and services and maintenance of those parks.**
**The other four divisions include Management Services: That's budget, accounting, information technology, procurement. There is our Parks Development Division. They're in charge of our five-year capital improvement program. Our Special Operations Division, that's our aquatics, forestry, maintenance as well.**
**And then our Natural Resources Division, that would be the last division, they're in charge of our preserves.**
Q. Got you. What is the Parks and Rec. Department's relationship with the City Council?
MR. CABOU: Object to form.
BY MS. RENE:
Q. I'm sorry, Mr. Whitfield, you can answer.
**A. Oh. Good.**
Q. I'm sorry. What is your working relation- -what's kind of the working relationship --
**A. Oh.**
Q. -- how do you interact on a professional



level with --
**A. Yeah, okay.**
Q. I'm sorry that wasn't clear.
MR. CABOU: Same objection.
**A. That's all right. Not sure really how to answer that, but they are interested in what our programs and projects are. So as a Director I'm responsible for meeting with them on a regular basis to brief them on what goes on in the Parks Department.**
BY MS. RENE:
Q. Okay. How often do you brief them, would you say?
**A. On a monthly basis with the exception of the summer when they're off.**
Q. And does that usually include the mayor?
**A. Yes. The nine elected officials I will meet with them individually, if that's what you're asking.**
Q. And same question, what is the Parks and Recreation Department's working professional relationship with, I believe, an agency called the Neighborhood Services Department?
MR. CABOU: Same objection.
**A. That's also a very good relationship. We work very close together.**



BY MS. RENE:
Q. What do you mean by "very close together"?
**A. Well, Neighborhood Services, if you're not aware of what their role is, I mean, they manage stuff in our neighborhoods. So they assist us in and around the parks as well. So if there's something that they might see, they'll let us know.**
Q. Do you also work with, I believe, the Office of Homeless Solutions?
**A. We do.**
Q. How often do you communicate, do you personally, Marty, communicate with the Neighborhood Services Department?
**A. That's hard to determine. Couple of times a month. And that's just from my desk, correct?**
Q. Yes, just you.
**A. Uh-huh.**
Q. How often do you personally communicate with the Office of Homeless Solutions?
**A. Maybe four or five times a month.**
Q. Have you spoken with the Neighborhood Services Department about the Ordinance?
**A. Yes.**
Q. Have you spoken to the City Council about the Ordinance, members of the City Council about the

Ordinance?
**A. Yes.**
Q. Have you spoken with the mayor about the Ordinance?
**A. No.**
Q. Have you spoken with the Office of Homeless Solutions about the Ordinance?
**A. Yes.**
Q. And how do you primarily communicate with them?
**A. This is about Office of Homeless Solutions?**
Q. Yes, I should clarify. How do you primarily communicate with the members of the City Council?
**A. Text message or call. And I mentioned the briefings as well.**
Q. The briefings, yes. Thank you.
And you said text messaging, would that be your work or personal cell phone?
**A. It's the same phone.**
Q. Same phone. And what about the Neighborhood Services Department, how do you communicate with individuals in that agency?
**A. Same way.**
Q. Also texting?
**A. Texting or call, sure, yes. E-mails once in**



**a while.**
Q. And what about the Office of Homeless Solutions, individuals in that office, also texting?
**A. Texting or calling, e-mailing, yes.**
Q. Do you know if you've texted with anyone, any member of the City Council about the Ordinance?
**A. Give me a second. I'm scanning.**
Q. Oh, take your time.
**A. I can't recall.**
Q. Okay. Do you know if you've texted with anybody from the Neighborhood Services Department about the Ordinance?
**A. Yes.**
Q. And do you know if you have texted with anyone from the Office of Homeless Solutions about the Ordinance?
**A. Yes.**
MS. RENE: J, if we could talk about getting copies of those texts later, that would be great.
MR. CABOU: We are happy to talk about any questions you have regarding documents, searching and production once the witness is done.
MS. RENE: Great. Thank you.
MR. CABOU: Sure.



BY MS. RENE:
Q. All right. Mr. Whitfield, I'm going to share my screen with you. And before we start chatting about the Ordinance and its Amended Rules, which I think is going to take up the bulk of our conversation here today, I'm going to try to share my screen. I'm a millennial so I should be able to do this, but maybe not as well. Let me see.
All right. Can you see the web page that I'm looking at, Marty?
**A. Yes.**
Q. Awesome. And this is a web page from the City of Phoenix Parks and Recreation Department, and the heading says, "Special Activity Request."
Do you see that?
**A. Yes, I do.**
Q. Awesome. I'm hoping you can give me some clarity about how this Special Activity Request -- and I believe it's a permit request; is that correct?
**A. Could you make it just a little bigger?**
Q. Bigger, probably. Let me see. Control screen -- is that better?
**A. Yeah, there you go. Thank you.**
Q. Absolutely. Can you see this?
**A. Yeah, I can. Repeat your question.**



Q. The Special Activity Request, is this another permit that is sometimes required by the Parks and Recreation Department?
**A. Yes.**
MR. CABOU: Object to form.
BY MS. RENE:
Q. I'm sorry, was that a yes?
**A. Yes.**
Q. And is this permit only required at events with more than 50 people?
**A. No.**
Q. Okay. Why not?
**A. You could need a permit for inflatables. You need a permit for amplified sound.**
Q. Okay. So it sounds to me like this permit, the Special Activity Request permit covers a wide variety of activities or things; is that correct?
**A. Yes.**
Q. Okay. I'm scrolling down -- first, I want to ask you if you don't mind kind of telling me in your own words what is the overlap, if any, with the Parks Services permit and this Special Activity Request permit?
MR. CABOU: Object to form.
**A. I'm not certain about your question. There's**

**no overlap.**

BY MS. RENE:

Q. Okay. So there's no overlap. So am I correct to say if I'm required -- if an individual or an organization is required to get a Parks Services permit, that individual or organization is not required to get a Special Activity Request permit?

**A. I would need to know the whole gist of what they're doing. They are two separate permits.**

Q. Okay. So I'm going to scroll down a little bit. There is a question on this form, this website, I should say, that I believe says, "Will food be provided/served?"

Do you see that?

**A. I do.**

Q. So if this is checked yes and submitted to the City -- I'm sorry, to the Parks and Recreation Department I should say, and that individual organization who has submitted that request has not applied for a Parks Services permit, how does the Parks and Recreation Department address that?

MR. CABOU: Object to form.

**A. So the Special Activity Request, that is for a private party or event.**

**//**



BY MS. RENE:

Q. What do you mean by "private"?

**A. It's not open to the public, so like a birthday party or a wedding reception.**

Q. Okay. So if somebody had completed this Special Activity Request permit, does the Parks and Recreation Department assume they do not need a Parks Services permit as well?

MR. CABOU: Object to form.

**A. Yeah, we wouldn't assume anything. When this is submitted, our team would call whoever is submitting it to discuss what the event is about.**

BY MS. RENE:

Q. Okay. And what do you mean "What the event is about?" Can you detail that a little bit for me, please?

**A. Whoever submitted the request, whatever division it is in, our recreation staff would call. If you submitted it, we would call you and ask you some questions about your event.**

Q. Would there be a determination as to whether that event is also subject to the Parks Services permit?

**A. Possibly.**

Q. So if the Parks and Recreation Department



considered the individual or organization submitting this request as a charitable or humanitarian organization, they would also need to seek a Parks Services permit; is that correct?

MR. CABOU: Object to form. Object to form.

**A. Again, our team will call and ask questions about the event and make a decision from there.**

BY MS. RENE:

Q. Sure. So I understand that, but I'm trying to understand as to if somebody only submits this request or an organization only submits this request and they have checked the box that says that yes, food is to be provided or served, it sounds to me like the City -- or, I'm sorry, the Parks and Rec. Department will reach out and gather more information about the event; is that correct?

**A. That is correct.**

Q. Is it correct, is it your understanding that if the Parks and Recreation Department determines that the organization is a charitable or humanitarian organization, it may also need to seek a Parks Services permit?

MR. CABOU: Object to form; lacks foundation; misstates the testimony.



**A. Possibly.**

BY MS. RENE:

Q. What information would the Parks and Recreation Department receive that would lead it to believe it does need a Parks Services permit?

MR. CABOU: Object to form.

**A. If it's a public event, then it would need a Parks Services permit.**

BY MS. RENE:

Q. Marty, could you please -- do you know where in the Phoenix city code the authority for the Special Activity Request permit is?

MR. CABOU: Object to form.

**A. Offhand I do not.**

BY MS. RENE:

Q. Okay. I might come back to that, but I'm going to stop sharing my screen right now. And I'd like to -- I think your answer to my last question leads us nicely into my next set of questions. So I'm going to try to share my screen again and pull that up. Let's see if I can do this.

All right. Marty, I've marked this as Exhibit 3 at the top.

(Exhibit No. 3 identified.)

//

BY MS. RENE:
Q. Do you see that?
**A. I do.**
Q. This is a copy of the Rules and Procedures for the Issuance of Medical Treatment and Food Distribution Parks Services Permits.
Do you see that?
**A. I do.**
Q. And these are the Amended Rules promulgated under the Ordinance; is that correct?
**A. That is correct.**
Q. I'm going to scroll down to the bottom -- I'm sorry. Do you need me to make it bigger?
**A. If you could, just a little bit. Thank you.**
Q. No problem. Is that better or bigger?
**A. That's better, yes. Perfect.**
Q. I'm going to scroll down to the very bottom. Is that your signature?
**A. Yes, it is.**
Q. Cool. So would you agree that this is a true and accurate copy of the Amended Rules?
**A. Yes, it is.**
Q. Great. All right. I would like to kind of run through some of the things here with you today.
You first -- you mentioned a moment ago that



the parks -- I'm sorry, the Special Activity Request permit you may need a Parks Services permit as well if you're holding an event in a Phoenix city park if it is open to the general public; is that correct?
MR. CABOU: Object to form.
**A. That is correct, and if you're feeding or doing medical treatment.**
BY MS. RENE:
Q. Okay. Does general public have a definition in these Amended Rules?
MR. CABOU: Object to form.
**A. I don't recall.**
BY MS. RENE:
Q. Let me scroll down and show you the definitions.
I see: "Allocation Period, Applicant, Blackout Dates, Department, Director, Eligible Park, Food Distribution Event, Medical Treatment, Organization Representative, Parks Code of Conduct, Parks Services Permit or Permit, Services Permit Allocation Committee."
Did I read all those correctly?
**A. Yes.**
Q. Okay. So the Amended Rules do not have a



definition for general public; is that correct?
MR. CABOU: Object to form. Counsel, I mean, there's only what's on the screen. So if what you want him to answer is did you read something that says, "general public," we agree, of course, you didn't read that. But if you want him to look at a multipage document he needs it or needs a chance to look through it.
BY MS. RENE:
Q. Okay. Marty, how does the Parks and Rec. Department interpret the term "general public" as it is used in the Ordinance?
**A. That's not a private event, like a birthday party or a wedding reception. It's open to the public.**
Q. What is "the public"?
**A. Someone who is not invited to an event.**
Q. So if I invite -- if an organization or an individual invites others to an event, they are not considered the public under the Ordinance?
MR. CABOU: Object to form.
**A. Correct.**
BY MS. RENE:
Q. And does the public include both the homeless and the not homeless?



**A. I'm really not sure how to answer that.**
Q. So does the Parks and Recreation Department interpret the term "general public" to include those who are housed?
MR. CABOU: Object to form.
**A. You said those that are housed?**
BY MS. RENE:
Q. Yes, those that are not homeless.
**A. Still not sure how to answer that, I mean --**
Q. I'm sorry. What's confusing about that question?
**A. You're asking me who the public is, so I would consider public housed and unhoused, sure, if that's what you're asking.**
Q. Okay. So I'm going to stop sharing my screen right now.
So let's go back. I'm going to pull up another -- I'd like to back up a little bit, Marty, because maybe I do need to lay a better foundation for some of my questions here.
Were you involved at all in the drafting of the Ordinance?
**A. Yes.**
Q. What was your involvement?
**A. Well, let me say this, my former boss,**

**Cynthia Aguilar, was the lead on it. So I supported her in any fashion I could.**

Q. Okay. I'm sorry, what was -- so her position -- was she Director when this ordinance was being drafted?

**A. Yes, she was.**

Q. And you were Assistant Director at that time?

**A. Correct.**

Q. In your own words, what was the purpose -- what did you all discuss would be the purpose of the Ordinance?

MR. CABOU: I'm going to object and instruct the witness not to answer to the extent that any of those conversations were held with counsel. And if the answer calls for -- if the answer would cause you to violate the attorney-client privilege, please don't answer. Otherwise, of course, you're free to answer.

BY MS. RENE:

Q. I'm sorry, Marty, do you have an answer to that? In your own words, what is the purpose of the Ordinance?

**A. I do not have an answer. This was a policy that was implemented by the Mayor and Council.**

Q. And what was the purpose behind that policy?



MR. CABOU: Objection, calls for speculation.

**A. I can't speak for the Mayor and Council.**

BY MS. RENE:

Q. What is your understanding of the policy purpose behind the Ordinance?

**A. So, I'll respond this way. We want to provide clean, safe and inviting locations in our parks.**

Q. So before the passage of the Ordinance, did the Parks and Recreation Department track how much liter or trash was left behind after food distribution events?

**A. We did not.**

Q. Are you aware of if any City agency tracked that information?

**A. I'm not aware of that.**

Q. So I'm sorry. I believe you testified that you helped the Director at the time with the drafting of the Ordinance; is that correct?

**A. That is correct.**

Q. Did you all ever have a conversation, and again, any conversation outside of counsel, no conversation you had with your attorney, but did you and the Director at that time have any conversation



about the term "general public"?

**A. I do not recall.**

Q. Did you have any conversation with the Director at that time about what is meant by "charitable"?

**A. I do not recall.**

Q. Do you recall whether you had any conversation with the Director in the drafting of the Ordinance about the term "humanitarian"?

**A. I do not recall either.**

Q. Okay. So now, Mr. -- I'm sorry, Marty -- I might just call you Mr. Whitfield because, I don't know, it seems more normal to me.

Mr. Whitfield, I'm trying to understand how the Parks and Recreation Department interprets those terms under the Ordinance and its Amended Rules. And I apologize if my questions were not clear earlier, but I believe you've testified that the Parks Services permit only applies to events that are open to the general public. So I'm trying to figure out how the Parks and Recreation Department determines whether an event is open to the general public.

So can you please explain to me how the Parks and Recreation Department makes that determination?

**A. Yeah, I think I mentioned before, but if the**



**event is not open to the public, right, so if it's -- again, I'm going to go back to the same thing. If it's a wedding, it's a birthday party -- I'm not sure if you have children, but you wouldn't invite the whole public to a birthday party. I certainly did not with my children, so that's how we've determined it.**

Q. Okay. So, Mr. Whitfield, so I represent Lance Brace and St. Herman's Table in this case.

Are you aware of them?

**A. I became aware of them several months ago, yes. Before then I did not know about them.**

Q. Okay. So every Thursday Mr. Brace and St. Herman's Table invite their homeless friends to eat with them in Phoenix City Park, the Cave Creek at Cactus Park. Do you consider that open to the general public?

MR. CABOU: Object to form.

**A. Yes, the Parks Department does.**

BY MS. RENE:

Q. So they are inviting their homeless friends to eat with them in the park. So why is that considered the general public?

MR. CABOU: Object to form.

**A. From what I know, isn't the event open to the**

**general public?**
BY MS. RENE:
Q. I'm sorry, Mr. Whitfield. I'll clarify my question for you. It is open to those -- yes, they are friends. They consider them their friends. They are their homeless friends and they welcome any of their homeless friends to the event on a Thursday night. So why is that considered open to the general public?
MR. CABOU: Object to form.
**A. I'm not sure how to answer that.**
BY MS. RENE:
Q. Mr. Whitfield, is the Ordinance and its Amended Rules in the permitting process, the Parks Services permit -- I'm sorry. This is a bad question so scratch that. Let me rephrase.
What type of organizations or individuals have to seek a Parks Services permit?
MR. CABOU: Object to form.
**A. Any organization that, again, wants to do food distribution or medical treatment in our eligible parks, that the event is open to the public would require a permit.**
BY MS. RENE:
Q. So you said "any organization"; is that



correct?
**A. That is not -- that is not sponsored by the City.**
Q. Any organization that is not sponsored by the City; is that correct?
**A. Correct.**
Q. Is it your understanding, Mr. Whitfield, that the Ordinance states that those organizations subject to the Ordinance are only humanitarian and charitable organizations?
MR. CABOU: Object to form. The Ordinance states what it states. The document speaks for itself.
**A. I don't have an answer for that.**
BY MS. RENE:
Q. I'm sorry, Mr. Whitfield, I'm asking for your understanding of the Ordinance. Does the Ordinance apply to just charitable and humanitarian organizations?
**A. The Ordinance applies to everyone.**
Q. So I'm going to bring up -- I'm sorry. I'm going to pull up again -- so these are the Amended Rules.
Can you see this?
**A. Yes.**



Q. I'm going to scroll down. Do you see where it says, "Who needs a permit"?
**A. Uh-huh. I do, yes.**
Q. Awesome.
And it reads: "Any individual or organization that wants to provide medical treatment services or hold a food distribution event at an eligible City park must obtain a Parks Services Permit."
Correct?
**A. That is correct.**
Q. All right. And then when you go down to Definitions:
"Food Distribution Event means a gathering conducted by a private individual or organization, for charitable or similar humanitarian purposes, at a park, that is planned, organized, or conducted to distribute food to any member of the general public at no cost or for a nominal charge, as further defined in Phoenix City Code Section 24-45."
Did I read that correctly?
**A. Yes.**
Q. So, Mr. Whitfield, I'm trying to determine



whether the Parks and Recreation Department believes the Ordinance and these Amended Rules apply to any individual or organization or just charitable or humanitarian organizations?
**A. I'll repeat again --**
MR. CABOU: Objection, asked and answered.
You can still answer, Mr. Whitfield.
**A. All right. Again, any organization or individual would require a permit.**
BY MS. RENE:
Q. Okay. Let me ask you this, Mr. Whitfield. What if it's a political candidate who wants to pass out food to the public, does the Parks and Recreation Department consider that political candidate subject to the Ordinance?
MR. CABOU: Objection, calls for speculation; assumes facts not in evidence.
**A. I would need to know the entire --**
BY MS. RENE:
Q. I'm asking for your opinion, Mr. Whitfield, whether the --
**A. Yeah, I would need to know the whole ramification of the event to make a decision.**
Q. Okay. But there is a chance, it sounds like,

that the Parks and Recreation Department would not require that individual to get a permit?

MR. CABOU: Object to form.

**A. Again, I can't speculate without knowing the entire situation.**

BY MS. RENE:

Q. Okay. Then I'm going to show you another document here. Just a moment, please.

All right, Mr. Whitfield, so I'll represent to you this is a document we received from your office in response to our request for production in this case.

Can you see this okay?

**A. I can, sure.**

Q. Do you see the organization, the column that says, "Organization" up at the top in purple?

**A. Yes.**

Q. And three rows down there is a Navajo Leadership. It states, "Navajo Leadership."

Do you see that?

**A. I do.**

Q. And the issue raised in this under "Issue" is

"Individual planning a meet-and-greet at Steele Indian School Park (10-20 attendees) is asking whether a permit is required to



sell food at the event. Event is free to the public, and the requester noted they are a candidate for Navajo Nation President."

And it says, "Requester's meet-and-greet with food sales does not fall under the Medical Treatment and Distribution permit."

Do you see that?

**A. Yes, I do.**

Q. Why is this -- why was this individual advised by the Parks and Recreation Department that he did not need a Parks Services permit?

MR. CABOU: Object to form.

**A. I'm looking at the dates and it doesn't seem the Ordinance was in effect then.**

BY MS. RENE:

Q. So this is -- so the -- I believe this is an inquiry form. It says, "Response." And again, I will represent to you that we received this from your office. So I believe your office was responding to inquiries about when the Parks Services permit applies and when it does not. And the response, somebody in your office wrote, "Responded that the requester's planned meet-and-greet event" as I just read.

So, again, I'm trying to figure out when does



the Parks and Services Department, you know, when and what type of organization and individual does the Parks and Recreation Department consider subject to the Ordinance?

MR. CABOU: Object to form.

**A. Again, same answer. All organizations or individuals would require a permit. I would have to talk to my team about that particular one.**

BY MS. RENE:

Q. Okay. Mr. Whitfield, do you see my screen still?

**A. I do.**

Q. And we're back at the Ordinance.

**A. Uh-huh.**

Q. I'm scrolling down and paragraph number 6, and I think I read all this but I'm happy to read it again.

"Food Distribution Event means a gathering conducted by a private individual or organization, for charitable or similar humanitarian purposes, at a park, that is planned, organized, or conducted to distribute food to any member of the general public at no cost or for a nominal charge."

You've testified that you consider the



park -- I'm sorry. You've testified that the Parks and Recreation Department considers all organizations and individuals subject to the Ordinance; is that correct?

**A. Correct.**

Q. Why do you believe that is in accordance with this ordinance?

MR. CABOU: Object to form.

**A. Yeah. I'm not sure how to answer that. Again, I'll repeat that the Mayor and Council are the ones that implemented this ordinance and my job is to implement it.**

BY MS. RENE:

Q. Have you spoken with the Mayor or Council about all -- I'm sorry, any individual or organization being subject to the Ordinance?

MR. CABOU: Object to form, vague.

**A. I believe you asked this earlier in the conversation, right?**

BY MS. RENE:

Q. No. I asked you if you had spoken about it, but now, I'm asking you specifically. Have you had a specific conversation with any member of the City Council about what types of organizations or individuals are subject to the Ordinance?

**A. No.**

Q. Okay. So how -- how is the Parks and Recreation Department's interpretation of this ordinance -- I mean, I'm sorry, Mr. Whitfield. I'm not trying to make this difficult, but I'm really trying to understand where you derived your authority as the Director of the Parks and Recreation Department to subject all and any organization to this ordinance when this ordinance states it only applies to charitable or humanitarian organizations?

MR. CABOU: Objection. Counsel, that is completely inappropriate. I know that's convenient for your case, but that's not what that ordinance says and you are not to put that in his mind. He's testified several times to this and I respectfully ask you to move on. He's answered this question. The document speaks for itself. If you want to take a break so we can get on the same page about this, that's fine. I'm not trying to obstruct your questioning, but the document speaks for itself. He's answered that question several times and you suggesting to him what it says to you, that's argument. And we respect your right to make arguments in court but not through this witness.

MS. RENE: J, I'm not making an argument. I'm really genuinely trying to understand how the Parks and Recreation Department is interpreting the Ordinance because I don't understand. So I am going to continue this line of questioning.



BY MS. RENE:

Q. Mr. Whitfield, I'm really trying to understand how the Parks and Recreation Department is applying the Ordinance.

It is my understanding that it is applying the Ordinance to every organization and individual; is that correct?

**A. That is correct.**

Q. Would you agree that that is not what the Ordinance says?

**A. I'm not a lawyer. My role --**

Q. Mr Whitfield --

**A. -- is to administer the policies and procedures here at the City of Phoenix.**

Q. Mr. Whitfield, I'm asking for your opinion.

**A. With all due respect, my opinion doesn't really matter.**

Q. Mr. Whitfield, it does because this is your deposition. So I'm going to ask you, is it your opinion that subjecting all organizations and individuals to the Ordinance is in accordance with the text of the Ordinance?



**A. Again, Ann-Marie, I will administer the ordinance as it was accepted by the Mayor and Council.**

Q. Mr. Whitfield, I do have the ability to move the court to compel your answer.

MR. CABOU: Counsel, that's not -- Counsel, no, we're not --

(Speaking simultaneously.)

MS. RENE: Well, he has not answered the question, J.

MR. CABOU: He has answered the question several times over the last several minutes, and there's no need to threaten anyone with compelling anything. He's going to answer your questions.

MS. RENE: He has not answered the question. He needs to answer the question --

(Speaking simultaneously.)

MR. CABOU: He hasn't given you --

MS. RENE: -- with a yes or no.

MR. CABOU: -- an answer you would prefer.

MS. RENE: He hasn't answered. He said he's not going to answer. I'm asking --

MR. CABOU: That's not what he said.



BY MS. RENE:

Q. Mr. Whitfield, I'm asking for a simple yes or no answer. Is the Parks and Recreation Department's interpretation of the Ordinance that it applies to all organizations and individuals in accordance with the text of the Ordinance?

**A. I believe I've answered this already.**

Q. Mr. Whitfield, you have not and I'm asking -- again, I'm going to ask for a yes or no answer.

Can you please answer the question yes or no?

**A. Whatever is in the Ordinance is how my team is going to administer it. So if you want to pull it up again we can look at it again.**

Q. Well, you told me -- Mr. Whitfield, that's contrary to your previous testimony because you just told me your team is interpreting the Ordinance to apply to all organizations. And I'm telling you we just read the Ordinance together, that the Ordinance itself says it applies to individuals and organizations with a charitable or humanitarian purpose.

MR. CABOU: Object to form; misstates the document, is again trying to testify to your version of the Ordinance and we're moving on.

MS. RENE: No, we're not moving on, J.

He needs to answer this question yes or no.

MR. CABOU: Okay. Well, I'm instructing him not to answer this question as long as you continue to try to tell him what answer you'd prefer by reading him what you say the document says without showing it to him and without realizing he's already answered your question and is doing his very best to answer those questions.

BY MS. RENE:

Q. Okay. Mr. Whitfield, I will show you the Ordinance one more time. I'm happy to read it for you, but I think you can read, I have no doubt, so I don't think I need to read it to you again.

So, Mr. Whitfield, "a Food Distribution Event means a gathering conducted by a private individual or organization, for charitable or similar humanitarian purposes, at a park, that is planned, organized, or conducted to distribute food to any member of the general public at no cost or for a nominal charge."

Is that what the Ordinance says?

**A. Yes.**

Q. Then why is the Parks and Recreation Department interpreting this ordinance to apply to all organizations and individuals?



**A. I'm still not sure how to answer that for you.**

Q. Okay. In your opinion, and I'm asking for your opinion and I want a yes or no question -- I'm sorry, a yes or no answer, please.

In your opinion, is subjecting all organizations and individuals to this ordinance in accordance with the text of the Ordinance?

MR. CABOU: Objection, calls for a legal conclusion.

**A. I answered it already.**

BY MS. RENE:

Q. No, Mr. Whitfield, you did not answer. I'm asking for a yes or no question. I'm sorry, I'm asking for a yes or no answer, so I'm going to ask you again, please answer yes or no.

MR. CABOU: Counsel, you can ask the questions but you can't tell him how to answer them.

BY MS. RENE:

Q. Well, this is a yes or no question, Mr. Whitfield. Yes or no?

**A. I can't give you a yes or no. We're administering the Ordinance as it was approved by our Mayor and Council.**

Q. So then it is just charitable and



humanitarian organizations are subject to the Ordinance?

MR. CABOU: Objection, misstates the testimony; argumentative; asked and answered; vague.

BY MS. RENE:

Q. Mr. Whitfield, please answer.

MR. CABOU: Which question do you want him to answer?

MS. RENE: I'm sorry, Ms. Ford, would you mind reading my last question, please, for the record?

(Thereupon, the court reporter read back the requested portion of the record.)

BY MS. RENE:

Q. Okay. I will ask one last time, Mr. Whitfield. In your opinion, the Parks and Recreation Department's enforcement of the Ordinance as to all organizations and individuals, do you consider that to be in accordance with the text of the Ordinance?

MR. CABOU: Same objections.

**A. Yeah, same answer from me. Again, the Parks Department is administering the Ordinance as approved by the Mayor and Council.**

MS. RENE: All right. I am going to go



ahead and put on the record that Mr. Whitfield is being a hostile witness.

MR. CABOU: We'll go ahead and put on the record that that's not true.

MR. MCFARLAND: Can I may make a suggestion, we take a five-minute break?

MR. CABOU: We'd be happy to take a break.

MS. RENE: All right. So let's reconvene at 1:00 p.m.

MR. CABOU: Just for the record, that's 10:00 a.m. in the witness's world.

MS. RENE: I'm sorry, 10:00 a.m. Thank you, J.

MR. CABOU: No problem.

THE COURT REPORTER: The time is 9:54 a.m. We're now off the record.

(Recess taken 9:54 a.m. - 10:02 a.m.)

THE COURT REPORTER: We're back on the record at 10:02.

MS. RENE: Awesome, thank you.

BY MS. RENE:

Q. So, Mr. Whitfield, I'm going to back up a little bit again. If I still -- I'm still having trouble understanding your testimony here today, so

Page 46

it might help, can you please describe for us first the drafting process for the Ordinance and how you were involved at the Parks and Recreation Department.
**A. Yeah, just to reiterate, Cynthia Aguilar, former Parks Director and current City Manager, she was the lead on this entire process, so I didn't have a lot to do with it but if there was items that she wanted to bounce off of me, and I don't remember exactly what those are. This is months and months ago. I would talk to her about it but she's the one was the lead.**
Q. Okay. And it's my understanding that the Ordinance originally only addressed medical treatment in Phoenix city parks; is that correct?
**A. That is correct.**
Q. And that food distribution was added thereafter; is that correct?
**A. That is correct.**
Q. How did that come to happen? How was food distribution added to the Ordinance?
**A. Yeah, unfortunately, I was not involved in those conversations so I do not know.**
Q. Okay. Were you only involved on the medical treatment aspects of the Ordinance?
**A. To an extent, yeah, before the food came in,**

Page 47

**if that's what you're asking, yes.**
Q. So what was your involvement with the food -- with the drafting of the Ordinance as it relates to food distribution?
**A. Not much. Again, let me just reiterate that she was the lead on this for the entire process. So I was here for support, whatever that looked like.**
Q. So did she draft the charitable humanitarian organization language in the Ordinance?
**A. I do not know that.**
Q. Do you recall having a conversation with her or anyone else in the Parks and Recreation Department about those terms?
**A. I do not.**
Q. Okay. So, Mr. Whitfield, does the Parks Services permit -- I'm sorry. Scratch that.
Is a Parks Services permit required for every organization that distributes food to the public or only to organizations that have a humanitarian or charitable purpose?
**A. Seems like I've answered this one, but try to do it again. Any individual or organization that is doing food distribution or medical treatment to the public would require a permit.**
Q. Okay. And then you've also -- I know we've

Page 48

talked about this a little bit, but I'm wondering what criteria is used by the Parks and Recreation Department to determine whether an event is open to the public? Can you --
**A. We -- yeah, oh, I'm sorry. Go ahead.**
Q. I'm sorry. You go ahead.
**A. No, whoever submits a permit, our team will ask the fact-finding questions. If it's open to the public, they will need a permit.**
Q. And what are those fact-finding questions?
**A. Again, I'll revert back to a private event like a birthday party or a wedding reception. Those are private events. If it's open to the public, then it would require a permit.**
Q. Okay. So there's no criteria or standards that the Parks and Recreation Department uses to determine whether an event is open to the public?
MR. CABOU: Object to form; misstates the testimony. He just told you what the criteria were. You can't then say there's no criteria.
BY MS. RENE:
Q. Are there any written criteria?
**A. No.**
Q. Are there any written standards?
MR. CABOU: Object to form.

Page 49

**A. No.**
BY MS. RENE:
Q. Okay. So I'd like to pull up again, I'm going to pull up the Amended Rules we've been discussing again.
I'm sorry, Mr. Whitfield, before I do that, one -- couple more follow-up questions. So it sounds -- or I'm sorry. Are you aware whether the Parks and Recreation Department receives inquiries about the applicability of the Parks Services permit.
**A. I'm aware and we do, yes.**
Q. Yes. And does your staff, are you aware of whether the Parks and Services Department answers those inquiries and do they inform individuals and individuals -- I'm sorry, do they inform individuals and organizations whether they are required to apply for Parks Services permit?
MR. CABOU: Object to form.
**A. Yes, we do.**
BY MS. RENE:
Q. Okay. I'm sorry. So let's go ahead and pull up -- share my screen again.
All right. So I'd like to discuss first, and we've been talking about this, and, you know, who needs a permit we've been discussing this, and under

the Amended Rules, I believe it says:

"As detailed below, many activities, including private gatherings, medical treatment for family members, distribution of water or electrolyte beverages, and outreach or education activities do not require a Parks Services permit."

Did I read that correctly?

**A. That is correct.**

Q. What is an outreach activity as that term is used in these Amended Rules?

**A. I'll do the best I can to answer that, but that could be our Office of Homeless Solutions giving education to folks on where they could get services. That could be our department letting folks know where they could get water or electrolytes. That's just talking to folks.**

Q. Okay. And what about an education activity as that term is used in these Amended Rules, what is an education activity?

**A. Same premise that I just mentioned.**

Q. Okay. So neither an outreach activity -- I'll say an outreach activity is not an activity that includes food distribution; is that correct?

**A. That is correct.**



Q. And it's the same for education activities, those are activities that do not include food distribution?

**A. Correct.**

Q. Okay. And I'd like to scroll down. Do you see paragraph 4 where it asks, "What are the only reasons a permit can be denied?"

**A. I do.**

Q. So "An application may be denied only if: (a) two permits have already been issued for the requested park in the requested calendar month; (b) there are competing requests for the same park on the same date that cannot both be accommodated or there is another previously-approved event at the same park on the same date and both events cannot be accommodated; (c) the requested date is a designated citywide Blackout Date or a Park Site Closure date; (d) the requested park is not an Eligible Park; (e) the application is materially incomplete or lacks required documentation; or (f) the applicant is subject to be an in-effect Activity Restriction Notice or otherwise ineligible under Parks Code of Conduct or City Code."

Did I read that correctly?



**A. Yes.**

Q. So I'd like to ask you about (b), "There are competing requests for the same park on the same date that cannot both be accommodated."

I'd like to start there. When does the Parks and Recreation Department consider whether an event, how -- I'm sorry, scratch that.

How does the Parks and Recreation Department consider that whether a event can -- two events can be accommodated on the same day or not?

**A. Yeah, well, luckily, we haven't had that situation since the Ordinance went into effect, which is great for folks who are seeking permits. I can't speculate. We have that language in there in case there's a -- it could be a baseball event going on, but again, there's plenty of permits to go around.**

Q. So is there any written criteria explaining when events cannot both be accommodated?

**A. Any written, no. That would be at my discretion.**

Q. And would it have to be that both the requester events are at the same time?

**A. Hard to determine. I'd have to have all the information.**

Q. So is possibly -- is that correct if, you



know, maybe if they both cannot be accommodated at the same time but maybe not?

**A. Possibly. Again, I'd have to have all the information to make a decision.**

Q. And then I'd like to go over (c) "The requested date is a designated citywide Blackout Date or a Park Site Closure date."

What is a citywide Blackout Date?

**A. Sure. I believe we have six or seven of those. I don't remember them offhand, but July 4th is a Blackout Date for us because we have other events going on. Easter, that's the Super Bowl of the Parks and Recreation Department; Christmas, there's a few other dates I just cannot remember right now.**

Q. What is a Park Site Closure date?

**A. We're talking about the same thing, I believe, right?**

Q. Well, here in paragraph 4 (c), it says, "The requested date is a designated citywide Blackout Date or a Park Site Closure date."

So you explained what a Blackout Date is, but what is a Park Site Closure date?

**A. Okay. That could be due to construction we might have going on in our parks.**

Q. Construction, what else?
MR. CABOU: I'm sorry, Counsel, for the record you're sharing your screen and I just want to make sure that you're intending to do that and --
MS. RENE: Thank you. I was not. I apologize. Thank you. I'd forgotten. There you go.
MR. CABOU: No problem.
**A. I can't think of anything offhand, but we have a lot of construction going on in our parks.**
BY MS. RENE:
Q. Okay. So a Park Site Closure date is a date when construction is happening at the park?
**A. Possibly, yes.**
Q. Possibly. Could that include other things?
**A. I can't think of anything.**
Q. Is there any written criteria for what constitutes a Park Site Closure date?
**A. I'm not sure, could be something for our city engineer department to answer. They're in charge of all of our construction.**
Q. Would you consult that agency when considering whether a permit may be denied as a Park Site Closure date under this provision?
**A. I would have all the information already to make my decision.**



Q. Then 4 (f) says, "The applicant is subject to an in-effect Activity Restriction Notice or is otherwise ineligible under the Parks Code of Conduct or City Code."
What is in-effect Activity Restriction Notice?
**A. I'm not certain on that. Sounds like it is something that's related to maybe an organization or individual who was in trouble by the City or the Parks Department and unable to go to our parks. I don't really recall that one.**
Q. How involved were you in the drafting of these Amended Rules?
MR. CABOU: Object to form.
**A. Somewhat.**
BY MS. RENE:
Q. What was your involvement?
**A. I reviewed them. Worked with our counsel on them.**
Q. Okay. Did you help draft any of the language that made it into these rules?
**A. I did not.**
Q. Did you approve prior versions or did you review -- I'm sorry, review prior versions of these Amended Rules?



**A. I approved the final version.**
Q. Did you see these Amended Rules before this final version?
**A. Yeah, I do not recall that. I do remember reviewing them before I signed, of course.**
Q. Were they in this final form when you signed them?
**A. Final format?**
Q. Yes.
**A. Yes.**
Q. Okay. I'm going to scroll down to Section V. Do you see where it says, "Compensations"?
**A. Yes.**
Q. So we've talked about this a little bit.
**A. Yeah, we have.**
Q. So "Food Distribution: The permit requirement does not apply to A, private gatherings, including family events, such as celebrations, weddings, meals, or reunions, or informal gatherings of family or family friends, where food is served to participants rather than to the general public."
Did I read that correctly?
**A. Correct, you did.**
Q. Is there any written criteria for how -- I'm sorry. Scratch that.



What is meant by "friends" in this provision?
**A. I do not have an answer. I mean, I know who my friends are. That's how I determine my friends.**
Q. So how does the Parks and Recreation Department determine whether an organization or an individual is hosting friends at a food distribution event?
**A. Through fact finding.**
Q. What kind of fact finding?
**A. Sure. As I mentioned earlier, whoever is submitting requests for a permit, our team will reach out to them and ask questions about the event.**
Q. Okay. Is that the same -- is the same true for the term, "family" in this provision?
**A. I would assume so, yes.**
Q. Would the same be true for "family friends" as that term is used in this provision?
**A. Yes.**
Q. Okay. So the Parks and Recreation Department engages in a fact-finding endeavor to determine whether an organization or individual is required to get a Parks Services permit. Is that fair to say?
MR. CABOU: Objection, misstates the testimony.
//

BY MS. RENE:
Q. I'm sorry, Mr. Whitfield, you can answer that.
**A. Yes, that is correct. I mentioned that before.**
Q. Okay. So, and the fact finding, you know, I called it a fact-finding endeavor, but the fact finding that the Parks and Recreation Department does to determine whether an event is open to family, family friends or friends, is that similar to the fact finding that's done to determine whether an event is open to the public?
MR. CABOU: Object to form.
**A. Yes, correct.**
BY MS. RENE:
Q. Cool. So I'm going to scroll down to Section VII, I believe. Let's see here. And Section VII says, "Review Criteria and Permit Issuance."
Do you see that?
**A. Yes.**
Q. Cool. I'm going to scroll down to subsection -- so subsection C says:
"Exceptions to Approval. An application may be denied, in whole or in part, only if one or more of the following circumstances



apply."
And I don't want to read all of this so I'm just going to read 1 through 6.
"Competing Requests or Events, Monthly Permit Limit, Blackout Dates or Park Site Closures, Ineligible Park, Incomplete Application, and Parks Code of Conduct."
Did I read that correctly?
**A. Yes, ma'am.**
Q. Section D says, "Resolution of Competing Requests. The Director shall award permits on a first-come, first-serve basis."
Did I read that correctly?
**A. Yes.**
Q. Can you please explain the first-come, first-serve basis as that phrase is used in these Amended Rules?
**A. As it relates to the Parks ordinance I certainly can. So we had two open, I'm going to call them sessions, for folks to request permits, but we also have an ongoing rolling request process as well. So, for instance, if Mr. McFarland wants Park ABC and he asks for it today, and you want ABC and you ask for it tomorrow, we would award it on a first-come, first-serve basis so we would award it to**



**Mr. McFarland. I hope that makes sense.**
Q. It does. Was that the policy of the Parks and Recreation Department prior to the issuance of these July 10th Amended Rules?
**A. Yes.**
Q. Okay. So, and I know the Ordinance was not in effect for very long before these rules came out, but for that I think the Ordinance, and please correct me if I'm wrong, Mr. Whitfield, but I think the Ordinance went into effect about June 7th, so for about that month from June 7th to July 10th when these rules were issued the Parks and Recreation Department also had the same first-come, first-serve basis; is that correct?
**A. That is correct.**
Q. Okay. Cool. Then I'd like to scroll down to IX:
"Event Duration and Timing. Park Services permit events are allotted for a two-hour service period, plus a 30-minute setup period and a 30-minute teardown period."
So it's my understanding that under the Ordinance and these Amended Rules, Parks Services permits are issued for three-hour increments; is that



correct?
**A. That is correct.**
Q. Are you aware of any organization that has been provided a permit, a Parks Services permit for more than three hours?
**A. I'm not aware of that.**
Q. All right. I'd like to scroll down to Section XII is also down here, I believe.
Do you see where it says, "Progressive Enforcement"?
**A. Yes, ma'am.**
Q. And it has First Violation, Second Violation, Third Violation, Fourth Violation; is that correct?
**A. Correct.**
Q. Can you please walk us through the progressive enforcement of the Ordinance?
**A. Yeah. Before I do that, we've had so many permits that are available we haven't really had to deal with all this, but yeah, first violation, if you do not have a permit for food distribution or medical treatment and a City representative comes across that organization or individual, we will give you an education explaining that you do need a permit, explain the Ordinance. And then we will follow that up with a documented letter.**

**We have not done a second, third, or fourth violation but I'll walk you through it best I can. If you've got a first violation and you do not have a permit on your second event, the City will give you a citation up to a 120-day trespass from all parks. Third violation, you can see one year trespass; fourth violation an additional year of trespass.**
Q. Okay. And I think you said you've given out a couple of first violation documented warnings thus far; is that correct?
**A. That is correct.**
Q. Who did you give those warnings to?
**A. Going by memory, an organization named Van Centers. Gosh, my apologies. I don't remember the other two or three.**
Q. No worries. And I'm sorry, did you say Van Centers, V-A-N?
**A. I believe I have the name right, yes, Van, like, Van Down the River, right? Van Centers. Got you on that one, huh?**
Q. And do you know what type of organization the Van Centers is?
**A. I do not recall.**
Q. So, Mr. Whitfield, the Ordinance does state that a violation of the Ordinance is a class 1



misdemeanor, correct?
**A. Yes.**
Q. So does the Parks and Recreation Department retain its authority under this Progressive Enforcement to cite any individual or organization as a class 1 misdemeanor for violation of the ordinance?
MR. CABOU: Objection to the extent it calls for a legal conclusion.
**A. Yeah, I'm not certain. I'd speak out of line on that one.**
BY MS. RENE:
Q. So has there been a discussion in -- are you aware of whether there's been a discussion in the Parks and Recreation Department about when an individual or organization will be cited criminally as a class 1 misdemeanor for a violation of the Ordinance?
**A. Not to my knowledge in the Parks and Recreation Department.**
Q. So you have not discussed that with anyone?
**A. I have not.**
Q. Would you agree that these Amended Rules do not limit your discretion to issue a citation as a class 1 misdemeanor?
MR. CABOU: Same objection; calls for a



legal conclusion, but you can still answer.
**A. Limit my discretion, I don't -- I don't believe so. It looks like the enforcement framework is pretty self-explanatory.**
BY MS. RENE:
Q. But it is your understanding that the Ordinance states a violation of it is a class 1 misdemeanor?
**A. That is my understanding, correct.**
Q. So we've talked a little bit about how these rules came to be, these Amended Rules came to be, Mr. Whitfield. Is it your understanding the Parks and Recreation Department can further amend these Amended Rules at any time?
**A. We can with the direction from the City Manager's office and our Law Department. We can always consider making it better. It's a new ordinance.**
Q. Okay. And I'm sorry, you mentioned the City Manager's office. So is the City Manager's office involved in the drafting of these Amended Rules?
MR. CABOU: Objection, vague.
**A. Yeah, I'm not certain. I hate to speak out of line on something.**
**//**



BY MS. RENE:
Q. But you mentioned they would be involved in any further amendments; is that correct?
**A. They're involved with everything with the City of Phoenix, so yes.**
MS. RENE: All right. I stopped sharing, I think.
MR. CABOU: You did.
BY MS. RENE:
Q. Mr. Whitfield, you mentioned a few times now this fact finding, and again, I called it a fact-finding endeavor, but this fact finding that the Parks and Recreation does to determine the applicability of the Parks Services permit.
So I'm wondering if you could walk us through that process and how it relates to the issuance of Parks Services permits under the Ordinance.
**A. Yeah, certainly. So, again, this is new for everybody, right? It just went into effect on June 7th, so -- and, luckily, I will repeat, 105 parks there's 105 out of 189 parks. We have a lot of opportunities for permits, so we have not run into challenges. I just want to put that on the record.**
**When individuals or organizations contact the Parks Department, whether that's by phone or e-mail,**

**our team will reach out either by phone or e-mail to ask whomever some fact-finding questions about their event so they can determine if they actually need a Parks Services permit.**
Q. Okay. And what is -- again, do you have any idea what questions or asked or what the process is like that your staff does to get that information from these individuals and organizations who reach out to the Department?
**A. Yeah, I certainly do. They will review the Ordinance since they should know like the back of their hand, and determine if it is a private gathering or a public event.**
Q. Okay. Have you told or has any training been provided to your employees about what organizations or individuals are subject to the Ordinance?
MR. CABOU: Objection, asked and answered again.
MS. RENE: I haven't asked about training or what you've informed your employees.
MR. CABOU: The premise of your question continues to be, as it has been before, that the organization discriminates based on the kind of organization and it does not. I understand that's your argument and we respect the argument. Of course



we disagree with it, but the premise of your question is not correct, and hence the objection.
MS. RENE: Okay. Well, I'm asking Mr. Whitfield.
BY MS. RENE:
Q. Do you tell your employees the Ordinance -- I'm sorry. Do you tell your employees, Mr. Whitfield, that all types of organizations and individuals are subject to the Ordinance?
**A. Again, yes, that's how I answered the question before, so trainings, yes, that's how we trained our staff. We also said don't make a decision, escalate it up to my desk.**
Q. So you are the final authority for determining whether an organization or an individual is required to get a Parks Services permit?
**A. Yes, but if there's a question I will work with our Law Department and City Manager, yes, ma'am.**
Q. How do you work with those two other entities to determine that?
**A. Well, I report to the City Manager's office so I always want to let them know about if there's any question with anything, not just related to this. But if it's a legal issue, I will always reach out to the Law Department, so hopefully that answered that.**



Q. Okay. Have you provided any training to your employees about how they are to understand the term "general public"?
**A. Yes, I have.**
Q. And what have you told them about how that term is to be understood?
**A. Same response. Again, I'll go back to if it's a birthday party, wedding event, that's a private event. Anything that is for the public and you're not invited to, that's how we're related to this ordinance.**
Q. Have you spoken with anyone at the -- sorry, I'm going to blank on the name. I'm going to check my notes. Have you spoken to anyone at the Neighborhood Services Department about what is meant by the term, "general public"?
**A. I don't recall that, no.**
Q. Mr. Whitfield, are you aware whether Councilman Debra Stark has reached out to the Parks and Recreation Department about the Ordinance?
**A. I don't speak for the Council offices.**
Q. I'm asking if you're aware whether her office has reached out to the Parks and Recreation Department?
**A. I am aware, yes.**



Q. What has she reached out to the Parks and Recreation Department about?
**A. She didn't reach out to me.**
Q. What are you aware of -- I'm sorry. Scratch that.
Are you aware of what she reached out to the Parks and Recreation Department about?
**A. Not 100 percent. I'm not -- I know she's had conversations with Cynthia Aguilar, but I'm not aware of what the conversations were about.**
Q. Are you aware of whether the conversations were about the Ordinance?
**A. Drafting the Ordinance or anything regarding the Ordinance, is that what you're asking?**
Q. Anything regarding the Ordinance, yes.
**A. She does reach out to staff on a whole bunch of items, so yes.**
Q. Are you aware about what about the Ordinance she reached out to the Parks and Recreation Department about?
**A. I'm not aware.**
Q. All right. And so, I'm sorry, I kind of started down this road and I can kind of diverted us elsewhere, so I'm going to try to refocus my attention.

We began talking about the fact-finding endeavor. Okay. From my understanding, once it is determined -- once the Parks and Recreation Department determines that an individual or organization does need to seek a Parks Services permit, that individual or organization submits an application to the Department; is that correct?
**A. That is correct.**
Q. Can you walk me through the process of what takes place internally at the Parks Rec. Department after the application is submitted?
**A. Yeah, certainly. So application is submitted. Simultaneously, staff member who is over this service right now will work with the geographical divisions just to ensure there is no competing event for that date and location. Haven't had that yet, so once that's determined, a letter will go out from my desk approving the dates and locations for the permits.**
Q. And is the application reviewed by the Permit Allocation Committee?
**A. Permit Allocation Committee, yes.**
Q. What is the Permit Allocation Committee?
**A. Yeah, there's a few staff members that have been involved from the get-go and pulled from a few**



**different departments. But, again, we haven't received that many requests that there -- that we need to reach out to other departments to get that approved. I can approve it from my desk, if that makes sense.**
Q. I'm sorry. I guess I'm a little confused to the process. So an application is submitted. Is the application then the next step is reviewed by the Permit Allocation Committee or is there a process between that? If you don't mind, just kind of from the very beginning --
**A. Certainly.**
Q. -- after an application is submitted what's the process?
**A. So we didn't know how many applications we were going to receive, so we created an application committee, right, and they reviewed a couple, but we have not received a lot. So that's at my discretion now. So, actually, I don't need them to review any longer.**
Q. I'm sorry, so the Permit Allocation Committee is no longer in existence?
**A. It's in existence but I can approve all of them from my desk. It would be different if I was getting, like, 5,000 a week but I'm not.**



Q. Okay. So who is on the committee?
**A. Lisa Huggins from Neighborhood Services; Chief Sean Kennedy from the Police Department; Rachel Milne from the Office of Homeless Solutions. Dang, you're making me work on this. Dolores Ernst from the Fire Department, Brandie Barrett, one of my Assistant Directors; Todd Shackelford, other Assistant Director, myself, and then Cynthia Aguilar. I think I got them all.**
Q. So -- and I'm sorry. Please correct me if I misunderstood, but sounds to me like after the passage of the Ordinance, you all created this committee to address the applications that would come in, but you didn't have as many as you thought you would so the committee has kind of been placed on hold, and you now review applications yourself personally; is that correct?
**A. That's pretty accurate. Again, we didn't know how many requests we were going to get. I used to tell my team we're either going to get two or two million, and it was closer to two. So, again, we've given out 94 permits -- excuse me, 94 requests and given out 75 permits, so it's not as many as we thought we were going to get.**
Q. So has the committee met recently at all, you



know, in the last couple of weeks or anything?
**A. No. No, ma'am.**
Q. Do you all have any internal regular meetings about the Parks Services permitting process at the Parks and Recreation Department?
**A. Inside the Parks and Recreation Department we certainly do, yes.**
Q. Okay. How often are those meetings?
**A. Weekly.**
Q. Weekly? And what is addressed at those meetings?
**A. Anything and everything that's Parks Services permit related, how many applications we're getting, if there's any issues or challenges that we have; that's it.**
Q. Have you ever discussed Mr. Lance Brace or St. Herman's Table at any of those meetings?
**A. No, ma'am.**
Q. And these meetings are currently ongoing? They're weekly meetings?
**A. Yes.**
Q. When do those meetings occur?
**A. It depends on my calendar.**
Q. Okay. Do you recall if there was a meeting last week?

**A. Give me a second, I'll look.**
Q. Do you just recall off the top of your head?
**A. I believe so, yes.**
Q. Okay. Do you recall what was discussed at that meeting?
**A. Again, what I just mentioned, applications that are coming in, any issues. It was a pretty short meeting.**
Q. Okay. Can you walk me through -- we've kind of discussed the application process and I'll probably come back to it in a little bit, but I'm just trying to get a general overview of everything at this point.
Can you walk me through kind of what happens or what does happen on the day of a food distribution event for which a permit has been issued? I think I've seen that some park rangers do a pre-enforcement and post-enforcement kind of check of the park. So if you don't mind just walking me through the day of the permitted event, please.
**A. Yeah, certainly. Again, let me reiterate it's a new process so we're all learning. The day of the event, right, we've already talked about it's a three-hour event, our geographical division, and that's my deputy and a staff member, it's not a park**



**ranger, will go out and greet the organization, introduce themselves, make sure they don't need anything, make sure they've got their permit with them. Then they'll leave and they will come back at the end of the event and make sure that all trash picked up and see if there's any other questions. And I will share this with you, sometimes my team goes back there and the folks are gone already. So that's the extent of it.**
Q. Okay. I'm sorry, you said it was a deputy not a park ranger?
**A. Right. So at the beginning of my conversation, I'm the Director, two assistant directors, eight deputy directors and four of those are geographical deputy directors.**
Q. So it's one of, in whichever geographic location the park is located in, that deputy will go to that park, I assume?
**A. You assume correctly.**
Q. Does that deputy do both the pre-enforcement and post-enforcement check?
**A. They do. They do.**
Q. And what have you asked them to look for in those pre and post checks?
**A. Just what I mentioned, make sure they have**



**their permit, see if there's anything we can help them with, that's it. At the end they do submit a, kind of an event checklist. There's been no issues though.**
Q. Have you or anybody else in the Parks and Recreation Department that you're aware of asked that those post checks include a count of the number of homeless people at the park?
**A. No, ma'am.**
Q. Mr. Whitfield, are you familiar, I should say, with Cave Creek Park At Cactus?
**A. Yes, ma'am.**
Q. Are you aware of whether there is a dumpster at Cave Creek Park At Cactus?
**A. I'm not aware, but there should be a dumpster at all of our parks.**
Q. So I will represent to you, Mr. Whitfield, that the dumpster at Cave Creek Park At Cactus has been removed. Do you know why that is?
**A. I do not.**
Q. And kind of another silly, funny question, the bathrooms, I'll represent to you, Mr. Whitfield, the bathrooms at Cave Creek Park At Cactus are always locked. Do you know why that is?
**A. I do not. I'd have to talk to my Northwest**



**team about that.**
Q. That would be -- I'm sorry, your Northeast team, Northwest team would be the deputy that would handle that park's concerns?
**A. Yes, ma'am.**
Q. And who is that?
**A. Bob Adams.**
Q. All right. Mr. Whitfield, we've talked about this a little bit, but you said, I believe, and please correct me if I'm wrong, that you became aware of Mr. Brace and St. Herman's Table because of this litigation; is that correct?
**A. That is correct.**
Q. So you just didn't -- you weren't aware of them before this case was filed?
**A. I was not.**
Q. Okay. And are you aware that a court order is currently in effect prohibiting enforcement of the Ordinance against Mr. Brace and St. Herman's Table?
**A. I am aware of that.**
Q. Are you aware of what St. Herman's Table and Mr. Brace does, what they do at Cave Creek Park At Cactus on Thursday evenings?
**A. Not to an extent, but I understand they do feeding there. That's all I know.**

Q. Okay. Would you mind just kind of detailing a little bit more of what your understanding is of what they do?
**A. I can't because that's all I know.**
Q. When you say, "feeding," what do you mean by "feeding"?
**A. That's the extent that I know they do food distribution there.**
Q. Do you know who they distribute food to?
**A. I do not.**
Q. So does the Parks -- if it were not for the court order prohibiting enforcement of the Ordinance, would the Parks and Recreation Department consider Mr. Brace and St. Herman's Table subject to the Ordinance?
**A. If it's a public event, we certainly would, yes.**
Q. And I think we've covered this, but to determine whether it was a public event, your staff would engage in a fact-finding endeavor, as I've called it?
**A. That is correct.**
Q. Are you aware of whether the City or the Parks and Recreation Department, if you know, has ever received any complaints about Mr. Brace or



St. Herman's?
**A. I have not heard specifically about Mr. Brace. I just learned about him recently. Now, we've received a lot of complaints about the Cave Creek system, certainly.**
Q. What kind of complaints have you heard about the Cave Creek system?
**A. Trash, excessive trash, needles, vandalism, bodily fluids, feces, urine.**
Q. Were any of those complaints about Cave Creek Park At Cactus specifically?
**A. Ann-Marie, I'd have to go back. Seems like I remember our entire Cave Creek system. It's a system of five parks, so...**
Q. The Cave Creek system, is it a large park system?
**A. It's a large linear system, yes.**
Q. Okay. We've talked a lot about, of course, the issuance of the permits, the application, and I'm wondering what is your understanding as the Parks and Recreation Department Director of the ability of the City to revoke a Parks Services permit?
**A. Can you repeat that question? I think I got it. I just want to make sure I answer it correctly.**
Q. Yeah, and I probably didn't say it clearly.



**A. It was just long. It was just long. That's okay.**
Q. A lot of my questions are.
So as the Director, what is your understanding of the City, the City's ability or the Parks and Recreation Department's ability to revoke a permit, a Parks Services permit that has been issued?
**A. To revoke a permit? I'm not sure how to answer that because if a permit has been issued, we wouldn't revoke it unless there was an issue during the event, but that would still be something that I would confer with our legal team and City Manager's office on.**
Q. Okay. Have you had any discussions with anyone about revocation of Parks Services permits?
**A. I have not.**
Q. And would you agree, Mr. Whitfield, that revocation of the permits are not addressed, that's not addressed in the Amended Rules?
**A. I'd have to review those again.**
Q. Okay. That's fair. I'd like to pull up another exhibit. Let's see if I can do this correctly instead of flashing between exhibits and myself. Let's see.
Can you see this, Mr. Whitfield?



**A. If I could ask you just to make it a little bit bigger. My best friend needs to -- he's an optometrist, he needs to fix my other eye.**
Q. Is that better?
**A. That's good.**
Q. Cool. I've marked this as Exhibit 7.
(Exhibit No. 7 identified.)
BY MS. RENE:
Q. This is, I believe, an e-mail from Brandie Barrett. Do you know who Brandie is?
**A. I certainly do.**
Q. Who is Brandie?
**A. She's one of my assistant directors.**
Q. Okay. So she -- this is an e-mail from her and it looks like you are CCed on it as well as Todd Shackelford.
Do you see that?
**A. I do.**
Q. And who is Todd Shackelford?
**A. He's the other assistant director for our department.**
Q. Okay. You said there are only two assistant directors; is that correct?
**A. That is correct.**
Q. Okay. Do you -- so you're CCed on this

Page 82

e-mail, looks like with Todd, and there's a number of people that this e-mail was directed to. Could you please run through who each of these individuals are? If you need me to make it bigger, please let me know.

**A. No. My team, I know who these are. So Danielle Poveromo, she's the Northeast Division Deputy Director. Bob Berlin is a Recreation --**

Q. I'm sorry. I did it again. Sorry, go ahead.

**A. No, no. Did you hear about Danielle?**

Q. Yes, I did.

**A. Bob Berlin is a Recreation Coordinator III in the Northeast Division. Cynthia Peiz is a Management Assistant II in the Director's office. Jana Krcek is an Administrative Assistant II in the Director's office. Joe Diaz is the Deputy Director in our South Division. Teleia Galaviz is our Public Information Officer for our Department. Tony Salinas is the Deputy Director for our Downtown Division. And looks like Cindy got two e-mails that day.**

Q. Oh, you're right. Who is Jana?

**A. Jana is a our Administrative Assistant II in the Director's office.**

Q. Okay. So, I'm sorry, are these all Parks and Recreation Department employees?

**A. Yes, they are.**

Page 83

Q. Okay. So it looks like Brandie sent this e-mail to Danielle, and says:

"Danielle, would you be able to enter in the hard closure dates into the appropriate spot on these? Not the soft closure dates, just the hard closures where permits will not be granted."

So what are the hard closure dates?

**A. I think we discussed this earlier, but those are like, 4th of July, Easter. I think New Year's Eve. I don't have all of the dates memorized, my apologies.**

Q. Okay. No worries, but the hard closure dates like I would assume state and federal and county holidays; is that right?

**A. Yes.**

Q. And what about -- she next says, "not the soft closure dates."

What are the soft closure dates?

**A. I'm not certain what she meant by that.**

Q. So do you have any idea what she meant by soft closure dates?

MR. CABOU: Objection, asked and answered; calls for speculation.

**A. I have no idea.**

Page 84

BY MS. RENE:

Q. Did you follow up on this e-mail and ask her what she meant by soft closure dates?

**A. That was at the end of May. Unfortunately, I do not recall that.**

Q. What is your understanding of just a soft closure date in general?

**A. Again, I m not sure what that means.**

Q. All right. I'd like to show you another exhibit.

**A. Okay.**

Q. I'm sorry, I'm back. Can you see me?

**A. Yes.**

Q. Great. Let me try to get the next pulled up, see what I'm looking at here.

We talked about earlier, Mr. Whitfield, the first-come, first-serve policy. Do you remember that conversation?

**A. I do.**

Q. And you testified that the first-come, first-serve policy was the policy of the Parks and Recreation Department from the beginning; is that correct?

**A. Yes.**

Q. Okay. So I'd like to see if I can do this correctly.

Page 85

Can you see this spreadsheet, Mr. Whitfield?

**A. Yes.**

Q. Great. Do you need me to make it any bigger?

**A. Always.**

Q. Always, got it. This is a spreadsheet so I hope I can do this same way, otherwise -- I think I can zoom this way, right? There we go.

**A. Perfect.**

Q. Awesome. So I'll represent to you, Mr. Whitfield, this is a document we received from your office.

Do you see in the left column it says, "Allocation Period"?

**A. Yes.**

Q. And do you know what that refers to?

**A. I do.**

Q. What is the allocation period?

**A. That was the first period that was effective after the Parks Ordinance went into effect.**

Q. Okay. So this says, "Allocation period Summer 26." I assume, and please correct me if I'm wrong, this is the allocation period for Summer 2026; is that correct?

**A. Correct.**

Q. Okay. And the next column says, "Date Received," next column says, "Organization Name," next column says, "Main Point of Contact," the next column is "Contact E-Mail," the next column is "Date Requested" the next column is "Park Location 1." I'm sorry, the next column is actually "Time Slot," then the next column is "Park Location 1," "Park Location 2," "Park Location 3."

Do you see that?

**A. I do.**

Q. Okay. So, according to this spreadsheet, Billy's Way Home, an organization, submitted an application on May 11th of 2026.

Do you see that?

**A. I do.**

Q. And it looks, again, please correct me if I'm wrong, but my understanding of this document is that Billy's Way Home submitted an application on May 11, 2026, for June 6th, June 13th, June 20th, July 4th, July 11th, July 18th, August 8th, August 15th, and August 22nd.

Do you see that?

**A. I do.**

Q. And then Billy's Way Home applied for the time slots of 6:00 p.m. to 9:00 p.m.



Do you see that?

**A. Correct.**

Q. And Billy's Way Home requested Cave Creek Park at Sweetwater, Cave Creek Park at Larkspur, and its third park location looks like Cave Creek Park at Cactus; is that correct?

**A. Yes.**

Q. So it's my understanding again, that that would be the Cave Creek Park at Sweetwater location was Billy's Way Home first choice; is that correct?

**A. Park location number 1, yes.**

Q. Okay. Then the second column, Reclaimed Lives Inc., applied on May 16th of 2026.

Do you see that?

**A. I do.**

Q. And Reclaimed Lives, Inc., applied for 6/20, 7/18 -- I'm sorry, June 20th, July 18th, August 1st, and August 22nd.

Do you see that?

**A. Yes.**

Q. And Reclaimed Lives, Inc., applied for the 12:30 to 3:30 time slot and they requested first at -- for the first park location Cave Creek Park at Sweetwater and their second requested location was Cave Creek Park at Larkspur.



Do you see that?

**A. I do.**

Q. So under the first-come, first-serve policy, Billy's Way Home applied first on the May 11, 2026, date.

Do you agree with that?

**A. Correct.**

Q. And from my understanding, Mr. Whitfield, that would mean that Billy's Way Home should have received its requested dates if available, I understand July 4th was not available, but it should have received its requested dates at its first park location request; is that right?

**A. That is correct.**

Q. I'm sorry. I'm going to stop sharing real quick. Pull this up again. Let me make this bigger.

Can you see that?

**A. I do.**

Q. Great. I've marked this Exhibit 11.

(Exhibit No. 11 identified.)

BY MS. RENE:

Q. So we just discussed that pursuant to the first-come, first-serve policy, Billy's Way Home applied first and requested the Sweetwater location for June 20th. This is an e-mail. It appears to be



from you to -- it's from yourself to yourself and you're CCing Tannia Ruiz, and this looks maybe to me like a draft e-mail. Is that fair to say?

**A. Maybe, yeah.**

Q. Okay. And the subject line is Parks Services Briefing Sheet.

MR. CABOU: I'm sorry, Counsel, can you scroll up a little bit, because I think if we can read that, that might answer your question.

BY MS. RENE:

Q. I don't see a sent there. Did you mean to copy someone else there? I'm sorry.

**A. No. From me -- I'm at a loss on that one. Can you -- if it's okay, J, can you scroll down? I don't remember the --**

Q. Yeah. It looks to me it says, "Hi Cynthia," so I assume --

**A. Maybe -- no.**

Q. So you told me before that you gave briefings to the City Council and others about the Parks Services Ordinance; is that correct?

**A. No, that is incorrect.**

Q. Oh, I'm sorry. Who do you give briefings to?

**A. I give overall Parks and Recreation Department briefings to the Mayor and Council, yeah.**

**But they've been on break for the summer so...**

Q. Okay. Well, either way, this was an e-mail that you sent and you at least CCed Tannia Ruiz, and you are listing, ii looks like, the approved organizations and dates for the June -- I'm sorry, for the Summer 2026 allocation period.

Do you see that?

**A. I do.**

Q. And we just discussed that Billy's Way Home had applied first for the June 20th date at Sweetwater, but according to this e-mail, you gave the June 20th Sweetwater date to Reclaimed Lives, Inc.

Why did you do that?

MR. CABOU: Object to form.

**A. I would have to have a discussion with staff about that.**

BY MS. RENE:

Q. I'm sorry. I didn't quite understand you.

**A. No, I'll repeat. I would have to have a discussion with staff about that.**

Q. What would that discussion have to be?

**A. I'll have to ask what happened on that date.**

Q. Okay. So, and again, maybe I'm a little bit confused about the permitting process.



So are you personally reviewing the permit applications?

**A. The applications, no.**

Q. What is your review like in the permitting process?

**A. Earlier in the conversation, I mentioned that we have weekly meetings with our team on the permit services application process, so we review items at that time. Again, I'm running the third largest department in the city.**

Q. Do you recall whether Billy's Way Home's applications and Reclaimed Lives, Inc.'s applications came up in any of those meetings?

**A. I do not recall.**

Q. So do you have any explanation as to why the first-come, first-serve policy was not followed in this case?

**A. Again, Ann-Marie, I would have to talk to staff on that decision.**

Q. Do you agree the policy was not followed?

MR. CABOU: Object to form.

**A. I don't -- I don't agree to that.**

BY MS. RENE:

Q. Why do you not agree?

**A. Because I don't know the entire story so ...**



Q. All right. I'd also like to pull up another exhibit for you. I'm sorry, we're back to me, right? Cool.

And we discussed earlier, Mr. Whitfield, I believe you testified that Parks Services permits are only issued for three-hour increments; is that correct?

**A. Correct.**

Q. Okay. See if I can share this again correctly.

Can you see that?

**A. Make it a little bigger for me.**

Q. Sure. I thought I did, but maybe I didn't.

Can you see that?

**A. Can you make it a little bigger for me?**

Q. Sure. I think I can zoom in this way. There you go.

Can you see that?

**A. Much better. Thank you.**

Q. Great. So I've marked this one as Exhibit 4 [sic].

(Exhibit No. 14 identified.)

BY MS. RENE:

Q. This appears to be a letter from the City of Phoenix Parks Services addressing the Divas of Da



Desert, their request for a Parks Services permit; is that correct?

**A. Yes.**

Q. And is this your signature at the bottom?

**A. Looks like my electronic signature, yes, it does.**

Q. Okay. And according to this letter, the Divas of Da Desert, they were allocated a Parks Services permit for five hours, from 11:00 a.m. to 4:00 p.m. on July 25th.

Why did they receive a permit for five hours?

**A. If my memory serves me correctly, they had an event there that was the entire time frame, but our staff told them they needed to do their food services at the allotted two hours. I'd have to verify that with the team, but I believe that's my recollection.**

Q. Okay. So I'm sorry, I'm confused. According to this letter, the letter says that the permit was issued for five hours. But -- so was the permit issued for five hours?

**A. So if my memory serves me correct, they had an event there for five hours, not just food distribution. So our team told them you have to do food distribution at a certain time and they agreed upon it. I would have to verify that with our team**

**though.**
Q. Why was the permit issued for five hours?
MR. CABOU: Object to form; asked and answered. He told you what he remembers. He's been very earnest about it.
BY MS. RENE:
Q. I'm sorry, Mr. Whitfield, you can answer.
**A. I did in the previous answer.**
Q. So if they were only allowed to have their food distribution event for the two or three hours they're allotted under the Ordinance, why was the permit issued for longer than those three hours?
MR. CABOU: Object to form; asked and answered; misstates the testimony, misstates the record.
**A. Same answer.**
BY MS. RENE:
Q. Would you agree though that this letter reflects that the permit was issued for five hours?
MR. CABOU: Same objections.
**A. And again, this is a letter not the actual permit, but I'd have to talk to the team about it.**
BY MS. RENE:
Q. But would you agree, and this is a different question than what I had asked, would you agree the



letter reflects that the permit was issued for five hours?
MR. CABOU: Same objections.
You can still answer, Mr. Whitfield.
**A. No, I wouldn't agree with that.**
BY MS. RENE:
Q. Why would you not agree with that?
**A. Same response I just gave the last couple of questions.**
Q. I'm sorry. What was that response? Would you mind repeating it for me?
**A. For the third time, yes, again, there was an event there that was not just food distribution. I don't think at the time they knew when they were going to do the food distribution. So the team -- my recollection, the team worked with them on the specific time frame they did the food distribution.**
Q. Okay. Then I've got another exhibit I'd like to run by you.
**A. Okay.**
Q. And we talked a little bit earlier about revocation-issued permits, but I believe you testified you hadn't had any conversations with anybody about revocation of Parks Services permits; is that correct?



**A. That is correct.**
Q. And I'm sorry, just to clarify your testimony from earlier because I'm actually forgetting what you said, so I apologize.
Would you please clarify for me of what is your understanding of why a Parks Services permit can be revoked?
MR. CABOU: Objection; asked and answered.
**A. Once it's issued, and again, we have not had this situation, if there's an issue during the event that they're not following the Ordinance, we might consider revoking the permit.**
BY MS. RENE:
Q. Okay. So I will pull up another exhibit for you. Let me go ahead and make it bigger already so I don't have to do it.
**A. Thank you.**
Q. This one is kind of small text so I've tried to make it -- let's see what I can do here.
All right. Can you see this one?
**A. Yes.**
Q. And I've marked it as Exhibit 12.
(Exhibit No. 12 identified.)
//



BY MS. RENE:
Q. I think, Mr. Whitfield, this is a copy of an actual permit, a Parks Services permit that has been issued to Billy's Way Home; is that correct?
**A. It looks like it, yes.**
Q. I'm going to scroll down. I want to ask you first, is stipulations of use. The permit says:
"This is a nonexclusive use permit which means the approved park area is first-come, first-served; service event does not guarantee availability of park areas."
What is your understanding of that stipulation of use?
**A. And this is the case for all of our permits. We can't distinguish where folks are going to do activities unless it's, you know, a sporting event.**
**So to answer your question, what we're saying is here is your permit to do whatever, but there may be other patrons in the area.**
Q. Okay. And you raise a good point, something I didn't raise before so I'd like to ask you about now. For Parks Services permits that are issued for food distribution events, are those food distribution events limited to any parts of the park for which the permit is issued?

**A. No, but there obviously are prohibited areas. We're not going to allow that inside our swimming pool areas.**
Q. Sure. What are the other prohibited areas?
**A. Again, we would talk to whomever, but we wouldn't allow it in the playground area, on the sporting fields.**
Q. Okay. Anywhere else?
**A. I can't think of anything. But again, we'll work with whomever to make sure they can do it.**
Q. Okay. So now I'm going to try to understand this number 1, Stipulation of Use. If the park is already being used by another individual or organization and the permittee arrives with the permit, they cannot displace the users that are already there even though they have this permit; is that correct?
**A. I would need to know the entire ramifications of that. Some of our parks are up to 80 acres, so there's a lot of room there. Some of our parks are two acres. So, again, number one, is it's a nonexclusive use, so there could be other patrons at the location.**
Q. Let me ask you this: Is there any enforcement rights that come with being a -- that



come with being issued a Parks Services permit?
MR. CABOU: Objection, vague.
**A. Yeah. Can you repeat that, please?**
BY MS. RENE:
Q. Yes. Are there any enforcement rights that come with a Parks Services permit? So, for example, if, you know, if you had worked, your team had worked with a food distribution event organizer who said, I'm going to have my event on this day and this time and it was approved and issued a permit, and they arrived that day and somebody is in that place, would the deputies, for example, who are there, would they be able to help enforce the permit?
MR. CABOU: Same objection.
**A. I'm following the question. I'm not sure if "enforce" is the right term. We will work with the permittees and make sure that everyone can do what they have their permit for. I hope that makes sense. Again, our parks are very large so I'm sure we can figure it out.**
BY MS. RENE:
Q. Okay. Would the Parks and Recreation Department ask others to leave the park if the permittee had the permit to be there at that time?
MR. CABOU: Object to form.



**A. Yeah, really hard for me to answer without having the entire ramification of what's going on.**
MR. CABOU: Counsel, when it's convenient for you, I'd like to take a quick break.
MS. RENE: Yeah, sure. Let's go ahead and do that right now. So maybe come back at like -- I'm sorry, what time is it there? 10:19? 11:19?
MR. CABOU: 11:19, yeah.
MS. RENE: How about 11:30, does that work?
MR. CABOU: Sure. Thank you. I appreciate it.
THE COURT REPORTER: Off the record at 11:19.
(Recess taken, 11:19 a.m. - 11:32 a.m.)
THE COURT REPORTER: Back on the record at 11:32.
MS. RENE: Awesome, thank you.
BY MS. RENE:
Q. And, I'm sorry, I think I had an exhibit pulled up. I want to share my screen again. See if I can do that again.
All right. Mr. Whitfield, do you see this again?
**A. Yes.**



Q. Cool. So we just talked about the first Stipulations of Use. And I wanted to scroll down some more. There it is.
So here in the middle of this, I think it's the third and final page -- I'm sorry, page 2 of 3, it looks like, it says, "Permit Revocation At Will."
Do you see that?
**A. I do.**
MR. CABOU: Just so we're clear, it says, "Permit Revocable at Will."
MS. RENE: I'm sorry. Thank you, J. It does say, Permit Revocable at Will. Yes, that is correct.
BY MS. RENE:
Q. And it says, I believe:
"This revocable permit is subject to revocation at any time in the discretion of the City Council or by the City Manager or his designee. Such discretion shall be controlled solely by consideration of the best interests of the City of Phoenix, which may include but are not limited to violation or breach of any federal, state or City of Phoenix law, ordinance, code, rule, regulation, court decree or any condition of

this permit."
Do you see that, Mr. Whitfield?
**A. I do, yes.**
Q. So I know you had testified earlier that you hadn't discussed revocation of Parks Services permits with anyone, but based off this reading, what is your understanding of permit revocation of Parks Services permits?
**A. Again, I'll repeat that we have not had any issues with our Parks Services permits. If someone receives a permit and is not adhering to the permits or the ordinance, we would have the discretion to revoke it.**
Q. Okay. Great. Thank you. I'm going to stop sharing for a moment.
Mr. Whitfield, do you -- have you heard of an organization called the Norton Vista Neighborhood Association?
**A. Say that one more time, be sure I heard it correctly.**
Q. Yep, the Norton Vista Neighborhood Association.
**A. Norton Vista. It does not sound familiar. I mean, we have a Norton park but ...**
Q. Okay. Great. Well, I'm going to show you,



I'm sorry, another exhibit. Let me figure out which one I'm trying to pull up here. And let me try to make it big again. Let me share my screen.
Can you see this picture, Mr. Whitfield?
**A. Yes, I can.**
Q. Okay. I think it says, "Sunnyslope Celebration, Cars: Games, free food, music, free movie."
Is that what it looks like to you?
**A. Yes.**
Q. And it says, "Norton Park 6/20, 6PM, movie 8PM."
NSD, do you see that little logo at the bottom?
**A. I do.**
Q. I believe that's the Neighborhood Services Department; is that correct?
**A. That is correct.**
Q. Okay. Mr. Whitfield, looking at this poster, do you believe that this event would require a Parks Services permit?
MR. CABOU: Object to form; calls for speculation; assumes facts not in evidence; lacks foundation. It's a poster.
**A. Again, I don't know the full ramification of**



**the event, and it looks like Neighborhood Services put this on.**
BY MS. RENE:
Q. Okay. So what does that mean? I'm sorry.
**A. Looks like the event that's sponsored by our Neighborhood Services Department. So they would be the ones that work with Norton Vista Neighborhood Group on the event.**
Q. Would this type of event with free food and games need a Parks Services permit?
MR. CABOU: Same objections.
**A. Again, without knowing the entire ramification of the event, it's hard for me to make a determination.**
BY MS. RENE:
Q. Okay. What type of information would you need to make a determination?
**A. Again, I'll repeat, whether it's an event that's open to the public or a private event would be where I'd start.**
Q. Okay. Does this -- in your opinion, does this look like it's open to the general public?
MR. CABOU: Same objections.
**A. I couldn't determine that.**
**//**



BY MS. RENE:
Q. So, Mr. Whitfield, I'll represent to you that this poster came from the Norton Vista Neighborhood Association's Facebook page. And I know we discussed earlier that you have discussions with the Neighborhood Services Department regularly; is that correct?
**A. I have discussions with them, sure. Regularly is different for different people.**
Q. Okay. Did you discuss this event with the Neighborhood Services Department?
**A. I do not recall discussing this event, no. Events normally don't get to my level unless it's Parks Services or something else.**
Q. Okay. And, I'm sorry, so you said you would have to ask some facts to determine whether this event would need a Parks Services permit to determine whether it was open to the general public; is that correct?
MR. CABOU: Object to form.
**A. I would need to know more information about the event, yes.**
BY MS. RENE:
Q. What kind of questions would you ask?
**A. Again, I would ask if the event is open to**

Page 106

**the public or a private event. That's where I would start.**
Q. And if anybody could go to this event, would you consider it open to the public?
**A. If it did not have an invite list and was open to the public, yes.**
Q. I'm sorry. I'm going to pull up another exhibit here. Would there be any other questions you would ask about determining whether it was open to the public aside from if there was an invite list, any questions?
**A. I think that depends on the answer to the first question. It's hard to speculate.**
Q. I'm going to pull up -- see if I can do this again. I'm sorry, Mr. Whitfield, we talked a little bit earlier about the Special Request Activity permit at the beginning.
Is that required, a Special Activity Permit, is that required if an event features tents or canopies?
MR. CABOU: Object to form.
**A. You know, I'm not certain. I do not believe so, but tents are not allowed in our parks anyway.**
BY MS. RENE:
Q. Okay. What about canopies, are they allowed

Page 107

in your parks?
**A. They are.**
Q. But the Special Activity Permit is required if more than 50 people attend the event?
**A. We ask for folks to fill that out if more than 50 people, yes.**
Q. Okay. And I'm sorry, the permit is required for more than 50 people; is that correct?
**A. We ask them to fill out the Special Activity Request so we know if it's over 50 people what we ask -- we want to know what's going on for the event. And again, like I mentioned before -- I don't think I mentioned it, but alcohol needs a permit, inflatables need a permit, and then amplified sound needs a permit.**
Q. I'm sorry. This is totally for my clarity. If there's no alcohol, inflatables, amplified sound and it's just 50 people gathering in the park, does that require a permit?
**A. Fifty or more, no, it does not.**
Q. Okay. Got you. I'm sorry. Let me pull up another exhibit.
I'm sorry, Mr. Whitfield, what do you mean by amplified sound?
**A. If there's a loud speaker or something or**

Page 108

**music, that requires a permit.**
Q. Is there a decimal level requirement or ...
**A. I believe there is. I don't know that offhand.**
Q. Okay. What about large screens, is there a requirement for a large movie-type screens?
**A. You know, I'm not sure. I'd have to double-check with the team on that one.**
Q. Okay. So, Mr. Whitfield, I just showed you a poster of an event that the Norton Vista Neighborhood Association held on June 20th. And I believe you testified that, you know, you'd have to gather some more facts before figuring out if that event would have required a Parks Services permit; is that correct?
MR. CABOU: Object to form.
**A. That is correct.**
BY MS. RENE:
Q. Now that you've become aware of that event, do you intend to seek any enforcement of the Parks Services permitting or the ordinance against the Norton Vista Neighborhood Association?
**A. For a future event I'm assuming you're asking about?**
Q. Well, I'm asking the -- it sounds like the --

Page 109

would you agree that the Norton Vista Neighborhood Association may have violated the Ordinance?
MR. CABOU: Objection, calls for a legal conclusion; lacks foundation; calls for speculation. You haven't even established they held that event. All you've established is you have a screenshot of something from a Facebook page.
BY MS. RENE:
Q. All right. Mr. Whitfield, I'll show you some pictures of the event. Just give me a moment, please.
And I will also represent to you, Mr. Whitfield, that these images from the Norton Vista Neighborhood Association Facebook page.
Can you see this?
**A. I can, yes.**
Q. It looks like there are -- and these I will represent to you, Mr. Whitfield, these photos are on the Neighborhood Association's Facebook page of the June 20th event that was held at Norton Park. So I'll scroll through some of these.
That looks like a movie screen to me which they projected the movie Cars based off of the photo, the marketing photo that we just discussed, the advertisement.

Then I'll scroll down more. And it looks like they had amplified sound out here. It looks to me like some speakers.

Again, it looks like they're starting to project some things for the movie to be shown. I assume the movie was loud enough for everyone to hear.

MR. CABOU: Counsel, I'm sorry, but, like, this is not a form for you to narrate pictures that neither you or the witness took and make conclusions. You can argue that for sure, but he has already said he doesn't know what this is. He said he didn't take the pictures himself. What are we doing?

MS. RENE: I'm asking Mr. Whitfield.

BY MS. RENE:

Q. Mr. Whitfield, do you believe that the Norton Vista Neighborhood Association may have been required to get a Parks Services permit for that June 20th event?

**A. I am not sure without all the information.**

Q. Do you intend to look into whether they should be given a warning for a possible violation of the Ordinance?

**A. Again, it's a new ordinance. We're trying to**



**make it better. I can certainly talk to the team and Neighborhood Services about it.**

Q. So do you intend to seek enforcement of the Ordinance potentially against the Norton Vista Neighborhood Association?

MR. CABOU: Object to form.

**A. Yeah, not seek enforcement. I will ask a few questions about the event, certainly.**

BY MS. RENE:

Q. Do you intend to issue a warning?

**A. I will have to --**

MR. CABOU: Calls for speculation; asked and answered.

**A. I will have to see what the event was all about.**

BY MS. RENE:

Q. I'm sorry, I'm going to take a look. If you determine that the event was open to the public, is that the end of your investigation?

MR. CABOU: Objection, assumes there's going to be an investigation, or that he ever planned an investigation. Lacks foundation; calls for speculation.

**A. Again, I'll discuss with the Neighborhood Services Department and find out what the event was**



**and go from there.**

BY MS. RENE:

Q. Based on the photos we just looked at, do you believe that the Norton Vista Neighborhood Association was required to get a Special Activities Permit?

MR. CABOU: Same objections.

**A. I'm not certain without all the information.**

BY MS. RENE:

Q. So I believe, Mr. Whitfield, you testified earlier that the Parks and Recreation Department has taken enforcement actions against at least one or two other organizations.

Do you recall the basis for their violation in that case?

**A. It was education, yes. Van Centers is the only one I can remember, and they were -- I'd have to go back. I think they were doing food distribution without a permit. Again, I cannot recall the other organization's names.**

Q. I'm sorry, you don't recall what type of organization Van Centers is?

**A. I do not.**

Q. Okay. I'd like to show you another exhibit, please. Bear with me. Let's see if I can do this,



one, two. I'm going to make it big. Let's see.

Can you see that, Mr. Whitfield?

**A. Thank you.**

Q. Cool. So I've marked this one as Exhibit 13.

(Exhibit No. 13 identified.)

BY MS. RENE:

Q. This is an e-mail from Cynthia Peiz to you with the subject Parks Ordinance. But I'm going to scroll down to the beginning of the e-mail chain so we can get the full context.

**A. Okay.**

Q. So I believe this is an e-mail -- let me make sure that's the first page. Let me scroll down all the way. Yep. Okay, cool. That is definitely the first e-mail chain.

And this looks like an initial e-mail from you to Cynthia and others detailing that you're going to issue these permits at these times. And I'm sorry, I'm going to scroll up. That's where the conversation begins.

Do you see that?

**A. I do.**

Q. And then somebody from the Neighborhood Parks Services Department, Lisa Huggins-Hubbard, I believe is her name, reaches out directly to you and asks:

"Marty, do we have any additional information on the Love Our City Outreach that is feeding at the University? Are they a nonprofit? I only ask as what I am finding is they may be associated with the New City Church that is holding events across the street from Hance Park."

Did I read that correctly?

**A. The only thing is feeding at the University Park to be -- clarify that.**

Q. Okay. She says, University, but it's University Park?

**A. Yeah. We know what she's talking about.**

Q. Okay. And then I believe you said:

"Hi, Lisa, let me check with Cindy on our team who manages our permit process @Cindy. Do you have any additional information about Love Our City Outreach? Did they provide a website on their application?"

**A. Uh-huh.**

Q. I believe Lisa responds to you -- I'm sorry. Cynthia, who was CCed on your e-mail responds:

"Hi, Lisa, yes, Love Our City Outreach are a nonprofit and they are associated with New City Church. They did not provide a



website with their application."

So I'm trying to understand why -- I'm sorry, I'm going to scroll back down again -- why there would be an inquiry about an outreach that is having a feeding at the University Park? She asks -- Lisa indicates, "I only ask as what I am finding is

they may be associated with the New City Church that is holding events across the street from Hance Park."

What was your understanding of Lisa's concerns in this e-mail?

**A. Again, I'm not going to speak for Lisa, but this is just her inquiring about feeding in or around our parks. So she's on our team. We responded accordingly with what we knew.**

Q. Is there anything prohibiting food -- I'm sorry. Is a feeding a food distribution event? Am I understanding that correctly?

**A. I'm sorry, repeat your question, please.**

Q. Is a feeding -- are you aware of whether a feeding is the same as a food distribution event?

MR. CABOU: Objection; calls for a legal conclusion; lacks foundation.

**A. Yeah, I'm not sure how to answer that.**

**//**



BY MS. RENE:

Q. This says, "Marty, do you have any additional information on the Love Our City Outreach that is feeding at the University.

I'm sorry. Let me scroll down because that might make it clear. Because it looks like Love Our City Outreach is at University Park and has been provided a permit, a food permit type.

**A. Correct.**

Q. So the feeding, is it your understanding that she meant a food distribution event?

**A. That's my understanding, yes.**

Q. Okay. So she asks, "I only ask as what I am finding is they may be associated with the New City Church that is holding events across the street from Hance Park."

What was your understanding of her concern?

**A. Again, I'll repeat, I'm not certain on what she's after, but I do know New City Church is across the street from Hance Park, and they do hold food distributions or feeding, whatever you'd like to call it, and a lot of that trash does end up in our parks, so maybe that's what she was asking about.**

Q. So would that have affected or does it affect Love Our City Outreach's ability to apply for permits



if they were associated with the New City Church?

MR. CABOU: Object to form.

**A. Not at all. Not at all.**

BY MS. RENE:

Q. And I believe Lisa -- I'm sorry. Cindy responded: "Hi Lisa, Yes, Love Our City Outreach are a nonprofit and they are associated with New City Church."

So it sounds like Cynthia did look into Love Our City Outreach, their nonprofit status and whether they were associated with New City Church. Is that your understanding of her response?

**A. She probably Googled them, yeah.**

Q. Does your team regularly look into the nonprofit status of organizations that apply for Parks Services permits?

**A. We do not.**

Q. Does your organization consider the religious affiliation of nonprofits -- I'm sorry, of organizations that apply for Parks Services permits?

**A. We do not. We do not discriminate against anyone.**

Q. But they did look into it in this instance; is that correct?

**A. Again, I'm not sure what Lisa's inquiry was**

**completely about. She asked our Department. We gave a response. I have not heard anything since. We did give Love Our City Outreach permits.**

Q. Were you aware of Love Our City Outreach before this e-mail?

**A. They might have applied for a permit before, but do I know them, no, I do not.**

Q. Okay. All right. I'm sorry, just one moment, please.

Okay. So I think, Mr. Whitfield, we've spent a lot of time trying to discuss various terms in the Ordinance and Amended Rules here today. And an organization's -- I guess my question now is if an organization is out in a park distributing food and does not have a permit, if one of your deputies were to approach that organization and the organization were to inform your deputy that the event was being held for friends, how have you directed, if at all, your deputies to respond?

**A. Yeah, I haven't directed them. That has not happened. If it does happen they are to escalate that up to my desk.**

Q. Have you considered what you -- how you would address such a circumstance?

**A. I would work with the Law Department or the**



**City Manager's office on a response.**

MS. RENE: So I'm getting pretty close, yeah, to the end here. So why don't we -- so it's noon y'all's time; is that correct?

MR. CABOU: Yeah, that's right.

MS. RENE: Can we break for 15 -- can we do 20 minutes, is that too much to ask? And then come back. We definitely should be done by 1:30 after that.

MR. CABOU: Yeah, if you need 20 minutes that's okay, but if we could take less that would be good too.

MS. RENE: Okay. Let's come back at 12:20 y'all's time.

MR. CABOU: Yeah, thank you.

THE COURT REPORTER: Off the record at 12:00 p.m.

(Recess taken, 12:00 p.m. - 12:21 p.m.)

THE COURT REPORTER: We're back on the record at 12:21.

MS. RENE: Awesome, thank you.

BY MS. RENE:

Q. All right, Mr. Whitfield, I have a handful of questions to ask you. I'm going to first start with is a charitable organization feeding the homeless



subject to the Parks Services permitting requirement?

MR. CABOU: Object to form.

**A. I think I've answered this before, but everyone is subject to the Parks Services permit.**

BY MS. RENE:

Q. So a charitable -- and I'm sorry. I'm going to request a yes or no answer. Is a charitable organization feeding the homeless subject to the Parks Services permit requirement?

MR. CABOU: Object to form; vague; calls for speculation.

**A. It's the same answer that I have.**

BY MS. RENE:

Q. Which is?

**A. All individuals or organizations that are subject to the Parks Services permit if they are doing food distribution or medical treatment to the public.**

Q. So is that a yes? I'm sorry. I didn't hear you.

**A. I didn't say anything else.**

Q. Well, is that a yes? Is a charitable organization that is feeding the homeless in a Phoenix city park required to get a permit under the Parks Services permitting scheme?



MR. CABOU: Same objection.

**A. It's the same answer.**

BY MS. RENE:

Q. Well, I'm sorry, Mr. Whitfield. I need a yes or no question to that.

**A. I'll repeat it again. Any individual or organization that is doing food distribution or medical treatment in our 105 eligible parks does require a permit.**

Q. So is that a yes?

**A. Feeding to the public.**

Q. So a charitable organization feeding the homeless, do they need a permit?

**A. Yes, they need a permit if they're feeding the public.**

Q. And the homeless -- the public includes the homeless; is that right?

MR. CABOU: Objection.

**A. Yeah, public is all persons, could be all persons.**

BY MS. RENE:

Q. Okay. What about a humanitarian organization feeding the homeless in Phoenix city parks, do they need to get a permit?

MR. CABOU: Same objections.

**A. Again, the City of Phoenix does not discriminate against anyone. I'll repeat it for the umpteenth time. An individual or organization that is doing medical treatment or food distribution in the 105 parks in the public does need a permit.**

BY MS. RENE:

Q. But that doesn't answer my questions, Mr. Whitfield.

MR. CABOU: It does answer your question, Counsel.

MS. RENE: No, it doesn't.

MR. CABOU: Is there a stipulation we can offer here? Like, what is the problem?

MS. RENE: The stipulation is he is not answering a yes or no --

BY MS. RENE:

Q. The question is a charitable organization feeding just the homeless, let's just say just the homeless in a Phoenix city park, do they need to get a permit under the Ordinance?

MR. CABOU: And I think where we're having some difficulty, and again, the facts are the facts. I'm confident that Mr. Whitfield is trying his level best to answer your questions. The facts are the facts. Like, he said that anyone who is



doing conduct covered by the Ordinance needs it, irrespective of what kind of organization they are or who they are. It's about --

MS. RENE: So then why can't he answer the question yes or no? I don't understand why it's a hard question.

MR. CABOU: He's trying his best, but I also think your question is incomplete and at times assumes things that just aren't true and it's very difficult to follow. So if you want to talk about this separately, we're not trying to -- I want to make an accurate record.

MS. RENE: Well, first of all, you know, J, if Mr. Whitfield does not answer the question yes or no we are going to hold this deposition open.

MR. CABOU: You can try that but we're going to oppose it. He's answered this question.

MS. RENE: You can do that but no he hasn't --

(Speaking simultaneously.)

MR. CABOU: Is there a fact that you don't, like, you don't really understand at this point?

MS. RENE: Yes, I am --

MR. CABOU: What is the thing?



BY MS. RENE:

Q. Okay, how about -- Mr. Whitfield, first of all, you do need to answer my question, first of all, but I will try this one with you, Mr. Whitfield. Is any organization that is feeding the homeless in a Phoenix city park subject to the Ordinance?

MR. CABOU: Objection; lacks foundation; assumes facts not in evidence; calls for speculation. If someone -- the fact that someone is or isn't homeless, Mr. Whitfield already testified that's not the sorting principles. The sorting principle is, is the event open to the public.

If I have -- if my brother happens to be homeless and I hold an event where he is among 15 people I invite, like, that's not open to the public but he's homeless.

MS. RENE: But he's also a member of your family so that doesn't -- I mean you're confusing different terms of the Ordinance.

MR. CABOU: What I'm trying to point out is that your question doesn't account for all the possible --

(Speaking simultaneously.)

MS. RENE: Okay, then let me -- thank you. I'll clarify.



BY MS. RENE:

Q. Mr. Whitfield, a charitable organization that is feeding just the homeless whom they are neither related to, who they are not related to, are they required to get a permit under the Ordinance?

**A. Again, it doesn't matter about the organization. If it's open to the public they would be required to get a permit.**

Q. So is the answer yes to that question?

**A. Ma'am, that's the best answer I can give you.**

Q. That's really not an answer, Mr. Whitfield.

**A. I disagree.**

Q. I'm asking you is any organization that is just feeding homeless people that they're not related to required to get a permit under the Ordinance? That's a simple yes or no question.

MR. CABOU: It's not because there are numerous things. I object for the same reasons. Like, they don't have to be related. They could be friends. They could be family. I could invite them to my wedding. I understand the argument you guys want to make. I respect that argument. I disagree with it vigorously, but I respect it. What I don't understand is what facts are literally still in question.

MS. RENE: All right. Well, we are going to have to hold this deposition open until Mr. Whitfield gives a yes or no answer to that.
MR. CABOU: He has answered your question multiple times.
MS. RENE: He has not answered the question, J.
MR. CABOU: He absolutely has. We disagree with your characterization but the record will speak for itself. If you have a legitimate continued lack of understanding about anything we welcome you to reach out to us for that and we'd be happy to consider a stipulation.
BY MS. RENE:
Q. Mr. Whitfield, is St. Herman's Table required to get a permit under the Ordinance to feed the homeless?
MR. CABOU: Same objections.
BY MS. RENE:
Q. What facts are missing? What more facts do you need to, Mr. Whitfield, to make that determination?
**A. Again, any organization that is doing medical treatment or food distribution in our eligible parks to the public will required to get a permit from the**



**City of Phoenix.**
Q. Let's walk through that element by element.
**A. Okay.**
Q. Any organization, and we'll fill in the facts together, how about that? Any organization, we're going to say St. Herman's Table is my client. So any organization, St. Herman's Table, and they're doing food distribution. They are distributing food in a Phoenix city park at Cave Creek Cactus on Thursday nights, Thursday evenings, to the homeless, to homeless people.
What other facts do you need to make a determination of whether they need to get a permit under the Ordinance?
**A. Is the event open to the public; if so, they would need a permit.**
Q. That's what I need to understand. What facts do you need to determine whether it's open to the public?
**A. I think we talked about a little bit so far, but again, I'll give you some examples; is it a wedding reception; is it a birthday party.**
Q. So it's not a wedding reception. It's not a birthday party. What other facts do you need?
**A. Is it a private event?**



Q. What do you mean by "private" so I can give you the facts that you need?
**A. Yeah, private is you've invited people that you know. So I'm not sure if you have children, would you invite my children to your birthday?**
Q. I would indeed. So I want to keep going down. This is helpful to me, Mr. Whitfield. This is very helpful.
I will represent to you that St. Herman's Table, every Thursday night, feeds the homeless and distributes food to the homeless, that Mr. Brace knows some of them, has formed significant friendly relationships with many of them but not always. Sometimes additional people will show up, homeless people that he has not met before.
So does he need to get a Parks Services permit with those facts?
**A. Our permit is right now he would need to get one. The Ordinance, how it's written, he would need to get a permit.**
Q. Okay. Thank you. I appreciate that.
And the same answer under the Amended Rules, correct? When we say, "permit, we're talking about both the Ordinance and the Rules, correct?
**A. Correct.**



Q. Okay. Thank you. And I don't think we covered this, but again, I think it's clear but I just need to confirm with you. Under both the Ordinance and current Amended Rules, only two permits per park can be issued per month; is that correct?
**A. Of the eligible 105 parks, that is correct.**
Q. And Cave Creek Park at Cactus is one of those eligible parks; is that correct?
**A. Yes. Like I mentioned before, it has a few parks in the Cave Creek system, but yes.**
Q. And that means that Mr. Brace and St. Herman's cannot, under the Ordinance, would be unable to continue their weekly food distribution under the Ordinance and the Amended Rules; is that correct?
MR. CABOU: Object to form.
**A. Can you repeat that just to make sure I've got --**
BY MS. RENE:
Q. Yes, I'm sorry. I'll clarify. Mr. Brace and St. Herman's, they're feeding -- they do a food distribution event every week. They're at Cave Creek Park every single week. Under the Ordinance and the Amended Rules as they currently are, only two permits per month are issued for Cave Creek Park At Cactus.

Page 130

So Mr. Brace and St. Herman's Table would be in violation of those rules and the Ordinance if they were out there every single week; is that correct?
**A. That is correct. So, again, let me clarify. 105 parks we will allot up to two permits per month per park. So yes, you are correct.**
Q. Okay. Thank you. And then, you know, we just kind of walked through the facts, and that was helpful for me to give you the facts that you need to make a determination, so I appreciate that.
And just for total clarity, your fact-intensive endeavor is something that happens to determine the organizations that are subject to the Ordinance, correct?
MR. CABOU: Object to form; misstates the testimony. It has nothing to do with the organizations. It has to do with the event. He's already testified several times that all persons and organizations are subject to the Ordinance if they're conducting qualifying activity.
BY MS. RENE:
Q. Mr. Whitfield, I'm sorry, what was your answer to that?
**A. I think I got your question right. Yes, our team will reach out to all organizations to have fact**

Page 131

**finding between the City and the organization to determine the permit.**
Q. Excellent. Thank you. And then I think you said that fact-intensive inquiry also happens to determine, like we just did, whether the event is open to the public; is that correct?
**A. That is correct.**
Q. And then, I think, that fact-intensive inquiry also occurs to determine whether a food distribution event is a private gathering, correct?
**A. We will ask those questions, correct.**
Q. So, and that fact-intensive inquiry also occurs to determine whether the friends or family are being served so that the Ordinance would not apply; is that correct?
MR. CABOU: Object to form.
**A. We just ask if it's a public or a private event.**
BY MS. RENE:
Q. Okay. And the private inquiry, what you might ask or you would ask that whether it's friends or family being served; is that correct?
**A. We might.**
Q. What else -- in any of those fact-intensive inquiries, and I know you said earlier that for the

Page 132

inquiry -- and we should take it one by one, I'm sorry.
The inquiry for open to the public, one of the questions you would ask is did you send out invites, did you, you know, just invite certain people. What other questions under that inquiry would you ask to determine whether it was open to the public?
**A. I have to ask my staff member what she asks.**
Q. I'm sorry. So this would be a staff member who would be reaching out and getting that information for you?
**A. Yes.**
Q. Do you have any idea what kind of questions you would ask in the private gathering inquiry?
**A. Again, I'll ask the staff member, but have invites gone out, probably something we would ask.**
Q. And then anything else comes to mind that you would ask in that inquiry?
**A. Not that comes to mind.**
Q. Then once that staff member gathers that information, he or she reports that back to you and you make the ultimate determination as to whether the Ordinance applies; is that correct?
**A. If they have a question about it, yes.**

Page 133

Q. What do you mean "if they have a question about it"?
**A. If the staff member can't make the decision, but I'm the ultimate decision-maker, yes.**
Q. Okay. Thank you. I'm going to show you one more document. I think I have an easier question for you for this one, Mr. Whitfield. Make sure I have the right one.
Can you see this document that I marked as Exhibit 2?
(Exhibit No. 2 identified.)
**A. Yes.**
Q. Great. And just I'm going to scroll through. I think -- there's 25 pages, so I'm just going to scroll through and briefly review it with you. It's obviously Medical Treatment and Food Distribution in Parks Ordinance. It looks like a PowerPoint presentation to me.
Do you recognize this document?
**A. I certainly do.**
Q. Great. Let me just -- if you need it bigger, I'm sorry. Let me keep scrolling.
**A. I'm good. Thank you, though.**
Q. Great. I'm just going to go all the way through just so I can confirm.

So, Mr. Whitfield, I'm going to go to the very beginning again to make sure I get the right title. This looks to me like a Medical Treatment and Food Distribution in Parks Ordinance Parks Employee Training.

Is this a training PowerPoint presentation that is presented to the Parks' employees?

**A. Yes, it is.**

Q. Is this a true and accurate copy of that training?

MR. CABOU: Counsel, you haven't shown him everything. I mean, we Bates stamped documents.

MS. RENE: Yeah, I asked if you would be willing to authenticate -- sorry, stipulate to the authenticity of documents. So if you guys are willing to stipulate to the authenticity, this is the Bates stamped number, J. And my AI assistant thing is popping up over it but the Bates number is there.

MR. CABOU: Yeah. So you're telling me all you did was add the heading Exhibit 2 to a document that we have produced with a Bates stamp that begins with --

MS. RENE: Oops. I'm sorry. Let me pull that back up. Where did it go?

MR. MCFARLAND: 3249.



MS. RENE: Would you repeat that, J? I'm sorry.

MR. CABOU: Yeah. So what you're saying is in preparation for the deposition you added the heading that says Exhibit 2 to the document that we produced which starts with COP003249 and ends with COP --

MS. RENE: Let's go to the bottom. COP -- looks like 3273.

MR. CABOU: Yeah. We will stipulate that we produced that.

MS. RENE: Okay. And that is an authentic copy of the training materials provided to the Parks and Recreation Department employees?

MR. CABOU: That's something you'd have to lay a foundation for. I don't know what happened to every document but I'm happy to stipulate that it was produced to us, and it is a document of the City of Phoenix, but beyond that I can't offer that stipulation because I just don't know.

MS. RENE: All right. Well, that's what I'm asking Mr. Whitfield.

BY MS. RENE:

Q. I'm sorry, Mr. Whitfield, that I did put Exhibit 2. J makes a good point and I apologize for



that, but I did put Exhibit 2 at the top and that is the only --

MR. CABOU: There's no apology needed. I just want to be clear.

MS. RENE: Yeah. Thank you, J. I appreciate it.

BY MS. RENE:

Q. I'm sorry, Mr. Whitfield, is this an authentic copy of the Parks Services training materials?

**A. That is the document that our team used to train the City of Phoenix Parks employees, yes.**

MS. RENE: Thank you. Awesome. Let me stop sharing my screen. Great. Yeah, and that, I think, wraps up all of the questions I had for you here today, Mr. Whitfield. So thank you for your time. I really appreciate it.

**THE WITNESS: Thank you. I appreciate it.**

THE COURT REPORTER: Mr. Cabou, do you want an e-Tran?

MR. CABOU: Well, first of all, I have no questions. I would like an e-Tran and I would like it as fast as you can get it to me.

THE COURT REPORTER: And read and sign or



waive?

MR. CABOU: We'll read.

THE COURT REPORTER: The time is 12:42 p.m. we are now off the record.

(Deposition concluded at 12:42 p.m.)

(Plaintiff's Exhibits were marked after the conclusion of the deposition.)

(Witness reserves signature.)

* * * * *

SIGNATURE PAGE

I, MARTIN WHITFIELD, a deponent exercising my right to read and sign my deposition taken on 08/31/2026 at the aforementioned time and place, do hereby attest to the correctness of the transcript (or make changes under separate cover) under penalty of perjury by placing my signature hereon on this day of , 2026.

MARTIN WHITFIELD



C E R T I F I C A T E

I, RACHELLE FORD, do hereby certify that the foregoing 137 pages constitutes a full, true and accurate transcript of all proceedings had in the above matter, all done to the best of my skill and ability.

DATED this 2nd day of September, 2026.

/s/ Rachelle Ford
RACHELLE FORD, RPR
Certified Reporter
Certificate No. 4003



GRIFFIN GROUP INTERNATIONAL -ERRATA SHEET - CHANGES IN TESTIMONY
3200 East Camelback Road Suite 177 Phoenix, Arizona 85018
Martin Whitfield - August 31, 2026
St. Herman's Table vs City of Phoenix
Errata & Signature due no later than October 6, 2026.

| PAGE | LINE | CORRECTIONS/CHANGES | REASON |
|---|---|---|---|
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |
| ____ | ____ | ____________________ | ____________________ |

____________________ ________
SIGNATURE OF WITNESS DATE

**Exhibits**

**Whitfield Depo_ Exhibit 1**
2:9
**Whitfield Depo_ Exhibit 7**
2:15 81:6,7
**Whitfield Depo_ Exhibit 11**
2:17 88:19,20
**Whitfield Depo_ Exhibit 12**
2:19 96:23,24
**Whitfield Depo_ Exhibit 13**
2:22 113:4,5
**Whitfield Depo_ Exhibit 14**
3:3 92:22

**(**

**(a)**
51:10
**(b)**
51:12 52:2
**(c)**
51:16 53:5,19
**(d)**
51:18
**(e)**
51:19
**(f)**
51:20 55:1

**-**

**-what's**
11:23

**1**

**1**
59:3 62:25 63:6,16, 24 64:7 86:5,7 87:11 98:12
**1,900**
9:7 10:19
**10-**
6:11
**10-20**
34:24
**100**
69:8
**105**
65:20,21 121:8 122:5 129:6 130:5
**10:00**
45:12,13
**10:02**
45:18,20
**10:19**
100:7
**10th**
60:4,11
**11**
86:18 88:4,19,20
**11:00**
93:9
**11:19**
100:7,8,14,15
**11:30**
100:9
**11:32**
100:15,17
**11th**
86:13,20
**12**
96:23,24
**120-day**
62:5
**12:00**
119:17,18
**12:20**
119:14
**12:21**
119:18,20
**12:30**
87:22
**12:42**
137:3,5
**13**
113:4,5
**13th**
86:19
**14**
92:22
**15**
119:6 124:14
**15-minute**
6:11
**15th**
86:20
**16th**
87:13
**189**
65:21
**18th**
86:20 87:17
**19**
9:18
**1:00**
45:10
**1:30**
119:8
**1st**
9:11 87:17

**2**

**2**
86:8 101:5 133:10,11 134:20 135:5,25 136:1
**20**
119:7,10
**2021**
9:11
**2026**
5:4 9:18 85:23 86:13, 19 87:13 88:4 90:6
**20th**
86:19 87:17 88:25 90:10,12 108:11 109:20 110:19
**22nd**
86:21 87:18
**24-45**
32:22
**25**
133:14
**25th**
93:10
**26**
85:22

**3**

**3**
21:23,24 86:8 101:5
**30-minute**
60:20,21
**31st**
5:4
**3249**
134:25
**3273**
135:9
**3:30**
87:22

**4**

**4**
51:6 53:19 55:1 92:20
**4:00**
93:10
**4th**
53:10 83:10 86:19 88:11

**5**

**5,000**
71:25
**50**
17:10 107:4,6,8,10, 18

**6**

**6**
36:15 59:3
**6/20**
87:16 103:11
**6:00**
86:25
**6PM**
103:11
**6th**
8:24 9:18 86:19

**7**

**7**
81:6,7
**7/18**
87:17
**75**
72:23
**7th**
60:10,11 65:20

**8**

**80**
98:19
**8PM**
103:12
**8th**
86:20

**9**

**94**
72:22
**9:00**
5:5 86:25
**9:54**
45:16,18

**@**

**@cindy**
114:16

**A**

**a.m.**
5:5 45:12,13,17,18 93:9 100:15
**ABC**
59:22,23
**ability**
40:5 79:21 80:5,6 116:25
**absolutely**
16:24 126:8
**accepted**
40:3
**accommodated**
51:13,16 52:4,10,18 53:1
**accordance**
37:6 39:25 41:5 43:8 44:19

**account**
124:21
**accounting**
11:7
**accurate**
22:21 72:18 123:12 134:9
**acres**
98:19,21
**actions**
112:12
**activities**
17:17 50:2,6 51:1,2 97:16 112:5
**activity**
16:14,18 17:1,16,22 18:7,23 19:6 21:12 23:1 50:10,18,20,22, 23 51:22 55:2,5 106:16,18 107:3,9 130:20
**actual**
94:21 97:3
**Adams**
77:7
**add**
134:20
**added**
46:16,20 135:4
**additional**
62:7 114:1,17 116:2 128:14
**address**
18:21 72:13 118:24
**addressed**
46:13 73:10 80:18,19
**addressing**
92:25
**adhering**
102:11
**administer**
39:17 40:2 41:12
**administered**
7:2
**administering**
43:23 44:23
**Administrative**
82:14,21
**advertisement**
109:25
**advised**
35:10
**affect**
116:24
**affected**
116:24
**affiliation**
117:19
**agency**
12:21 14:22 27:15 54:21
**agree**
22:20 24:5 39:13 63:22 80:17 88:6 91:20,22,24 94:18, 24,25 95:5,7 109:1
**agreed**
93:24
**Aguilar**
9:21 26:1 46:4 69:9 72:8
**ahead**
45:1,3 48:5,6 49:21 82:8 96:16 100:5
**AI**
134:17
**alcohol**
107:13,17
**allocated**
93:8
**allocation**
23:16,22 70:21,22,23 71:9,21 85:14,18,21, 23 90:6
**allot**
130:5
**allotted**
60:19 93:15 94:11
**allowed**
94:9 106:23,25
**amend**
64:13
**Amended**
16:4 22:9,21 23:10, 25 28:16 30:14 31:22 33:2 49:4 50:1,11,19 55:13,25 56:2 59:17 60:4,24 63:22 64:11, 14,21 80:19 118:12 128:22 129:4,14,24
**amendments**
65:3
**amount**
10:21
**amplified**
17:14 107:14,17,24 110:2
**Ann-marie**
5:8,25 6:1 11:2 40:2 79:12 91:18
**answering**
122:15
**answers**
7:17,24 49:13
**apologies**
62:14 83:12
**apologize**
28:17 54:6 96:4 135:25
**apology**
136:3
**appearances**
5:6
**appears**
88:25 92:24
**applicability**
49:10 65:14
**applicant**
23:16 51:21 55:1
**application**
51:9,19 58:23 59:7 70:7,11,12,20 71:7,8, 13,16 74:10 79:19 86:13,18 91:8 114:19 115:1
**applications**
71:15 72:13,16 73:13 74:6 91:2,3,12
**applied**
18:20 86:24 87:13, 16,21 88:4,24 90:10 118:6
**applies**
28:19 31:20 35:21 38:10 41:4,19 132:24
**apply**
31:18 33:2 41:17 42:24 49:16 56:17 59:1 116:25 117:15, 20 131:14
**applying**
39:8,9
**approach**
118:16
**Approval**
58:23
**approve**
55:23 71:4,23
**approved**
43:23 44:23 56:1 71:4 90:4 97:9 99:10
**approving**
70:18
**aquatics**
11:11
**area**
97:9,19 98:6
**areas**
97:11 98:1,3,4
**argue**
110:11
**argument**
38:23,25 66:25 125:21,22
**argumentative**
44:4
**arguments**
38:24
**arrived**
99:11
**arrives**
98:14
**Ashurt**
5:13
**asks**
51:6 59:23 113:25 115:5 116:13 132:9
**aspects**
46:24
**assist**
13:5
**assistant**
9:15 10:11,15 26:7 72:7,8 75:13 81:13, 20,22 82:13,14,21 134:17
**Association**
102:18,22 108:11,22 109:2,14 110:18 111:5 112:5
**Association's**
105:4 109:19
**assume**
19:7,10 57:15 75:18, 19 83:14 85:22 89:17 110:6
**assumes**
33:18 103:23 111:20 123:9 124:8
**assuming**
108:23
**attend**
107:4
**attendees**
34:24
**attention**
69:25
**attorney**
7:18 27:24
**attorney-client**
7:25 26:16
**August**
5:4 86:20,21 87:17, 18
**authentic**
135:13 136:9
**authenticate**
134:14
**authenticity**
134:15,16
**authority**
21:11 38:6 63:4 67:14
**availability**
97:11
**award**
59:11,24,25
**aware**
13:4 27:15,17 29:10, 11 49:8,11,12 61:3,6 63:13 68:18,22,25 69:4,6,9,11,18,21 76:6,13,15 77:10,14, 17,20,21 78:23 108:19 115:20 118:4
**Awesome**
7:6 9:9 16:12,17 32:4 45:21 85:10 100:18 119:21 136:13

B

**B-A-Y-S**
10:10
**back**
21:16 25:17,18 29:2 36:13 44:12 45:19,23 48:11 66:11 68:7 74:11 75:4,8 79:12 84:12 92:2 100:6,16 112:18 115:3 119:8, 13,19 132:22 134:24
**background**
6:14
**bad**
30:15
**band**
10:4,5
**Barrett**
72:6 81:10
**baseball**
52:15
**based**
66:23 102:6 109:23 112:3
**basis**
12:8,14 59:12,16,25 60:14 112:14
**Bates**
134:12,17,18,21
**bathrooms**
76:22,23
**Bays**
10:10
**Bear**
112:25
**began**
70:1
**beginning**
71:11 75:12 84:22 106:17 113:9 134:2
**begins**
113:20 134:22
**behalf**
5:8,13,14
**believes**
33:1
**Berlin**
82:7,11
**beverages**
50:5
**big**
103:3 113:1
**bigger**
16:20,21 22:13,15 81:2 82:4 85:4 88:16 92:12,15 96:16 133:21
**Billy's**
86:12,18,24 87:3,10 88:4,9,23 90:9 91:11 97:4
**birthday**
19:4 24:13 29:3,5 48:12 68:8 127:22,24 128:5
**bit**
8:9 9:2 18:11 19:15 22:14 25:18 45:24 48:1 56:14 64:10 74:11 77:9 78:2 81:2 89:8 90:24 95:21 106:16 127:20
**Blackout**
23:17 51:17 53:6,8, 11,20,22 59:5
**blank**
68:13
**Bob**
77:7 82:7,11
**bodily**
79:9
**boss**
9:25 10:2 25:25
**bottom**
22:12,17 93:4 103:14 135:8
**bounce**
46:8
**Bowl**
53:12
**box**
20:13
**Brace**
29:9,13 73:16 77:11, 19,22 78:14,25 79:3 128:11 129:11,20 130:1
**Brandie**
72:6 81:9,10,12 83:1
**breach**
101:23
**break**
6:5,9,11 38:18 45:6,8 90:1 100:4 119:6
**Briefing**
89:6
**briefings**
14:15,16 89:19,23,25
**briefly**
133:15
**bring**
31:21
**brother**
124:13
**budget**
11:7
**bulk**
16:5
**bunch**
69:16

C

**Cabou**
5:12 7:21 8:3 11:18 12:4,23 15:21,25 17:5,24 18:22 19:9 20:5,24 21:6,13 23:5, 11 24:2,21 25:5 26:12 27:1 29:18,24 30:10,19 31:11 33:6, 17 34:3 35:12 36:5 37:8,17 38:11 40:7, 12,19,21,25 41:22 42:2 43:9,17 44:3,7, 21 45:3,7,11,15 48:18,25 49:18 54:2, 7 55:14 57:23 58:13 63:7,25 64:22 65:8 66:17,21 83:23 89:7 90:15 91:21 94:3,13, 20 95:3 96:8 99:2,14, 25 100:3,8,11 101:9 103:22 104:11,23 105:20 106:21 108:16 109:3 110:8 111:6,12,20 112:7 115:22 117:2 119:5, 10,15 120:2,10 121:1,18,25 122:9, 12,21 123:7,16,21,25 124:7,20 125:17 126:4,8,18 129:16 130:15 131:16 134:11,19 135:3,10, 15 136:3,20,22 137:2
**Cactus**
29:16 76:11,14,18,23 77:23 79:11 87:6 127:9 129:7,25
**calendar**
51:11 73:23
**call**
5:22,25 14:14,25 19:11,18,19 20:7 28:12 59:19 116:21
**called**
12:21 58:7 65:11 78:21 102:17
**calling**
15:4
**calls**
26:15 27:1 33:17 43:9 63:8,25 83:24 103:22 109:3,4 111:12,22 115:22 120:10 124:8
**candidate**
33:13,15 35:3
**canopies**
106:20,25
**capital**
11:10
**Cars**
103:7 109:23
**case**
5:9 29:9 34:12 38:13 52:14 77:15 91:17 97:14 112:15
**Casselman**
5:12
**Cave**
29:15 76:11,14,18,23 77:22 79:4,7,10,13, 15 87:3,4,5,9,23,25 127:9 129:7,10,22,25
**CCED**
81:15,25 90:3 114:22
**CCING**
89:2
**Celebration**
103:7
**celebrations**
56:18
**cell**
14:18
**Centers**
62:14,17,19,22 112:16,22
**chain**
113:9,15
**challenges**
65:23 73:14
**chance**
24:7 33:25
**characterization**
126:9
**charge**
11:9,14 32:20 36:24 42:20 54:19
**charitable**
20:2,21 28:5 31:9,18 32:16 33:3 36:20 38:10 41:20 42:16 43:25 47:8,20 119:25 120:6,7,22 121:12 122:17 125:2
**chatting**
16:3
**check**
68:13 74:18 75:21 114:15
**checked**
18:16 20:13
**checklist**
76:3
**checks**
75:24 76:7
**Chief**
72:3
**children**
29:4,6 128:4,5
**choice**
87:10
**Christian**
5:10
**Christmas**
53:13
**Church**
114:6,25 115:7 116:15,19 117:1,8,11

**Cindy**
82:19 114:15 117:5
**circumstance**
118:24
**circumstances**
58:25
**citation**
62:5 63:23
**cite**
63:5
**cited**
63:15
**city**
9:6,24 10:3,7,11 11:17 13:24,25 14:13 15:6 16:13 18:17 20:15 21:11 23:3 27:15 29:15 31:3,5 32:8,21 37:23 39:18 46:5,14 51:23 54:18 55:4,9 61:21 62:4 64:15,19,20 65:5 67:18,21 78:23 79:22 80:5,12 89:20 91:10 92:24 101:18,21,23 114:2,5,18,23,25 115:7 116:3,7,15,19, 25 117:1,6,8,10,11 118:3,4 119:1 120:24 121:23 122:1,19 124:6 127:1,9 131:1 135:18 136:12
**City's**
80:5
**citywide**
51:17 53:6,8,20
**clarify**
14:12 30:3 96:2,5 114:10 124:25 129:20 130:4
**clarity**
16:18 107:16 130:11
**class**
62:25 63:6,16,24 64:7
**clean**
27:8
**clear**
12:3 28:17 101:9 116:6 129:2 136:4
**client**
127:6
**close**
12:25 13:2 119:2
**closer**
72:21
**closure**
51:18 53:7,16,21,23 54:11,17,23 83:4,5,8, 13,18,19,22 84:3,7
**closures**
59:6 83:6
**Coast**
6:3,5
**code**
21:11 23:20 32:21 51:23,24 55:3,4 59:7 101:24
**Coie**
5:13
**column**
34:15 85:13 86:1,2,3, 4,5,6,7 87:12
**committee**
23:22 70:21,22,23 71:9,17,21 72:1,13, 15,25
**communicate**
13:11,12,18 14:9,13, 21
**communicating**
7:12
**community**
9:8
**compel**
40:6
**compelling**
40:14
**Compensations**
56:12
**competing**
51:12 52:3 59:4,10 70:16
**complaints**
78:25 79:4,6,10
**completed**
19:5
**completely**
38:12 118:1
**concern**
116:17
**concerns**
77:4 115:11
**concluded**
137:5
**conclusion**
43:10 63:8 64:1 109:4 115:23 137:7
**conclusions**
110:11
**condition**
101:25
**conduct**
23:20 51:23 55:4 59:7 123:1
**conducted**
32:15,18 36:19,22 42:15,18
**conducting**
130:20
**confer**
80:12
**confident**
122:23
**confirm**
129:3 133:25
**confused**
71:6 90:25 93:17
**confusing**
25:10 124:18
**Congratulations**
8:25
**consideration**
101:20
**considered**
20:1 24:20 29:23 30:8 118:23
**considers**
37:2
**constitutes**
54:17
**construction**
53:24 54:1,9,12,20
**consult**
54:21
**contact**
65:24 86:3,4
**context**
113:10
**continue**
39:4 42:4 129:13
**continued**
126:11
**continues**
66:22
**contrary**
41:15
**Control**
16:21
**controlled**
101:20
**convenient**
38:12 100:3
**conversation**
8:9 16:6 27:22,23,24, 25 28:3,8 37:19,23 47:11 75:13 84:18 91:6 113:20
**conversations**
26:14 46:22 69:9,10, 11 95:23
**cool**
6:23 8:19 22:20 58:16,21 60:16 81:6 92:3 101:1 113:4,14
**Coordinator**
82:11
**COP**
135:7,9
**COP003249**
135:6
**copies**
15:19
**copy**
22:4,21 89:12 97:2 134:9 135:13 136:9
**correct**
8:23 10:8 13:15 16:19 17:17 18:4 20:4,17,18,19 22:10, 11 23:4,6 24:1,22 26:8 27:20,21 31:1,5, 6 32:10,11 37:4,5 39:11,12 46:14,15, 17,18 50:9,24,25 51:4 52:25 56:23 58:4,14 60:9,14,15 61:1,2,13,14 62:10, 11 63:1 64:9 65:3 67:2 70:7,8 72:10,17 77:10,12,13 78:22 81:23,24 84:23 85:22,24,25 86:16 87:2,6,10 88:7,14 89:21 92:7,8 93:2,21 95:25 96:1 97:4 98:17 101:13 103:17, 18 105:7,19 107:8 108:15,17 116:9 117:24 119:4 128:23, 24,25 129:5,6,8,15 130:3,4,6,14 131:6,7, 10,11,15,22 132:24
**correctly**
23:23 32:23 50:8 51:25 56:22 59:8,13 75:19 79:24 80:23 85:1 92:10 93:12 102:20 114:8 115:18
**cost**
32:20 36:24 42:20
**Council**
11:17 13:24,25 14:13 15:6 26:24 27:3 37:10,14,24 40:4 43:24 44:24 68:21 89:20,25 101:18
**Councilman**
68:19
**counsel**
5:6 6:24 7:21,23 8:5 24:2 26:14 27:23 38:11 40:7,8 43:17 54:2 55:18 89:7 100:3 110:8 122:10 134:11
**count**
76:7
**county**
83:14
**couple**
13:14 49:7 62:9 71:17 73:1 95:8
**court**
5:3 7:1,2,16 38:24 40:6 44:12 45:16,19 77:17 78:12 100:13, 16 101:25 119:16,19 136:20,25 137:3
**covered**
7:25 78:18 123:1 129:2
**covers**
17:16

**created**
8:12 71:16 72:12
**Creek**
29:15 76:11,14,18,23 77:22 79:5,7,10,13, 15 87:3,4,5,9,23,25 127:9 129:7,10,22,25
**criminally**
63:15
**criteria**
48:2,15,19,20,22 52:17 54:16 56:24 58:18
**current**
10:2 46:5 129:4
**Cynthia**
9:21 26:1 46:4 69:9 72:8 82:12 89:16 113:7,17 114:22 117:9

**D**

**Da**
92:25 93:8
**Dang**
72:4
**Danielle**
82:6,9 83:2,3
**date**
9:16 51:13,15,16,17, 18 52:4 53:6,7,8,11, 16,20,21,22,23 54:11,17,23 70:16 84:7 86:1,4 88:5 90:10,12,23
**dates**
23:17 35:13 53:14 59:5 70:18 83:4,5,8, 11,13,18,19,22 84:3 88:10,12 90:5
**Dave**
10:2
**day**
6:23 52:10 74:15,19, 22 82:19 99:9,11
**day-to-day**
9:4
**deal**
61:19
**Debra**
68:19
**decimal**
108:2
**decision**
20:8 33:24 53:4 54:25 67:13 91:19 133:3
**decision-maker**
133:4
**decree**
101:25
**defendants**
5:13
**defined**
32:21
**definition**
23:9 24:1
**definitions**
23:15 32:13
**delivers**
9:7
**denied**
51:7,9 54:22 58:24
**department**
8:23 9:10,13,16,23 10:13 12:10,22 13:13,22 14:21 15:11 16:13 17:3 18:18,21 19:7,25 20:16,20 21:4 23:17 24:11 25:2 27:11 28:15,21, 24 29:19 33:1,15 34:1 35:10 36:1,3 37:2 38:8 39:2,7 42:24 44:23 46:3 47:12 48:3,16 49:9, 13 50:15 52:6,8 53:13 54:19 55:10 57:5,19 58:8 60:3,13 63:3,14,19 64:13,16 65:25 66:9 67:18,25 68:15,20,24 69:2,7, 20 70:4,7,10 72:3,6 73:5,6 76:6 78:13,24 79:21 81:21 82:17,24 84:22 89:25 91:10 99:23 103:17 104:6 105:6,11 111:25 112:11 113:24 118:1, 25 135:14
**Department's**
11:17 12:20 38:3 41:3 44:17 80:6
**departments**
71:1,3
**depends**
73:23 106:12
**deposed**
6:20
**deposition**
6:7,15,25 39:23 123:15 126:2 135:4 137:5,7
**deputies**
99:12 118:15,19
**deputy**
9:24 10:3,6,16,18,20 74:25 75:10,14,15, 17,20 77:3 82:7,15, 18 118:17
**derived**
38:6
**describe**
46:1
**Desert**
93:1,8
**designated**
51:17 53:6,20
**designee**
101:19
**desk**
13:15 67:13 70:18 71:4,24 118:22
**detail**
19:15
**detailed**
50:2
**detailing**
78:1 113:17
**determination**
19:21 28:24 104:14, 17 126:22 127:13 130:10 132:23
**determine**
13:14 32:25 48:3,17 52:23 57:3,5,20 58:9, 11 65:13 66:3,12 67:20 78:19 104:24 105:16,17 111:18 127:18 130:13 131:2, 5,9,13 132:7
**determined**
29:6 70:3,17
**determines**
20:20 28:21 70:4
**determining**
67:15 106:9
**Development**
11:9
**Diaz**
82:15
**difficult**
38:5 123:10
**difficulty**
122:22
**DIRECT**
5:19
**directed**
82:2 118:18,20
**direction**
64:15
**directly**
113:25
**director**
8:22 9:5,15,17,19 10:1,14,20 12:7 23:17 26:4,7 27:19, 25 28:4,8 38:7 46:5 59:11 72:8 75:13 79:21 80:4 81:20 82:7,15,18
**Director's**
82:13,14,22
**directors**
10:15,16,18 72:7 75:14,15 81:13,23
**disagree**
67:1 125:12,22 126:9
**discretion**
52:20 63:23 64:2 71:18 101:17,19 102:12
**discriminate**
117:21 122:2
**discriminates**
66:23
**discuss**
7:23 19:12 26:10 49:23 105:10 111:24 118:11
**discussed**
63:20 73:16 74:4,10 83:9 88:22 90:9 92:4 102:5 105:4 109:24
**discussing**
49:5,25 105:12
**discussion**
63:12,13 90:16,21,22
**discussions**
80:14 105:5,8
**displace**
98:15
**distinguish**
97:15
**distribute**
32:19 36:23 42:18 78:9
**distributes**
47:18 128:11
**distributing**
118:14 127:8
**distribution**
8:10 22:6 23:18 27:13 30:21 32:8,14 35:6 36:18 42:14 46:16,20 47:4,23 50:4,24 51:3 56:16 57:6 61:20 74:15 78:8 93:23,24 94:10 95:13,15,17 97:23 99:8 112:18 115:17, 21 116:11 120:17 121:7 122:4 126:24 127:8 129:13,22 131:10 133:16 134:4
**distributions**
116:21
**Divas**
92:25 93:8
**diverted**
69:23
**division**
10:22,25 11:1,2,9,11, 13,14 19:18 74:24 82:6,12,16,18
**divisions**
10:23,25 11:3,6 70:15
**document**
24:7 31:12 34:8,10 38:17,20 41:23 42:5 85:11 86:17 133:6,9,

19 134:21 135:5,17, 18 136:11
**documentation** 51:20
**documented** 61:25 62:9
**documents** 15:22 134:12,15
**Dolores** 72:5
**double-check** 108:8
**doubt** 42:12
**Downtown** 11:1 82:18
**draft** 47:8 55:20 89:3
**drafted** 26:5
**drafting** 25:21 27:19 28:8 46:2 47:3 55:12 64:21 69:13
**due** 39:20 53:24
**duly** 5:16
**dumpster** 76:13,15,18
**Duration** 60:18

**E**

**e-mail** 65:25 66:1 81:9,14 82:1,2 83:2 84:2 86:4 88:25 89:3 90:2,11 113:7,9,12,15,16 114:22 115:11 118:5
**e-mailing** 15:4
**e-mails** 14:25 82:19
**e-tran** 136:21,23
**earlier** 28:17 37:18 57:10 83:9 84:16 91:6 92:4 95:21 96:3 102:4 105:5 106:16 112:11 131:25
**earnest** 94:5
**easier** 133:6
**East** 6:3,5
**Easter** 53:12 83:10
**eat** 29:15,22
**education** 50:6,14,18,20 51:1 61:23 112:16
**effect** 35:14 52:12 60:7,10 65:19 77:18 85:20
**effective** 85:19
**elected** 12:17
**electrolyte** 50:5
**electrolytes** 50:16
**electronic** 93:5
**element** 127:2
**eligible** 23:18 30:22 32:8 51:19 121:8 126:24 129:6,8
**Employee** 134:4
**employees** 10:17,19,21 66:15,20 67:6,7 68:2 82:24 134:7 135:14 136:12
**end** 75:5 76:2 84:4 111:19 116:22 119:3
**endeavor** 57:20 58:7 65:12 70:2 78:20 130:12
**ends** 135:6
**enforce** 99:13,16
**enforcement** 44:17 61:10,16 63:5 64:3 77:18 78:12 98:25 99:5 108:20 111:3,7 112:12
**engage** 78:20
**engages** 57:20
**engineer** 54:19
**ensure** 70:15
**entails** 9:3
**enter** 83:3
**entire** 33:19 34:5 46:6 47:6 79:13 91:25 93:13 98:18 100:2 104:12
**entities** 67:19
**Ernst** 72:5
**escalate** 67:13 118:21
**established** 109:5,6
**Eve** 83:11
**evenings** 77:23 127:10
**event** 18:24 19:12,14,20,22 20:8,17 21:7 23:3,18 24:13,17,19 28:22 29:1,25 30:7,22 32:8, 14 33:24 35:1,23 36:18 42:14 48:3,11, 17 51:14 52:6,9,15 57:7,12 58:9,12 60:18 62:4 66:3,13 68:8,9 70:16 74:16, 20,23,24 75:5 76:3 78:16,19 80:11 93:13,22 94:10 95:13 96:11 97:10,16 99:8, 9 103:20 104:1,5,8,9, 13,18,19 105:10,12, 17,22,25 106:1,3,19 107:4,11 108:10,13, 19,23 109:5,10,20 110:20 111:8,14,18, 25 115:17,21 116:11 118:17 124:12,14 127:15,25 129:22 130:17 131:5,10,18
**events** 17:9 27:13 28:19 48:13 51:15 52:9,18, 22 53:12 56:18 59:4 60:19 97:23,24 105:13 114:6 115:8 116:15
**evidence** 33:18 103:23 124:8
**EXAMINATION** 5:19
**examined** 5:18
**examples** 127:21
**Excellent** 131:3
**exception** 12:14
**Exceptions** 58:23
**excessive** 79:8
**excuse** 72:22
**exhibit** 21:23,24 80:22 81:6, 7 84:10 88:19,20 92:2,20,22 95:18 96:15,23,24 100:20 103:1 106:8 107:22 112:24 113:4,5 133:10,11 134:20 135:5,25 136:1
**exhibits** 80:23 137:6
**existence** 71:22,23
**explain** 28:23 59:15 61:24
**explained** 53:22
**explaining** 52:17 61:23
**explanation** 91:15
**extent** 26:13 46:25 63:7 75:9 77:24 78:7
**eye** 81:3

**F**

**Facebook** 105:4 109:7,14,19
**fact** 57:8,9 58:6,7,11 65:11,12 123:21 124:9 130:25
**fact-** 130:11
**fact-finding** 48:8,10 57:20 58:7 65:12 66:2 70:1 78:20
**fact-intensive** 131:4,8,12,24
**facts** 33:18 103:23 105:16 108:13 122:22,23,24, 25 124:8 125:24 126:20 127:4,12,17, 24 128:2,17 130:8,9
**fair** 57:22 80:21 89:3
**fairly** 6:7
**fall** 35:5
**familiar** 76:10 102:23
**family** 50:4 56:18,20 57:14, 16 58:9,10 124:18 125:20 131:13,22
**fashion** 26:2
**fast** 7:7 136:24
**features** 106:19

**feces**
79:9
**federal**
83:14 101:23
**feed**
126:16
**feeding**
23:6 77:25 78:5,6 114:3,9 115:5,13,17, 20,21 116:4,10,21 119:25 120:8,23 121:11,12,14,23 122:18 124:5 125:3, 14 129:21
**feeds**
128:10
**Feel**
6:10
**fields**
98:7
**Fifty**
107:20
**figure**
28:20 35:25 99:20 103:1
**figuring**
108:13
**filed**
77:15
**fill**
107:5,9 127:4
**final**
56:1,3,6,8 67:14 101:5
**find**
111:25
**finding**
57:8,9 58:6,8,11 65:11,12 114:4 115:6 116:14 131:1
**fine**
5:22 38:19
**Fire**
72:6
**first-**
84:20
**first-come**
59:12,15,24 60:13 84:17,20 88:3,23 91:16 97:9
**first-serve**
59:12,16,25 60:13 84:17 88:3,23 91:16
**first-served**
97:10
**five-minute**
45:6
**five-year**
11:10
**fix**
81:3
**flashing**
80:23
**fluids**
79:9
**folks**
9:7 50:14,15,17 52:13 59:20 75:8 97:15 107:5
**follow**
61:24 84:2 123:10
**follow-up**
49:7
**food**
8:10 18:12 20:14 22:5 23:18 27:12 30:21 32:7,14,19 33:14 35:1,5 36:18, 23 42:14,19 46:16, 19,25 47:2,4,18,23 50:24 51:2 56:16,20 57:6 61:20 74:15 78:7,9 93:14,22,24 94:10 95:13,15,17 97:23 99:8 103:7 104:9 112:18 115:16, 17,21 116:8,11,20 118:14 120:17 121:7 122:4 126:24 127:8 128:11 129:13,21 131:9 133:16 134:4
**Ford**
44:9
**forestry**
11:11
**forgetting**
96:3
**forgotten**
54:6
**form**
11:18 17:5,24 18:11, 22 19:9 20:5,6,24 21:6,13 23:5,11 24:2, 21 25:5 29:18,24 30:10,19 31:11 34:3 35:12,17 36:5 37:8, 17 41:22 48:18,25 49:18 55:14 56:6 58:13 90:15 91:21 94:3,13 99:25 103:22 105:20 106:21 108:16 110:9 111:6 117:2 120:2,10 129:16 130:15 131:16
**format**
56:8
**formed**
128:12
**foundation**
20:25 25:19 103:24 109:4 111:22 115:23 124:7 135:16
**fourth**
61:13 62:1,7
**frame**
93:13 95:17
**framework**
64:3
**free**
6:10 26:18 35:1 103:7 104:9
**friend**
81:2
**friendly**
128:12
**friends**
29:14,21 30:5,6,7 56:20 57:1,3,6,16 58:10 118:18 125:20 131:13,21
**full**
103:25 113:10
**funny**
76:21
**future**
108:23

**G**

**Galaviz**
82:16
**games**
103:7 104:10
**gather**
20:16 108:12
**gathering**
32:15 36:19 42:15 66:13 107:18 131:10 132:15
**gatherings**
50:3 56:17,19
**gathers**
132:21
**gave**
89:19 90:11 95:8 118:1
**general**
23:4,9 24:1,5,11 25:3 28:1,20,22 29:17,23 30:1,8 32:19 36:23 42:19 56:21 68:3,16 74:12 84:7 104:22 105:18
**genuinely**
39:1
**geographic**
75:16
**geographical**
10:25 11:2 70:15 74:24 75:15
**get-go**
70:25
**gist**
18:8
**give**
9:2 10:12 15:7 16:17 43:22 61:22 62:4,12 74:1 89:23,24 109:10 118:3 125:10 127:21 128:1 130:9
**giving**
6:25 7:4 50:13
**good**
5:21,22 11:21 12:24 81:5 97:20 119:12 133:23 135:25
**Googled**
117:13
**Gosh**
62:14
**granted**
83:7
**great**
8:19,25 15:20,24 22:23 52:13 84:14 85:4 88:19 92:20 102:14,25 133:13,21, 24 136:14
**greet**
75:1
**ground**
6:16
**Group**
104:8
**guarantee**
97:11
**guess**
71:6 118:13
**guys**
125:21 134:15

**H**

**Hance**
114:7 115:9 116:16, 20
**hand**
66:12
**handful**
119:23
**handle**
77:4
**happen**
46:19 74:15 118:21
**happened**
90:23 118:21 135:16
**happening**
54:12
**happy**
15:21 36:16 42:11 45:7 126:13 135:17
**hard**
13:14 52:23 83:4,6,8, 13 100:1 104:13 106:13 123:6
**hate**
64:23
**he'll**
7:18
**head**
6:19 7:15 74:2
**heading**

16:14 134:20 135:5
**hear**
82:9 110:7 120:19
**heard**
6:24 7:7 79:2,6 102:16,19 118:2
**held**
26:14 108:11 109:5, 20 118:18
**helped**
27:19
**helpful**
128:7,8 130:9
**Herman's**
29:9,14 73:17 77:11, 19,21 78:14 79:1 126:15 127:6,7 128:9 129:12,21 130:1
**hired**
9:14
**hold**
32:7 72:16 116:20 123:15 124:14 126:2
**holding**
23:3 114:6 115:8 116:15
**holidays**
83:15
**Home**
86:12,18,24 87:3,10 88:4,9,23 90:9 97:4
**Home's**
91:11
**homeless**
13:9,19 14:6,11 15:2, 15 24:24,25 25:8 29:14,21 30:6,7 50:13 72:4 76:8 119:25 120:8,23 121:13,16,17,23 122:18,19 124:5,10, 14,16 125:3,14 126:17 127:10,11 128:10,11,14
**hop**
8:20
**hope**
60:1 85:7 99:18
**hoping**
6:6 16:17
**hostile**
45:2
**hosting**
57:6
**hours**
61:5 93:9,11,15,19, 20,22 94:2,10,12,19 95:2
**housed**
25:4,6,13
**Huggins**
72:2
**Huggins-hubbard**
113:24
**humanitarian**
20:2,21 28:9 31:9,18 32:17 33:4 36:21 38:10 41:20 42:17 44:1 47:8,19 121:22

**I**

**idea**
66:6 83:21,25 132:14
**identified**
21:24 81:7 88:20 92:22 96:24 113:5 133:11
**ii**
82:13,14,21 90:4
**III**
82:11
**images**
109:13
**implement**
37:12
**implemented**
26:24 37:11
**improvement**
11:10
**in-effect**
51:21 55:2,5
**inappropriate**
38:12
**Inc.'s**
91:12
**include**
11:6 12:16 24:24 25:3 51:2 54:14 76:7 101:22
**includes**
50:24 121:16
**including**
50:3 56:17
**incomplete**
51:20 59:6 123:8
**incorrect**
89:22
**increments**
60:25 92:6
**Indian**
34:24
**individual**
18:4,6,18 20:1 24:19 32:5,15 33:3,10 34:2, 23 35:9 36:2,19 37:15 39:10 42:16 47:22 55:9 57:6,21 61:22 63:5,15 67:15 70:4,6 98:13 121:6 122:3
**individually**
12:18
**individuals**
14:22 15:3 30:17 36:7 37:3,25 39:25 41:5,19 42:25 43:7 44:18 49:14,15 65:24 66:8,16 67:9 82:3 120:15
**ineligible**
51:23 55:3 59:6
**inflatables**
17:13 107:13,17
**inform**
49:14,15 118:17
**informal**
56:19
**information**
9:3 11:7 20:16 21:3 27:16 52:24 53:4 54:24 66:7 82:16 104:16 105:21 110:21 112:8 114:2, 17 116:3 132:12,22
**informed**
66:20
**initial**
113:16
**inquiries**
35:20 49:9,14 131:25
**inquiring**
115:13
**inquiry**
35:17 115:4 117:25 131:4,9,12,20 132:1, 3,6,15,19
**inside**
73:6 98:2
**instance**
59:22 117:23
**instruct**
26:13
**instructing**
42:2
**intend**
108:20 110:22 111:3, 10
**intending**
54:4
**intensive**
130:12
**interact**
11:25
**interested**
12:6
**interests**
101:21
**interim**
8:22 9:17
**internal**
73:3
**internally**
70:10
**interpret**
24:11 25:3
**interpretation**
38:3 41:4
**interpreting**
39:2 41:16 42:24
**interprets**
28:15
**interrupt**
7:22
**introduce**
75:2
**introductory**
6:16
**investigation**
111:19,21,22
**invite**
24:18 29:4,14 106:5, 10 124:15 125:20 128:5 132:5
**invited**
24:17 68:10 128:3
**invites**
24:19 132:5,17
**inviting**
27:8 29:21
**involved**
25:21 46:3,21,23 55:12 64:21 65:2,4 70:25
**involvement**
25:24 47:2 55:17
**irrespective**
123:2
**issuance**
22:5 58:18 60:3 65:16 79:19
**issue**
34:22 63:23 67:24 80:10 96:11 111:10 113:18
**issued**
51:10 60:12,25 74:16 80:7,9 92:6 93:19,20 94:2,12,19 95:1 96:10 97:4,22,25 99:1,10 129:5,25
**issues**
73:14 74:7 76:3 102:10
**items**
46:7 69:17 91:8
**IX**
60:17

**J**

**Jana**
82:13,20,21
**January**
9:18
**job**
37:11
**Joe**
82:15
**July**
8:24 9:18 53:10 60:4,

11 83:10 86:19,20 87:17 88:11 93:10
**June** 60:10,11 65:20 86:19 87:17 88:25 90:5,10, 12 108:11 109:20 110:19

**K**

**Kennedy** 72:3
**kind** 8:20 9:25 11:23 17:20 22:23 57:9 66:23 69:22,23 71:10 72:15 74:9,14,18 76:3,21 78:1 79:6 96:19 105:24 123:2 130:8 132:14
**knew** 95:14 115:15
**knowing** 34:4 104:12
**knowledge** 63:18
**Krcek** 82:13

**L**

**lack** 126:11
**lacks** 20:24 51:20 103:23 109:4 111:22 115:23 124:7
**Lance** 29:9 73:16
**language** 47:9 52:14 55:20
**large** 79:15,17 99:19 108:5,6
**largest** 91:9
**Larkspur** 87:4,25
**law** 64:16 67:18,25 101:24 118:25
**lawyer** 39:15
**lay** 25:19 135:16
**lead** 21:4 26:1 46:6,11 47:6
**Leadership** 34:19
**leads** 21:19
**learned** 79:3
**learning** 74:22
**leave** 75:4 99:23
**left** 9:22 27:12 85:13
**legal** 5:10 43:9 63:8 64:1 67:24 80:12 109:3 115:22
**legitimate** 126:10
**letter** 61:25 70:17 92:24 93:7,18 94:18,21 95:1
**letting** 50:15
**level** 12:1 105:13 108:2 122:24
**limit** 59:5 63:23 64:2
**limited** 97:24 101:22
**linear** 79:17
**Lisa** 72:2 113:24 114:15, 21,23 115:6,12 117:5,6
**Lisa's** 115:10 117:25
**list** 106:5,10
**listing** 90:4
**liter** 27:12
**literally** 125:24
**litigation** 77:12
**Lives** 87:13,16,21 90:12 91:12
**located** 75:17
**location** 70:16 75:17 86:5,7,8 87:5,9,11,23,24 88:13,24 98:23
**locations** 27:8 70:19
**locked** 76:24
**logo** 103:13
**long** 9:9 42:3 60:7 80:1
**longer** 71:20,22 94:12
**looked** 47:7 112:3
**Lori** 10:10
**loss** 89:13
**lot** 46:7 54:9 65:21 71:18 79:4,18 80:3 98:20 116:22 118:11
**loud** 7:8 107:25 110:6
**Love** 114:2,18,23 116:3,6, 25 117:6,9 118:3,4
**luckily** 52:11 65:20
**lucky** 6:23
**lunch** 6:4,5,8

**M**

**made** 55:21
**Main** 86:3
**maintenance** 11:4,12
**make** 6:8 7:12,19 8:14 16:20 20:8 22:13 33:24 38:5,23 45:5 53:4 54:4,25 67:12 75:2,3,5,25 79:24 81:1 82:4 85:4 88:16 92:12,15 96:16,20 98:10 99:17 103:3 104:13,17 110:10 111:1 113:1,12 116:6 123:12 125:22 126:21 127:12 129:17 130:10 132:23 133:3,7 134:2
**makes** 8:5 28:24 60:1 71:5 99:18 135:25
**making** 38:25 64:17 72:5
**manage** 13:4
**Management** 11:6 82:12
**Manager** 9:24 10:3,7,11 46:5 67:18 101:18
**Manager's** 64:16,20 67:21 80:12 119:1
**manages** 114:16
**Margo** 5:12
**marked** 21:22 81:6 88:19 92:20 96:23 113:4 133:9 137:6
**marketing** 109:24
**MARTIN** 5:15
**Marty** 5:22,24 8:21 13:12 16:10 21:10,22 24:10 25:18 26:20 28:11 114:1 116:2
**materially** 51:19
**materials** 135:13 136:10
**Mathews** 10:2
**matter** 39:21 125:6
**mayor** 12:16 14:3 26:24 27:3 37:10,14 40:3 43:24 44:24 89:25
**Mcfarland** 5:11 45:5 59:22 60:1 134:25
**meals** 56:19
**means** 32:14 36:18 42:15 84:8 97:9 129:11
**meant** 28:4 57:1 68:15 83:20,21 84:3 116:11
**medical** 8:10 22:5 23:7,19 30:21 32:6 35:6 46:13,23 47:23 50:3 61:20 120:17 121:8 122:4 126:23 133:16 134:3
**meet** 6:1 12:17
**meet-and-greet** 34:23 35:4,23
**meeting** 12:8 73:24 74:5,8
**meetings** 73:3,8,11,17,19,20, 22 91:7,13
**member** 15:6 32:19 36:23 37:23 42:19 70:13 74:25 124:17 132:9, 10,16,21 133:3
**members** 13:25 14:13 50:4 70:24
**memorized** 83:11

**memory**
62:13 93:12,21
**mention**
9:17
**mentioned**
9:16 14:14 22:25 28:25 50:21 57:10 58:4 64:19 65:2,10 74:6 75:25 91:6 107:12,13 129:9
**message**
14:14
**messaging**
14:17
**met**
72:25 128:15
**middle**
101:4
**millennial**
16:7
**million**
72:21
**Milne**
72:4
**mind**
17:20 38:14 44:10 71:10 74:19 78:1 95:11 132:18,20
**minutes**
40:13 119:7,10
**misdemeanor**
63:1,6,16,24 64:8
**missing**
126:20
**misstates**
20:25 41:22 44:3 48:18 57:23 94:14 130:15
**misunderstood**
72:11
**moment**
22:25 34:8 102:15 109:10 118:9
**month**
13:15,20 51:11 60:11 129:5,25 130:5
**monthly**
12:14 59:4
**months**
29:11 46:9
**morning**
5:21 6:2,4
**move**
38:16 40:5
**movie**
103:8,11 109:22,23 110:5,6
**movie-type**
108:6
**moving**
6:7 41:24,25
**multipage**
24:7
**multiple**
126:5
**music**
103:7 108:1

**N**

**named**
8:24 62:13
**names**
112:20
**narrate**
110:9
**Nation**
35:3
**Natural**
11:13
**Navajo**
34:18,19 35:3
**needed**
93:14 136:3
**needles**
79:8
**Neighborhood**
12:22 13:3,12,21 14:20 15:11 68:15 72:2 102:17,21 103:16 104:1,6,7 105:3,6,11 108:10,22 109:1,14,19 110:18 111:2,5,24 112:4 113:23
**neighborhoods**
13:5
**nice**
6:1
**nicely**
21:19
**night**
30:8 128:10
**nights**
127:10
**nods**
6:19
**nominal**
32:20 36:24 42:20
**nonexclusive**
97:8 98:22
**nonprofit**
114:4,24 117:7,10,15
**nonprofits**
117:19
**noon**
119:4
**normal**
28:13
**Northeast**
10:25 77:2 82:6,12
**Northwest**
11:1 76:25 77:3
**Norton**
102:17,21,23,24 103:11 104:7 105:3 108:10,22 109:1,13, 20 110:17 111:4 112:4
**noted**
35:2
**notes**
68:14
**Notice**
51:22 55:2,6
**November**
9:11
**NSD**
103:13
**number**
36:15 76:7 82:1 87:11 98:12,21 134:17,18
**numerous**
125:18

**O**

**oath**
7:1
**object**
11:18 17:5,24 18:22 19:9 20:5,24 21:6,13 23:5,11 24:2,21 25:5 26:12 29:18,24 30:10,19 31:11 34:3 35:12 36:5 37:8,17 41:22 48:18,25 49:18 55:14 58:13 90:15 91:21 94:3,13 99:25 103:22 105:20 106:21 108:16 111:6 117:2 120:2,10 125:18 129:16 130:15 131:16
**objection**
12:4,23 27:1 33:6,17 38:11 43:9 44:3 57:23 63:7,25 64:22 66:17 67:2 83:23 96:8 99:2,14 109:3 111:20 115:22 121:1, 18 124:7
**objections**
7:19,20 8:5 44:21 94:20 95:3 104:11,23 112:7 121:25 126:18
**obstruct**
38:19
**obtain**
32:9
**occur**
73:22
**occurs**
131:9,13
**offer**
122:13 135:19
**offhand**
21:14 53:10 54:8 108:4
**office**
13:8,19 14:6,11 15:2, 3,15 34:11 35:19,22 50:13 64:16,20 67:21 68:22 72:4 80:13 82:13,15,22 85:12 119:1
**Officer**
82:17
**offices**
68:21
**officials**
12:17
**ongoing**
59:21 73:19
**Oops**
134:23
**open**
7:1 19:3 23:4 24:14 28:19,22 29:1,16,25 30:4,8,22 48:3,8,13, 17 58:9,12 59:19 104:19,22 105:18,25 106:4,6,9 111:18 123:15 124:12,15 125:7 126:2 127:15, 18 131:6 132:3,7
**Operations**
11:11
**opinion**
33:21 39:19,20,24 43:3,4,6 44:16 104:21
**opportunities**
65:22
**oppose**
123:17
**optometrist**
81:3
**order**
77:17 78:12
**ordinance**
8:8,11,13,16 13:22, 25 14:1,4,7 15:6,12, 16 16:4 22:10 24:12, 20 25:22 26:4,11,22 27:6,10,20 28:9,16 30:13 31:8,9,12,17, 20 33:2,16 35:14 36:4,13 37:3,7,11,16, 25 38:4,9,13 39:3,8, 10,14,25 40:1,3 41:4, 6,11,16,18,24 42:11, 21,24 43:7,8,23 44:2, 17,20,23 46:2,13,20, 24 47:3,9 52:12 59:18 60:6,8,10,24 61:16,24 62:24,25 63:6,17 64:7,18 65:17 66:11,16 67:6, 9 68:11,20 69:12,13, 14,15,18 72:12 77:19 78:12,15 85:20 89:21

94:11 96:12 101:24 102:12 108:21 109:2 110:24,25 111:4 113:8 118:12 122:20 123:1 124:6,19 125:5,15 126:16 127:14 128:19,24 129:4,12,14,23 130:2,14,19 131:14 132:24 133:17 134:4

**organization**
18:5,6,19 20:1,3,12, 21,22 23:19 24:18 30:20,25 31:4 32:6, 16 33:3,9 34:15,16 36:2,20 37:16 38:8 39:10 42:16 47:9,18, 22 55:8 57:5,21 61:3, 22 62:13,21 63:5,15 66:23,24 67:15 70:5, 6 75:1 86:2,12 98:14 102:17 112:22 117:18 118:14,16 119:25 120:8,23 121:7,12,22 122:3,17 123:2 124:5 125:2,7, 13 126:23 127:4,5,7 131:1

**organization's**
112:20 118:13

**organizations**
30:17 31:8,10,19 33:4 36:6 37:2,24 38:10 39:24 41:5,17, 20 42:25 43:7 44:1, 18 47:19 49:16 65:24 66:8,15 67:8 90:5 112:13 117:15,20 120:15 130:13,17,19, 25

**organized**
32:18 36:22 42:18

**organizer**
99:8

**originally**
46:13

**outreach**
50:5,10,22,23 114:2, 18,23 115:4 116:3,7 117:6,10 118:3,4

**Outreach's**
116:25

**overlap**
17:21 18:1,3

**overview**
74:12

**P**

**p.m.**
45:10 86:25 93:10 119:17,18 137:4,5

**pages**
133:14

**paragraph**
36:15 51:6 53:19

**park**
23:3,18 29:15,16,22 32:8,17 34:24 36:21 37:1 42:17 51:11,12, 15,17,18,19 52:3 53:7,16,21,23 54:11, 12,17,22 59:5,6,22 60:18 74:17,18,25 75:11,17,18 76:8,11, 14,18,23 77:22 79:11,15 86:5,7,8 87:4,5,9,11,23,25 88:12 97:9,11,24 98:12 99:23 102:24 103:11 107:18 109:20 114:7,10,12 115:5,9 116:7,16,20 118:14 120:24 122:19 124:6 127:9 129:5,7,23,25 130:6

**park's**
77:4

**parks**
8:11,22 9:5,10,13,15, 17,19,23 10:13 11:5, 8,16 12:9,19 13:6 16:13 17:2,21 18:5, 17,20,21 19:6,7,22, 25 20:3,15,20,22 21:3,5,8 22:6 23:1,2, 20 24:10 25:2 27:9, 11 28:15,18,21,23 29:19 30:14,18,22 32:9 33:1,14 34:1 35:10,11,20 36:1,3 37:1 38:2,7 39:2,7 41:3 42:23 44:16,22 46:3,5,14 47:12,15, 17 48:2,16 49:8,10, 13,17 50:7 51:23 52:5,8 53:13,25 54:9 55:3,10 57:4,19,22 58:8 59:7,18 60:2,12, 24 61:4 62:5 63:3,14, 18 64:12 65:13,14, 17,21,25 66:4 67:16 68:19,23 69:1,7,19 70:3,5,10 73:4,5,6,12 76:5,16 78:11,13,24 79:14,20,22 80:6,7, 15 82:23 84:21 85:20 89:5,20,24 92:5,25 93:1,8 95:24 96:6 97:3,22 98:19,20 99:1,6,19,22 102:5,7, 10 103:20 104:10 105:14,17 106:23 107:1 108:14,20 110:19 112:11 113:8, 23 115:14 116:22 117:16,20 120:1,4,9, 16,25 121:8,23 122:5 126:24 128:16 129:6, 8,10 130:5 133:17 134:4 135:14 136:9, 12

**Parks'**
134:7

**part**
58:24

**participants**
56:21

**parts**
97:24

**party**
18:24 19:4 24:14 29:3,5 48:12 68:8 127:22,24

**pass**
33:13

**passage**
27:10 72:12

**patrons**
97:19 98:22

**Peiz**
82:12 113:7

**people**
17:10 76:8 82:2 105:9 107:4,6,8,10, 18 124:15 125:14 127:11 128:3,14,15 132:6

**percent**
69:8

**Perfect**
22:16 85:9

**period**
23:16 60:20,21,22 85:14,18,19,21,23 90:6

**Perkins**
5:13

**permanent**
8:24 9:18

**permit**
8:12 16:19 17:2,9,13, 14,15,16,22,23 18:6, 7,20 19:6,8,23 20:4, 23 21:5,8,12 23:2,21 28:19 30:15,18,23 32:2,9 33:10 34:2,25 35:6,11,20 36:7 47:16,17,24 48:7,9, 14 49:10,17,25 50:7 51:7 54:22 56:16 57:11,22 58:18 59:5 60:19 61:4,20,23 62:4 65:14 66:4 67:16 70:6,20,22,23 71:9,21 73:13 74:16 75:3 76:1 79:22 80:7, 8,9 91:1,7 93:1,9,11, 18,19 94:2,12,19,22 95:1 96:6,13 97:3,7, 8,18,25 98:15,16 99:1,6,10,13,18,24 101:6,10,12,16 102:1,7,11 103:21 104:10 105:17 106:16,18 107:3,7, 13,14,15,19 108:1,14 110:19 112:6,19 114:16 116:8 118:6, 15 120:4,9,16,24 121:9,13,14,24 122:5,20 125:5,8,15 126:16,25 127:13,16 128:17,18,20,23 131:2

**permits**
18:9 22:6 51:10 52:13,16 59:11,20 60:25 61:18 65:17,22 70:19 72:22,23 79:19 80:15,18 83:6 92:5 95:22,24 97:14,22 102:5,8,10,11 113:18 116:25 117:16,20 118:3 129:4,24 130:5

**permitted**
74:20

**permittee**
98:14 99:24

**permittees**
99:17

**permitting**
8:12 30:14 73:4 90:25 91:4 108:21 120:1,25

**personal**
14:18

**personally**
13:12,18 72:17 91:1

**persons**
121:19,20 130:18

**Phoenix**
8:22 9:6 16:13 21:11 23:3 29:15 32:21 39:18 46:14 65:5 92:25 101:21,24 120:24 121:23 122:1, 19 124:6 127:1,9 135:19 136:12

**phone**
14:18,19,20 65:25 66:1

**photo**
109:23,24

**photos**
109:18 112:3

**phrase**
59:16

**picked**
75:6

**picture**
103:4

**pictures**
109:10 110:9,13

**place**
70:10 99:11

**plaintiff's**
137:6

**plaintiffs**
5:9

**planned** 32:18 35:23 36:22 42:18 111:21
**planning** 34:23
**playground** 98:6
**plenty** 52:16
**point** 74:13 86:3 97:20 123:23 124:20 135:25
**Police** 72:3
**policies** 39:17
**policy** 26:23,25 27:5 60:2 84:17,21 88:3,23 91:16,20
**political** 33:13,15
**pool** 98:3
**popping** 134:18
**portion** 44:13
**position** 9:22 26:4
**positions** 9:12,14
**possibly** 19:24 21:1 52:25 53:3 54:13,14
**post** 75:24 76:7
**post-enforcement** 74:18 75:21
**poster** 103:19,24 105:3 108:10
**potentially** 111:4
**Poveromo** 82:6
**Powerpoint** 133:17 134:6
**pre** 75:24
**pre-enforcement** 74:17 75:20
**prefer** 40:22 42:4
**premise** 50:21 66:21 67:1
**preparation** 6:15 135:4
**presentation** 133:18 134:6
**presented** 134:7
**preserves** 11:15
**President** 35:3
**pretty** 7:8 64:4 72:18 74:7 119:2
**prevent** 7:3
**previous** 41:15 94:8
**previously-approved** 51:14
**primarily** 11:3 14:9,12
**principle** 124:11
**principles** 124:11
**prior** 55:23,24 60:3
**private** 18:24 19:2 24:13 32:15 36:19 42:15 48:11,13 50:3 56:17 66:12 68:9 104:19 106:1 127:25 128:1,3 131:10,17,20 132:15
**privilege** 8:1 26:16
**problem** 22:15 45:15 54:7 122:13
**procedures** 22:4 39:18
**process** 30:14 46:2,6 47:6 59:21 65:16 66:6 70:9 71:7,9,14 73:4 74:10,22 90:25 91:5, 8 114:16
**procurement** 11:8
**produced** 134:21 135:6,11,18
**production** 15:23 34:11
**professional** 11:25 12:20
**program** 11:10
**programs** 9:7 11:4 12:7
**progressive** 61:9,16 63:4
**prohibited** 98:1,4
**prohibiting** 77:18 78:12 115:16
**project** 110:5
**projected** 109:23
**projects** 12:7
**promoted** 9:24
**promulgated** 22:9
**provide** 27:8 32:6 114:18,25
**provided** 20:14 61:4 66:15 68:1 116:8 135:13
**provided/served** 18:13
**provision** 54:23 57:1,14,17
**public** 19:3 21:7 23:4,9 24:1,5,11,15,16,20, 24 25:3,12,13 28:1, 20,22 29:1,5,17,23 30:1,9,22 32:20 33:14 35:2 36:24 42:19 47:18,24 48:4, 9,13,17 56:21 58:12 66:13 68:3,9,16 78:16,19 82:16 104:19,22 105:18 106:1,4,6,10 111:18 120:18 121:11,15,16, 19 122:5 124:12,15 125:7 126:25 127:15, 19 131:6,17 132:3,8
**pull** 21:20 25:17 31:22 41:12 49:3,4,21 80:21 88:16 92:1 96:15 103:2 106:7,14 107:21 134:23
**pulled** 70:25 84:14 100:21
**purple** 34:16
**purpose** 26:9,10,21,25 27:6 41:21 47:20
**purposes** 32:17 36:21 42:17
**pursuant** 88:22
**put** 38:14 45:1,3 65:23 104:2 135:24 136:1

**Q**

**qualifying** 130:20
**question** 7:10 8:7 12:19 16:25 17:25 18:11 21:18 25:11 30:4,15 38:16, 21 40:11,12,17 41:10 42:1,3,7 43:4,14,20 44:7,10 66:21 67:1, 11,17,23 76:21 79:23 89:9 94:25 97:17 99:15 106:13 115:19 118:13 121:5 122:9, 17 123:5,6,8,14,17 124:3,21 125:9,16,25 126:4,7 130:24 132:25 133:1,6
**questioning** 38:20 39:4
**questions** 6:16 7:15 15:22 19:20 20:7 21:19 25:20 28:17 40:15 42:8 43:18 48:8,10 49:7 57:12 66:2,6 75:6 80:3 95:9 105:24 106:8,11 111:8 119:24 122:7, 24 131:11 132:4,6,14 136:15,23
**quick** 6:11 10:12 88:16 100:4
**quickly** 6:7,17

**R**

**Rachel** 72:3
**raise** 97:20,21
**raised** 34:22
**ramification** 33:24 100:2 103:25 104:13
**ramifications** 98:18
**ranger** 75:1,11
**rangers** 74:17
**reach** 20:16 57:11 66:1,8 67:24 69:3,16 71:3 126:12 130:25
**reached** 68:19,23 69:1,6,19
**reaches** 113:25
**reaching** 132:11
**read** 23:23 24:4,6 32:23 35:24 36:16 41:18 42:11,12,13 44:12 50:8 51:25 56:22 59:2,3,8,13 89:9 114:8 136:25 137:2

**reading** 42:5 44:10 102:6
**reads** 32:5
**real** 88:15
**realizing** 42:6
**reason** 7:9
**reasons** 51:7 125:18
**Rec** 9:23 10:13 11:16 20:15 24:10 70:10
**recall** 15:9 23:12 28:2,6,7, 10 47:11 55:11 56:4 62:23 68:17 73:24 74:2,4 84:5 91:11,14 105:12 112:14,19,21
**receive** 21:4 71:16 93:11
**received** 34:10 35:18 71:2,18 78:25 79:4 85:11 86:2 88:10,12
**receives** 49:9 102:11
**recently** 72:25 79:3
**reception** 19:4 24:14 48:12 127:22,23
**recess** 45:18 100:15 119:18
**Reclaimed** 87:12,16,21 90:12 91:12
**recognize** 133:19
**recollection** 93:16 95:16
**reconvene** 45:9
**record** 5:4,7 7:13,20 44:11, 13 45:1,4,11,17,20 54:3 65:23 94:15 100:13,16 119:16,20 123:12 126:9 137:4
**recreation** 8:23 9:5,10,13,15 12:20 16:13 17:3 18:17,21 19:7,18,25 20:20 21:4 25:2 27:11 28:15,21,24 33:1,14 34:1 35:10 36:3 37:2 38:3,7 39:2,7 41:3 42:23 44:17 46:3 47:12 48:2,16 49:9 52:6,8 53:13 57:4,19 58:8 60:3,12 63:3,14,19 64:13 65:13 68:20,23 69:2,7,19 70:3 73:5,6 76:6 78:13,24 79:21 80:6 82:7,11,24 84:22 89:24 99:22 112:11 135:14
**referring** 8:17
**refers** 85:16
**reflects** 94:19 95:1
**refocus** 69:24
**regular** 12:8 73:3
**regularly** 105:6,9 117:14
**regulation** 101:25
**reiterate** 46:4 47:5 74:21
**related** 55:8 67:23 68:10 73:13 125:4,14,19
**relates** 47:3 59:18 65:16
**relation-** 11:22
**relationship** 11:17,23 12:21,24
**relationships** 128:13
**religious** 117:18
**remember** 46:8 53:10,14 56:4 62:14 79:13 84:17 89:15 112:17
**remembers** 94:4
**removed** 76:19
**Rene** 5:8,20,25 8:2,4 11:19 12:11 13:1 15:18,24 16:1 17:6 18:2 19:1, 13 20:9 21:2,9,15 22:1 23:8,13 24:9,23 25:7 26:19 27:4 29:20 30:2,12,24 31:15 33:11,20 34:6 35:15 36:9 37:13,20 38:25 39:5 40:10,16, 20,23 41:1,25 42:9 43:12,19 44:5,9,14, 25 45:9,13,21,22 48:21 49:2,20 54:5, 10 55:16 58:1,15 63:11 64:5 65:1,6,9 66:19 67:3,5 81:8 84:1 88:21 89:10 90:18 91:23 92:23 94:6,17,23 95:6 96:14 97:1 99:4,21 100:5,9,18,19 101:11,14 104:3,15 105:1,23 106:24 108:18 109:8 110:15, 16 111:9,16 112:2,9 113:6 116:1 117:4 119:2,6,13,21,22 120:5,13 121:3,21 122:6,11,14,16 123:4,13,18,24 124:1,17,24 125:1 126:1,6,14,19 129:19 130:21 131:19 134:13,23 135:1,8, 12,21,23 136:5,7,13
**repeat** 7:10 16:25 33:5 37:10 65:20 79:23 90:20 99:3 102:9 104:18 115:19 116:18 121:6 122:2 129:17 135:1
**repeating** 95:11
**rephrase** 30:16
**report** 10:1 67:21
**reporter** 5:3 7:2,16 44:12 45:16,19 100:13,16 119:16,19 136:20,25 137:3
**reports** 10:10 132:22
**represent** 29:8 34:9 35:18 76:17,22 85:10 105:2 109:12,18 128:9
**representative** 23:20 61:21
**request** 16:14,18,19 17:1,16, 22 18:7,19,23 19:6, 17 20:2,12 21:12 23:1 34:11 59:20,21 88:13 93:1 106:16 107:10 120:7
**requested** 44:13 51:11,16,18 53:6,20 86:5 87:3,22, 24 88:10,12,24
**requester** 35:2 52:22
**requester's** 35:4,23
**requests** 51:12 52:3 57:11 59:4,11 71:2 72:19, 22
**require** 30:23 33:10 34:2 36:7 47:24 48:14 50:6 103:20 107:19 121:9
**required** 17:2,9 18:4,5,7 34:25 47:17 49:16 51:20 57:21 67:16 106:18, 19 107:3,7 108:14 110:18 112:5 120:24 125:5,8,15 126:15,25
**requirement** 56:16 108:2,6 120:1, 9
**requires** 108:1
**reserves** 137:8
**Resolution** 59:10
**Resources** 11:13
**respect** 38:23 39:20 66:25 125:22,23
**respectfully** 38:15
**respond** 27:7 118:19
**responded** 35:22 115:14 117:6
**responding** 35:19
**responds** 114:21,22
**response** 34:11 35:17,21 68:7 95:8,10 117:12 118:2 119:1
**responsibilities** 9:4
**responsible** 9:6 11:4 12:8
**Restriction** 51:22 55:2,5
**retain** 63:4
**reunions** 56:19
**revert** 48:11
**review** 55:24 58:18 66:10 71:19 72:16 80:20 91:4,8 133:15
**reviewed** 55:18 70:20 71:8,17
**reviewing** 56:5 91:1
**revocable** 101:10,12,16
**revocation** 80:15,18 95:24 101:6,17 102:5,7

**revocation-issued** 95:22
**revoke** 79:22 80:6,8,10 102:13
**revoked** 96:7
**revoking** 96:13
**rights** 98:25 99:5
**River** 62:19
**road** 69:23
**role** 9:3,4 13:4 39:15
**rolling** 59:21
**room** 98:20
**rows** 34:18
**Ruiz** 89:2 90:3
**rule** 101:24
**rules** 6:14,16 16:4 22:4,9, 21 23:10,25 28:16 30:14 31:23 33:2 49:4 50:1,11,19 55:13,21,25 56:2 59:17 60:4,7,12,24 63:22 64:11,14,21 80:19 118:12 128:22, 24 129:4,14,24 130:2
**run** 6:17 10:21 22:24 65:22 82:3 95:19
**rundown** 10:12
**running** 91:9

**S**

**safe** 27:8
**sales** 35:5
**Salinas** 82:17
**scanning** 15:7
**scheme** 120:25
**School** 34:24
**scratch** 30:16 47:16 52:7 56:25 69:4
**screen** 16:3,7,22 21:17,20 24:3 25:15 36:10 49:22 54:3 100:21 103:3 109:22 136:14
**screens** 108:5,6
**screenshot** 109:6
**scroll** 18:10 22:12,17 23:14 32:1 51:5 56:11 58:16,21 60:16 61:7 89:8,14 97:6 101:2 109:21 110:1 113:9, 13,19 115:3 116:5 133:13,15
**scrolling** 17:19 36:15 133:22
**Sean** 72:3
**searching** 15:22
**Section** 32:21 56:11 58:16,17 59:10 61:8
**seek** 20:3,22 30:18 70:5 108:20 111:3,7
**seeking** 52:13
**self-explanatory** 64:4
**sell** 35:1
**send** 132:4
**sense** 8:14 60:1 71:5 99:18
**separate** 18:9
**separately** 123:11
**serve** 84:21
**served** 20:14 56:20 131:14, 22
**serves** 93:12,21
**service** 60:20 70:14 97:10
**services** 8:12 9:7 11:4,7 12:22 13:3,13,22 14:21 15:11 17:22 18:5,20 19:8,22 20:4,23 21:5, 8 22:6 23:2,21 28:19 30:15,18 32:7,9 35:11,20 36:1 47:16, 17 49:10,13,17 50:7, 14 57:22 60:19,24 61:4 65:14,17 66:4 67:16 68:15 70:5 72:2 73:4,12 79:22 80:7,15 89:5,21 91:8 92:5,25 93:1,9,14 95:24 96:6 97:3,22 99:1,6 102:5,7,10 103:16,21 104:1,6,10 105:6,11,14,17 108:14,21 110:19 111:2,25 113:24 117:16,20 120:1,4,9, 16,25 128:16 136:9
**sessions** 59:20
**set** 21:19
**setup** 60:21
**Shackelford** 72:7 81:16,19
**shake** 7:14
**share** 16:2,6 21:20 49:22 75:7 92:9 100:21 103:3
**sharing** 21:17 25:15 54:3 65:6 88:15 102:15 136:14
**Sheet** 89:6
**short** 74:8
**show** 23:14 34:7 42:10 84:9 102:25 109:9 112:24 128:14 133:5
**showed** 108:9
**showing** 42:6
**shown** 110:5 134:11
**sic** 92:21
**sign** 136:25
**signature** 22:18 93:4,5 137:8
**signed** 56:5,6
**significant** 128:12
**silly** 76:21
**similar** 32:16 36:20 42:17 58:10
**simple** 41:2 125:16
**simultaneously** 40:9,18 70:13 123:20 124:23
**single** 129:23 130:3
**Site** 51:17 53:7,16,21,23 54:11,17,23 59:5
**situation** 34:5 52:12 96:11
**slot** 86:6 87:22
**slots** 86:25
**slow** 7:10
**small** 96:19
**Society** 5:10
**soft** 83:5,18,19,22 84:3,6
**solely** 101:20
**Solutions** 13:9,19 14:7,11 15:3, 15 50:13 72:4
**sorting** 124:11
**sound** 17:14 102:23 107:14, 17,24 110:2
**sounds** 17:15 20:14 33:25 49:7 55:7 72:11 108:25 117:9
**South** 11:1 82:15
**speak** 5:17 7:6 27:3 63:9 64:23 68:21 115:12 126:10
**speaker** 107:25
**speakers** 110:3
**speaking** 40:9,18 123:20 124:23
**speaks** 31:12 38:17,20
**Special** 11:10 16:14,18 17:1, 16,22 18:7,23 19:6 21:12 23:1 106:16,18 107:3,9 112:5
**specific** 37:23 95:17
**specifically** 7:13 37:22 79:2,11
**speculate** 7:22 34:4 52:14 106:13
**speculation**

27:2 33:18 83:24 103:23 109:4 111:12, 23 120:11 124:8
**spent** 118:10
**spoken** 6:14 13:21,24 14:3,6 37:14,21 68:12,14
**sponsored** 31:2,4 104:5
**sporting** 97:16 98:7
**spot** 83:5
**spreadsheet** 85:2,6 86:11
**St** 29:9,14 73:17 77:11, 19,21 78:14 79:1 126:15 127:6,7 128:9 129:12,21 130:1
**staff** 19:18 49:12 66:7 67:12 69:16 70:13,24 74:25 78:19 90:16,21 91:19 93:14 132:9, 10,16,21 133:3
**stamp** 134:21
**stamped** 134:12,17
**standards** 48:15,24
**Stark** 68:19
**start** 6:7,13 16:3 52:5 104:20 106:2 119:24
**started** 69:23
**starting** 110:4
**starts** 135:6
**state** 5:6 62:24 83:14 101:23
**states** 31:8,12 34:19 38:9 64:7
**status** 117:10,15
**Steele** 34:24
**step** 71:8
**Steve** 5:11
**stipulate** 134:14,16 135:10,17
**stipulation** 97:13 98:12 122:12, 14 126:13 135:20
**stipulations** 97:7 101:2
**stop** 21:17 25:15 88:15 102:14 136:14
**stopped** 65:6
**story** 91:25
**street** 114:7 115:8 116:16, 20
**structure** 10:13
**stuff** 13:5
**subject** 19:22 31:8 33:15 36:3 37:3,16,25 38:8 44:1 51:21 55:1 66:16 67:9 78:14 89:5 101:16 113:8 120:1,4,8,16 124:6 130:13,19
**subjecting** 39:24 43:6
**submit** 76:2
**submits** 20:11,12 48:7 70:6
**submitted** 18:16,19 19:11,17,19 70:11,13 71:7,13 86:12,18
**submitting** 19:12 20:1 57:11
**subsection** 58:21,22
**suggesting** 38:22
**suggestion** 45:6
**summer** 12:15 85:22,23 90:1, 6
**Sunnyslope** 103:6
**Super** 53:12
**support** 47:7
**supported** 26:1
**Sweetwater** 87:4,9,24 88:24 90:11,12
**swimming** 98:2
**sworn** 5:16
**system** 79:5,7,13,15,16,17 129:10

**T**

**Table** 29:9,14 73:17 77:11, 19,21 78:14 126:15 127:6,7 128:10 130:1
**takes** 70:10
**taking** 6:2
**talk** 15:18,21 36:8 46:10 76:25 91:18 94:22 98:5 111:1 123:10
**talked** 48:1 56:14 64:10 74:23 77:8 79:18 84:16 95:21 101:1 106:15 127:20
**talking** 49:24 50:17 53:17 70:1 114:13 128:23
**Tannia** 89:2 90:3
**team** 9:6 19:11 20:7 36:8 41:11,16 48:7 57:11 66:1 72:20 75:7 77:1, 3 80:12 82:5 91:7 93:16,23,25 94:22 95:15,16 99:7 108:8 111:1 114:16 115:14 117:14 130:25 136:11
**teardown** 60:21
**technology** 11:8
**Teleia** 82:16
**telling** 17:20 41:17 134:19
**tend** 7:6
**tents** 106:19,23
**term** 8:8,16 24:11 25:3 28:1,9 50:10,19 57:14,17 68:2,6,16 99:16
**terms** 28:16 47:13 118:11 124:19
**testified** 5:18 27:18 28:18 36:25 37:1 38:15 84:20 92:5 95:23 102:4 108:12 112:10 124:10 130:18
**testify** 41:23
**testimony** 6:25 7:1,4 20:25 41:15 44:4 45:25 48:19 57:24 94:14 96:2 130:16
**text** 14:14,17 40:1 41:6 43:8 44:19 96:19
**texted** 15:5,10,14
**texting** 14:24,25 15:3,4
**texts** 15:19
**thing** 11:3 29:2 53:17 114:9 123:25 134:17
**things** 17:17 22:24 54:14 110:5 123:9 125:18
**thought** 72:14,24 92:13
**threaten** 40:14
**three-hour** 60:25 74:24 92:6
**Thursday** 29:13 30:7 77:23 127:9,10 128:10
**time** 5:4 6:2,6 15:8 26:7 27:19,25 28:4 42:11 44:15 45:16 52:22 53:2 64:14 86:6,25 87:22 91:9 93:13,24 95:12,14,17 99:9,24 100:7 101:17 102:19 118:11 119:4,14 122:3 136:17 137:3
**times** 13:14,20 38:15,21 40:13 65:10 113:18 123:8 126:5 130:18
**Timing** 60:18
**title** 134:3
**today** 5:4 7:2,4,20 8:6,9 16:6 22:24 45:25 59:23 118:12 136:16
**Todd** 72:7 81:16,19 82:1
**told** 7:18 41:14,16 48:19 66:14 68:5 89:19 93:14,23 94:4
**tomorrow** 59:24
**Tony** 82:17
**top** 21:23 34:16 74:2

136:1
**total** 130:11
**totally** 107:16
**track** 27:11
**tracked** 27:15
**train** 136:12
**trained** 67:12
**training** 66:14,19 68:1 134:5, 6,10 135:13 136:9
**trainings** 67:11
**trash** 27:12 75:5 79:8 116:22
**treatment** 8:10 22:5 23:7,19 30:21 32:7 35:6 46:13,24 47:23 50:4 61:21 120:17 121:8 122:4 126:24 133:16 134:3
**trespass** 62:5,6,7
**trouble** 45:25 55:9
**true** 22:20 45:4 57:13,16 123:9 134:9
**truth** 5:17,18
**truthful** 7:4
**two-hour** 60:20
**type** 30:17 36:2 62:21 104:9,16 112:21 116:8
**types** 37:24 67:8

**U**

**Uh-huh** 13:17 32:3 36:14 114:20
**ultimate** 132:23 133:4
**umpteenth** 122:3
**unable** 55:10 129:13
**underneath** 10:20
**understand** 7:8,11 20:10,11 28:14 38:6 39:1,3,7 66:24 68:2 77:24 88:11 90:19 98:11 115:2 123:5,22 125:21,24 127:17
**understanding** 20:19 27:5 31:7,17 39:9 45:25 46:12 60:23 64:6,9,12 70:2 78:2 79:20 80:5 84:6 86:17 87:8 88:8 96:6 97:12 102:7 115:10, 18 116:10,12,17 117:12 126:11
**understood** 68:6
**unhoused** 25:13
**University** 114:3,9,11,12 115:5 116:4,7
**urine** 79:9
**users** 98:15

**V**

**V-A-N** 62:17
**vague** 37:17 44:4 64:22 99:2 120:10
**Van** 62:13,16,18,19,22 112:16,22
**vandalism** 79:8
**variety** 17:17
**verify** 93:15,25
**version** 41:23 56:1,3
**versions** 55:23,24
**vigorously** 125:23
**VII** 58:17
**violate** 26:16
**violated** 109:2
**violation** 61:12,13,19 62:2,3,6, 7,9,25 63:6,16 64:7 101:22 110:23 112:14 130:2
**Vista** 102:17,21,23 104:7 105:3 108:10,22 109:1,14 110:18 111:4 112:4
**volunteer** 7:24

**W**

**waive** 137:1
**walk** 61:15 62:2 65:15 70:9 74:9,14 127:2
**walked** 130:8
**walking** 74:19
**wanted** 46:8 101:2
**warning** 110:23 111:10
**warnings** 62:9,12
**water** 50:5,16
**web** 16:9,12
**website** 18:11 114:19 115:1
**wedding** 19:4 24:14 29:3 48:12 68:8 125:21 127:22,23
**weddings** 56:18
**week** 71:25 73:25 129:22, 23 130:3
**weekly** 73:9,10,20 91:7 129:13
**weeks** 73:1
**whichever** 75:16
**Whitfield** 5:15,21 6:20 8:6 11:20 16:2 28:12,14 29:8 30:3,13 31:7,16 32:25 33:8,12,21 34:9 36:10 38:4 39:6, 16,19,22 40:5 41:2,8, 14 42:10,14 43:13,21 44:6,16 45:1,23 47:15 49:6 58:2 60:9 62:24 64:12 65:10 67:4,8 68:18 76:10, 17,22 77:8 80:17,25 84:16 85:2,11 88:8 92:4 94:7 95:4 97:2 100:23 102:2,16 103:4,19 105:2 106:15 107:23 108:9 109:9,13,18 110:15, 17 112:10 113:2 118:10 119:23 121:4 122:8,23 123:14 124:2,4,10 125:2,11 126:3,15,21 128:7 130:22 133:7 134:1 135:22,24 136:8,16
**whomever** 66:2 98:5,10
**wide** 17:16
**witness's** 45:12
**wondering** 48:1 65:15 79:20
**words** 17:21 26:9,21
**work** 12:25 13:8 14:18 67:17,19 70:14 72:5 98:10 99:16 100:10 104:7 118:25
**worked** 55:18 95:16 99:7
**working** 11:22,23 12:20
**works** 6:17
**world** 45:12
**worries** 62:16 83:13
**wraps** 136:15
**written** 48:22,24 52:17,19 54:16 56:24 128:19
**wrong** 60:9 77:10 85:23 86:17
**wrote** 35:22

**X**

**XII** 61:8

**Y**

**y'all's** 119:4,14
**year** 62:6,7
**Year's** 83:10

**Z**

**zoom** 6:2 85:8 92:16