**ASHURST PERKINS COIE US LLP**
Jean-Jacques Cabou (#022835)
Margo R. Casselman (#034963)
2525 E. Camelback Road, Suite 500
Phoenix, Arizona 85016-4227
Telephone: +1.602.351.8000
J.Cabou@ashurstperkins.com
Margo.Casselman@ashurstperkins.com
DocketPHX@perkinscoie.com

Jonathan P. Hawley (WA#56297)*
1301 Second Avenue, Suite 4200
Seattle, Washington 98101-3804
Telephone: +1.206.359.8000
Jonathan.Hawley@ashurstperkins.com
*Admitted Pro Hac Vice

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| St. Herman's Table et al.,<br><br>Plaintiffs,<br><br>v.<br><br>City of Phoenix,<br><br>Defendant. | No. CV-26-03882-PHX-KML<br><br>**DEFENDANT'S COMBINED**<br><br>**RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR JUDGMENT AND FOR PERMANENT INJUNCTIVE AND DECLARATORY RELIEF**<br><br>**- AND -**<br><br>**MOTION TO DISMISS** |

**INTRODUCTION**

The City of Phoenix (the "City") is committed to supporting unsheltered residents. Ordinance G-7514 (the "Ordinance") is one "tool[] in [the City's] policy toolbox" for "tackl[ing] the complicated issues of housing and homelessness." *City of Grants Pass v. Johnson*, 603 U.S. 520, 533 (2024) (citation modified). The Ordinance "align[s] with the [C]ity's overall aspiration to provide supportive care to vulnerable populations" while recognizing that "these activities can [] strain the parks and [C]ity resources." Doc. 1-4 at 2. Balancing these competing concerns, the Ordinance is a content-neutral regulation that limits the charitable distribution of food—events that most directly contribute to trash and crowding in the City's parks—and preserves myriad other opportunities for Phoenicians to serve their communities and exercise their rights of expression and assembly.

Plaintiffs seek a permanent injunction based on conduct that is not constitutionally protected and speech the Ordinance nowhere prohibits. The Ordinance does not discriminate against religious practices while favoring secular activities: *All* charitable food distribution in City parks, much of which is undertaken by *nonreligious* groups, requires a permit. Because the Ordinance (at worst) only incidentally burdens Plaintiffs' religious undertakings, their free-exercise claim fails. Plaintiffs' free-speech claims fare no better: They have not proved protected expressive conduct and, even if food distribution were protected expression, the Ordinance is a valid content-neutral restriction that limits official discretion, is tailored to a substantial interest, and provides ample alternatives for expression. Finally, no vagueness claim can succeed where the Ordinance employs commonsense terminology and cabins official discretion.

Plaintiffs' Motion should be denied and final judgment entered for the City.[1]

---

[1] For efficiency, the City combines this Opposition with its Motion to Dismiss Plaintiffs' Complaint. For the reasons discussed below, Plaintiffs' claims fail as a matter of law—even without considering extrinsic evidence.

## BACKGROUND

### I. The City has long dealt with concerns about public food distribution and medical treatment in its parks.

For years, the City has received regular complaints from residents, employees, and other stakeholders about the negative impacts of food-distribution events and medical-treatment activities on parks and their users. *See generally* Ex. 1 ("Stark Decl."); Ex. 2 ("Whitfield Decl."); Ex. 3 ("Ramirez Decl."); Ex. 4 ("Porras Decl."); Ex. 5 ("Cypher Decl."). Among other concerns, "well-intentioned groups trying to feed or provide medical care in City parks are displacing other park users through their medical treatment activities and food distribution events," resulting in the accumulation of medical waste, trash, and discarded food; conflicts with other scheduled park activities; and disruptive and unsafe behavior such as open drug use, damage to City property, crowds, and noise. Whitfield Decl. ¶ 8; *see* Ex. 2-D (photographs of food-distribution event at Cave Creek Park); Ex. 2-E (City staff presentation explaining and depicting concerns Ordinance is designed to address); Stark Decl. ¶¶ 10–14; Ex. 1-A (photographs of March 2025 food-distribution event at Cave Creek Park); Ex. 1-B (photographs from August 2024 event).

Personnel from the Parks and Recreation Department (the "Parks Department") attest that food-distribution and medical-treatment events "place[] unique strains on [City parks] and on staff responsible for" those parks and "cause[] impacts and issues at parks that are very different from other events." Ramirez Decl. ¶¶ 8–10; *see* Porras Decl. ¶¶ 9–18; Cypher Decl. ¶¶ 7–17. Foremen and other Parks Department staff have frequently been called on—and taken away from other work at City parks—to clean up food, needles, and other waste after these events. Ramirez Decl. ¶¶ 10–12; Porras Decl. ¶¶ 19–20. And the unique features of these public events sometimes "block[] access and displac[e] families and other users of the park." Cypher Decl. ¶ 12. These challenges are exacerbated because, prior to the Ordinance, Parks Department staff lacked advance notice when food-

distribution or medical-treatment events would take place and thus could not plan or allocate resources accordingly. Ramirez Decl. ¶ 10; Cypher Decl. ¶¶ 10–12.

Residents and organizations implored the City to act. For example, at a community meeting at the Sunnyslope Community Center on April 8, 2026, Deputy City Manager Cynthia Aguilar listened as a fifty-five-year resident of the Washington Park neighborhood recounted how their niece found a used needle in the park playground. *See* Ex. 7 (summary of public comments). During the City Council's public meeting on the Ordinance on May 6, 2026, Derrick Talano, a representative of the Cactus Youth Baseball League, explained that his league has encountered needles and other paraphernalia at City parks—creating "real safety risks, not just perceived ones." CityofPhoenixAZ, *Phoenix City Council Formal Meeting - May 6, 2026*, at 1:59:25, YouTube (May 6, 2026), https://www.youtube.com/watch?v=RMCOpePmtGI. Echoing those concerns, at that same meeting, a boy named Miguel Angel testified that, while going down a slide in his Maryvale neighborhood, he was stuck by a needle, bled, and had to be treated at the hospital, including being tested for HIV. *Id.* at 2:59:24.

These public comments underscored that the "City lacked a specific, effective tool to regulate and manage the growing competition in [its] parks … between food distribution events and other, more traditional park uses, like children's play, youth sports, adult recreation, and family outings." Stark Decl. ¶ 10; *see* Whitfield Decl. ¶ 41. "Put another way, one group's desire to use a park at a particular time and in a particular way [] exclude[ed] others from using the same parks at those times." Whitfield Decl. ¶ 9. As District 5 Councilwoman Betty Guardado explained, the Ordinance was needed to "strike that balance" between competing uses so that "everyone is able to use the parks." *Formal Meeting*, *supra*, at 6:28:14.

## II. The Ordinance is a legislative solution to these ongoing problems.

In May 2026, following extensive public hearings and stakeholder engagement, *see*

Ex. 2-E at 14; Ex. 2-C; Ex. 7, the City Council adopted the Ordinance to address these concerns, *see* Doc. 1-4 at 2. As relevant here, the Ordinance requires permits from the Director of Parks and Recreation (the "Director") to host "Food Distribution Event[s]" in City parks, defined as "gathering[s] conducted by a private individual or organization, for charitable or similar humanitarian purposes, at a park, … to distribute food to any member of the general public at no cost or for a nominal charge." *Id.* §§ B(6)–(7), C(3), D. No permit is required for "private events, not open to the general public, where food is served." *Id.* §§ B(6)(i), G(3).

The Ordinance authorizes the Director to "adopt rules and procedures for the issuance of permits" subject to specified guidelines, including that the Director may "not issue more than two (2) permits" for any of the City's 100-plus eligible parks "in any calendar month." *Id.* § E. Consistent with these directives, the Director adopted detailed implementing rules and procedures governing the permitting process (the "Rules"), modeled after the City's existing process for allocating athletic fields among competing users. Whitfield Decl. ¶¶ 10–11; Ex. 2-A ("Rules"); Ex. 2-B. The Rules are publicly available on the City's website, along with the permit application, FAQs, and other guidance for applicants. *See Parks Services Permits*, City of Phx. https://www.phoenix.gov/administration/departments/parks/rentals-permits/parks-services-permits.html (last visited Sept. 22, 2026).

The Rules include the following provisions governing the permit process:

- Applying for a permit requires submitting a short application form and accompanying documentation; there is no fee. Rules 5.

- "All applicants who submit a properly completed application … will receive a permit, subject only to limited exceptions specified in" the Rules, and "[n]o qualified applicant will be denied a permit altogether when alternative parks and dates are available." *Id.* at 2, 6.

- In the event of competing requests, the Director "shall award Permits on a first-come, first-served basis." *Id.* at 6–7.

- The Director must "notify each applicant in writing (by email or letter) of the status of their application" within fourteen days. *Id.* at 7. If an application is denied or modified, the Director must provide the "specific reason(s)," alternative dates/parks, and contact information for follow up. *Id.*

- An applicant who is denied a permit may seek reconsideration by the Director and, if still unsuccessful, may appeal to the City Manager, who "will issue a final decision in writing." *Id.* at 8.[2]

To date, no one has been denied a permit under the Ordinance. Whitfield Decl. ¶ 28.

Since the Ordinance took effect, the Parks Department has "seen a noticeable, positive change in the condition of the Parks," including "fewer needles, used toilet paper, and scattered trash after Food Distribution events." Ramirez Decl. ¶¶ 13, 18. The Ordinance is also consistent with the City's extensive initiatives to address homelessness, which include a policy "that coordinated, shelter-based giving is superior policy to unstructured, one-off aid delivered directly to individuals on the street." Ex. 6 ("Milne Decl.") ¶ 13. This policy, among others developed by the City's Office of Homeless Solutions ("OHS"), "reflect[s] a considered, evidence-informed approach to reducing unsheltered homelessness and connecting individuals with the resources they need to exit homelessness." *Id.* ¶ 16.

### III. Plaintiffs' activities include—but are in no way limited to—the distribution of food at Cave Creek Park.

Every Thursday evening, Mr. Brace and approximately five to eight volunteers go to Cave Creek Park at Cactus, where they set up tables with food, water, hygiene items, Bibles, and sometimes clothing:

[2] The Rules were amended on July 10, 2026, so allegations in the Complaint based on the prior rules or Plaintiffs' misunderstanding of them (like paragraphs 3, 5, 7, 9, 16–17, and 35) are no longer accurate. Under the amended Rules, applicants for food-distribution permits (1) are not required to submit proof of insurance or provide food-handler certificates, (2) are not limited to parking-lot areas, (3) may submit reasonable estimates regarding potential attendees, and (4) may apply on a rolling basis for available permits at any time. *See* Rules 4–5, 8.




Ex. 8 ("Brace Dep.") 13:6–7, 22:4–16, 45:3–7, 127:22–128:13; FOX 10 Phoenix, *Phoenix Church Sues City over Park Feeding Ban*, YouTube (June 11, 2026), https://www.youtube.com/watch?v=HesYsekfyAE.[3] According to Mr. Brace, while at the park, he and his fellow volunteers also pray, engage in conversation, wear crosses, and display religious icons. Doc. 2-2 ¶¶ 14–18. As he acknowledges, the Ordinance regulates only food distribution; no permit is required for any other aspect of Plaintiffs' Thursday events. Brace Dep. 28:19–29:5, 93:20–95:9.

Critically, Mr. Brace concedes his religion does not require him to distribute food at Cave Creek Park at Cactus, on Thursdays, or even in any park at all. *Id.* at 38:1–19. Others at St. Herman's Table have even suggested going to other parks, *id.* at 70:13–19, 76:24–77:5, and Mr. Brace himself hopes to "expand to other parks," Doc. 33-1 ¶ 18, which would be consistent with Plaintiffs' goal of spreading the Church's message to all, Brace Dep. 54:8–56:1. Mr. Brace further testified that several of the individuals he serves have cars or could otherwise meet him at other nearby parks. *Id.* at 60:24–63:23.

Plaintiffs have never applied for a permit under the Ordinance, though Mr. Brace admits that they can readily satisfy the requirements and are "eligible for a permit on equal terms as anyone else" who seeks one. *Id.* at 36:12–15, 114:23–115:13, 116:11–19. He further concedes that there are enough available permits to allow Plaintiffs to conduct

[3] Mr. Brace testified that this video accurately depicts how St. Herman's Table events typically look (except that he had signs created in August 2026, which he now displays as well). Brace Dep. 26:18–27:1, 27:22–28:13, 127:22–128:13.

more food-distribution events than they have capacity for and that there are at least five other parks that are connected to their preferred park where they could hold their events. *Id.* at 65:21–68:2, 71:20–73:19, 81:11–18. Plaintiffs nonetheless seek a special exemption from the Ordinance because they want to conduct food-distribution events every Thursday at Cave Creek Park at Cactus specifically. *Id.* at 36:19–25, 73:20–74:15.

## ARGUMENT

"The decision to grant or deny a permanent injunction is within the Court's equitable discretion" and requires a plaintiff to establish

> (1) actual success on the merits; (2) that it has suffered an irreparable injury; (3) that remedies available at law are inadequate; (4) that the balance of hardships justifies a remedy in equity; and (5) that the public interest would not be disserved by a permanent injunction.

*Luxury Auto Collection LLC v. Walker*, No. CV-21-02025-PHX-SRB, 2022 WL 17361292, at *7 (D. Ariz. July 6, 2022) (citation modified). An injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). To state a claim for relief under Rule 8, a plaintiff must plead both "a cognizable legal theory," *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008), and "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Plaintiffs fail to meet these requirements. In fact, their Motion *affirmatively declines* to address four of the five required factors for injunctive relief. *See* Doc. 33 at 2 n.1. Their request should be denied, and this case should be dismissed.

### I. Plaintiffs do not succeed on the merits and their claims fail as a matter of law.

#### A. Plaintiffs' free-exercise claim (Count I) fails because the Ordinance only incidentally burdens religious activity and is neutral and generally applicable.

As Plaintiffs acknowledge, "laws incidentally burdening religion are ordinarily not

subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021). The Ordinance readily satisfies this standard.

**Incidental burden.** At worst, the Ordinance imposes only an incidental burden on Plaintiffs' religious activities. "Though [Plaintiffs'] desire to perform acts that contravene [the Ordinance] is motivated in part by religious belief," nothing in the Ordinance (or elsewhere) "prohibit[s Plaintiffs] from expressing [their] religious beliefs." *Olympus Spa v. Armstrong*, 169 F.4th 817, 832 (9th Cir.), *petition for cert. filed*, No. 26-286 (U.S. Sept. 3, 2026). Plaintiffs are free to exercise their religious beliefs both inside and outside the City's parks with just one narrow restriction imposed by the Ordinance: They must get a free permit to distribute food. As is clear from the Complaint, and as Mr. Brace further admitted in his deposition and declarations, the vast majority of Plaintiffs' almsgiving and other religious activities *are not regulated by the Ordinance at all*. *See, e.g.*, Brace Dep. 28:19–29:5, 91:13–16; Doc. 1 at 2. Plaintiffs remain free to engage in almsgiving outside of the City's parks, as they regularly do, *see* Brace Dep. 42:24–43:19, 88:18–20, and also remain free within the City's parks to "engage[] in conversation with the homeless about God," "pray," "evangelize the Church," "hand out Bibles" and "icons of St. Herman of Alaska," and distribute "water," "hygiene products," "[e]lectrolyte drink mixes," "[p]onchos," and "clothes." Doc. 2-2 ¶¶ 14, 16; *see* Brace Dep. 22:4–16, 28:15.

The Ordinance in no way regulates (much less prohibits) any of these activities. The *only* activity regulated by the Ordinance is food distribution, and even then, *Plaintiffs remain free to engage in food distribution at City parks.* They simply must obtain a permit, which are available on 358 days each year at 105 parks—including the 6 individual parts of Cave Creek Park. *See* Brace Dep. 66:19–21, 71:20–73:9; Whitfield Decl. ¶ 39. Indeed, Plaintiffs do not contest that the burden on their religious exercise is merely incidental, *see* Doc. 33 at 7–13, because they cannot.

**Neutrality.** The Ordinance "is neutral because its object, text, legislative history, and real-world operation are neutral with respect to religious exercise. Nothing in the statute prohibits religious conduct while permitting secular conduct." *Olympus Spa*, 169 F.4th at 832 (citation modified). The "Ordinance does not target religious activity on its face … and the statutory language does not use religiously significant or loaded language," *St. Mark Roman Cath. Par. Phx. v. City of Phoenix*, No. CV 09-1830-PHX, 2010 WL 11519169, at *9 (D. Ariz. Mar. 3, 2010), and so because the Ordinance "make[s] no reference to any religious practice, conduct, belief, or motivation, [it is] facially neutral," *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1076 (9th Cir. 2015). And the Ordinance is also "operationally neutral" because it prohibits charitable food distribution by *anyone*—religious and secular groups alike.

In granting a TRO, the Court disagreed because the Ordinance "requir[es] a permit only for those events undertaken for 'charitable or similar humanitarian purposes'" and, "[a]lthough subtle, charitable purposes certainly correlate with religious ones." Doc. 18 at 6 (quoting Doc. 1-4 § B(6)). The fuller factual record now presented demonstrates that charitable undertakings do *not* correlate with religious ones. Since the Ordinance was enacted, a variety of organizations have applied for food-distribution permits, and the majority have been *secular*. *See* Whitfield Decl. ¶ 27 (listing applicants including Billy's Way Home and Someburros burrito shop); Doc. 33-7 at 5, 8; Brace Dep. 87:5–88:1. Moreover, even if there were some correlation as previously posited by the Court, "[t]he possibility that [religious groups] may be burdened disproportionately does not undermine the [Ordinance's] neutrality. The Free Exercise Clause is not violated even if a particular group, motivated by religion, may be more likely to engage in the proscribed conduct." *Stormans*, 794 F.3d at 1077. In other words, "[n]eutrality is not destroyed by the supposition that" groups like St. Herman's Table "will be burdened disproportionately," *id.* at 1078—and here, that supposition is not even supported by the evidence.

The language from *Stormans* on which the Court put particular emphasis—that "[n]eutrality requires conduct be proscribed 'regardless of motivation,'" Doc. 18 at 6 (quoting *Stormans*, 794 F.3d at 1077)—must be considered in context. Neither *Stormans* nor any other authority holds that a motivation- or purpose-driven regulation like the Ordinance violates the Free Exercise Clause just because religious groups might share that motivation, even disproportionately. Instead, what matters is whether "[g]overnment action … burdens religious conduct because of its *religious* motivation," either facially or operationally. *McTernan v. City of York*, 564 F.3d 636, 647 (3d Cir. 2009) (emphasis added).[4] Even then, operational neutrality asks whether a challenged law "accomplishe[s] a religious gerrymander, an impermissible attempt to target religious practices through careful legislative drafting." *Stormans*, 794 F.3d at 1076 (citation modified); *see Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 524–25, 535–37 (1993) (striking down ordinance that prohibited animal sacrifice but excluded "almost all killings of animals except for religious sacrifice" such that net result was that "few if any killings of animals are prohibited other than [religious] sacrifice"). There is not a shred of evidence here suggesting the Ordinance was crafted to target only religious undertakings such that it constitutes a "subtle departure[] from neutrality." *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018) (citation modified). Quite the contrary: Secular groups are impacted by the Ordinance just as much as (if not more so than) religious groups.

The Court further questioned the Ordinance's neutrality and general applicability "because it permits secular activities that 'undermine[] the government's asserted interest in a similar way,'" faulting the City for "provid[ing] no evidence or meaningful argument explaining why a birthday party providing cake to twenty select two-year-olds is any less

[4] It thus does not matter that "a secular organization motivated by something other than 'charitable or similar humanitarian purposes' [is] free to conduct food distribution events without a permit," Doc. 18 at 6, so long as the motivation at issue is not religious.

likely to strain park resources with noise or mess than a religiously-motivated gathering open to twenty members of the public." Doc. 18 at 6–7 (quoting *Fulton*, 593 U.S. at 533). With the benefit of a fuller record, this issue has also been settled by uncontroverted facts. As explained by Parks Department personnel and other City officials, charitable food-distribution events present unique issues and place unique strains on parks that are not generally present for private events like birthday parties. *See, e.g.*, Stark Decl. ¶¶ 6, 10–14; Whitfield Decl. ¶¶ 8, 34–38; Ramirez Decl. ¶¶ 8–12; Porras Decl. ¶¶ 7–21; Cypher Decl. ¶¶ 7–17; Milne Decl. ¶¶ 13–16.

For example, according to Mr. Ramirez—who has worked in the City's parks for twelve years and "personally observed numerous Food Distribution … events"—these events "placed unique strains on the park and on staff responsible for the park" and "caused impacts and issues at parks that are very different from other events[] like family reunions or children's birthday parties," including "food waste and other debris, often including needles and other drug paraphernalia, all over the park"—requiring City staff to "walkdown the entire park" to ensure safety. Ramirez Decl. ¶¶ 8, 10. Unlike private events like birthday parties or family gatherings, charitable food-distribution events open to the public often resulted in trash scattered throughout parks, generally did not require permits—which meant the City could not allocate resources accordingly—and resulted in "a noticeable increase in needles, human waste, used toilet paper, or other dangerous trash." *Id.* ¶ 12. Mr. Porras and Mr. Cypher, with their collective forty-three years of experience working in parks, similarly attest that the "strains and impacts on our parks from Food Distribution events are nothing like the impacts of a birthday party or a family gathering," including because of the "difference in the amount, location, and types of trash and debris left behind after each kind of event." Porras Decl. ¶¶ 9–10; *see* Cypher Decl. ¶¶ 8–17. In their words, "[t]hese are serious problems for [them and their] colleagues" in the Parks Department, Porras Decl. ¶ 19, problems that they "have never seen or heard of

being caused by a child's birthday party or other similar family party," Cypher Decl. ¶ 17.

City leadership has also received numerous complaints and identified specific policy concerns that are unique to charitable food-distribution events. Councilwoman Stark is "deeply involved in and familiar with the challenges facing the parks in [her] District and in the City as a whole" and, "for several years," has "received regular complaints from constituents about the deleterious impacts on our parks, and on neighborhoods around our parks," specifically caused by "food distribution events." Stark Decl. ¶¶ 4, 6. The Director attests that the Parks Department and "departments across the City" "have received complaints, photographs, and other information … demonstrating that well-intentioned groups trying to feed or provide medical care in City parks are displacing other park users." Whitfield Decl. ¶¶ 8–9.

Against this overwhelming evidence from the individuals who personally oversee the City's parks and policymaking, Plaintiffs submit speculation and anecdotes about their own personal experiences. *See, e.g.*, Doc. 33-1 ¶¶ 13, 21. But the fact that *Mr. Brace* might clean up after his events in no way undermines the City's interest in addressing the very real issues before it, and even he admits he has witnessed attendees of his events litter and use drugs and alcohol and has personally seen a needle in a City park. Brace Dep. 57:18–59:15. Mr. Brace also candidly concedes that managing parks is not his "area of expertise" and he has never proposed a solution other than the one the City's elected officials adopted. *Id.* at 47:10–24, 125:12–20. In short, the fact that Plaintiffs' events might not cause all the problems that motivated the Ordinance does not somehow make the Ordinance constitutionally suspect. The government, after all, is not prohibited from enacting speed limits just because some drivers don't speed.

In sum, according to the individuals who run the City's parks, "without the Ordinance—which allows [staff] to schedule, plan for, and clean up after public Food Distribution and Medical Treatment events—it [wa]s almost impossible ... to maintain the

parks in a clean, safe, and accessible condition for all residents to enjoy." Ramirez Decl. ¶ 21. The Ordinance thus addresses a real problem the City faces, one to which private events like children's birthday parties do not contribute. "That the ordinance requires permits based on motivation rather than crowd size or trash output" does *not* "undermine[ the City's] asserted interest for enacting it" given that charitable food distribution is a disproportionate cause of the issues the Ordinance was enacted to address. Doc. 18 at 7.

For this reason, *Tandon v. Newsom*, 593 U.S. 61 (2021) (per curiam)—on which Plaintiffs continue to place great weight—does not help Plaintiffs. *Tandon* emphasized that "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any comparable* secular activity more favorably than religious exercise." *Id.* at 62 (second emphasis added). Here, no *comparable* secular activities are treated differently from religious activities; *all* charitable food-distribution events are subject to the same rules. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue" because "[c]omparability is concerned with the risks various activities pose." *Id.* (citation omitted). And while "[s]ometimes finding the right secular analogue may raise hard questions," *id.* at 65 (Kagan, J., dissenting), such difficulty is not present here: The Ordinance's interest is regulating *charitable food-distribution events open to the public* because of their disproportionately negative impact on the City's parks and resources. And no *secular* charitable food-sharing events are treated differently from Plaintiffs' desired activities. The Ordinance is therefore neutral.

**General applicability.** The Ordinance is also generally applicable. Plaintiffs disagree because, they claim, the Director "and the Department's employees consider on a case-by-case fact-intensive basis whether an individual or organization is distributing food to the public to determine whether an individual or organization must get a Park

Services Permit." Doc. 33 at 10 (citation modified). But as Plaintiffs themselves acknowledge, general applicability fails only "if the government has 'in place a system of *individual* exemptions,'" *id.* at 9 (emphasis added) (quoting *Fulton*, 593 U.S. at 534)—and there are no individual exemptions here. Only certain *classes* of events (events the City has not received complaints about and that have not similarly strained its parks), not individual activities, fall outside the permit requirement. *See* Doc. 1-4 § B(6) ("Food Distribution Event" requiring permit is limited to "a gathering … for charitable or similar humanitarian purposes [that] distribute[s] food to any member of the general public at no cost or for a nominal charge"); *id.* § G(3) (permit requirement "does not apply to *any* event that was not planned or intended to serve or distribute food to the general public" (emphasis added)). Parks Department staff do *not* have discretion to waive or withhold permits from otherwise-qualifying food-distribution events on an individual basis—which is the focus of the *Fulton* analysis. *See* 593 U.S. at 537 ("The creation of a formal mechanism for granting exceptions renders a policy not generally applicable … because it invites the government to decide which reasons for not complying with the policy are worthy of solicitude."). Because the Ordinance does not contain "a mechanism for individualized exemptions," *id.* at 533 (citation modified), it is generally applicable, *see* *Olympus Spa*, 169 F.4th at 833 (law constitutional where its "carveouts apply to categories of businesses rather than individuals or individual businesses" and "[t]hese exclusions are mandatory, not discretionary, and require no consideration of the particular reasons for a business's conduct" (citation modified)).[5]

* * *

"[E]ven in a charitable reading, [the Ordinance] imposes only incidental burdens

---

[5] Nor does the Ordinance "prohibit[] religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 534. Again, *all* charitable food-distribution events, religious and secular alike, are held to the same permitting requirement. *See Olympus Spa*, 169 F.4th at 832–33.

on religious expression and is neutral and generally applicable" and thus "is subject to rational basis review and will be upheld if it is rationally related to a legitimate government purpose"—review that "is highly deferential to the government." *Olympus Spa*, 169 F.4th at 833 (citation modified). Combatting the issues the Ordinance seeks to remedy—"large crowds, increased noise, obstruction of public spaces, litter, and the accumulation of trash, debris, and food waste," Doc. 1-4 at 2—is a legitimate interest served by regulating charitable food-distribution events, *see, e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 797 (1989) ("The city enjoys a substantial interest in ensuring the ability of its citizens to enjoy whatever benefits the city parks have to offer …."). Because the Ordinance satisfies rational-basis review, it is constitutional.[6]

**B. Plaintiffs' prior-restraint and equal-access claims (Counts II and III) fail because their distribution of food is not expressive conduct.**

Plaintiffs fail to show that their *distribution of food*—the only of their activities regulated by the Ordinance—is expressive conduct.

Plaintiffs' free-speech claims rest on their conclusory statement that they engage in "weekly religious speech and exercise." Doc. 33 at 14. But "[w]hether food distribution can be [protected] expressive activity" is a case-specific inquiry, and "it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies." *Santa Monica Food Not Bombs v. City of Santa Monica* ("*SMFNB*"), 450 F.3d 1022, 1032 (9th Cir. 2006) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984)). In their Motion, Plaintiffs do not even attempt to satisfy this burden; the term "expressive conduct" is nowhere to be found. *See* Doc. 33 at 13–21 (assuming without analysis that Plaintiffs must be engaged in protected speech merely because their conduct is part of "religious exercise"). This alone is

[6] Plaintiffs emphasize that they "also bring their Free Exercise Claim as applied," Doc. 33 at 11, but there is no substantive difference between their facial and as-applied arguments, *compare id.* at 7–11, *with id.* at 11–13.

dispositive. *See Lopez*, 680 F.3d at 1072 (plaintiff bears burden of proof on every element). But even if the Court allows Plaintiffs to pursue an argument they waived, and even generously viewing Plaintiffs' evidence, they come nowhere close to satisfying their heavy burden.

"[N]ot everything that communicates an idea counts as 'speech' for First Amendment purposes. The Supreme Court has consistently rejected the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1058 (9th Cir. 2010) (citation modified). Instead, a "complex legal framework" governs the constitutional protection afforded to "[c]onduct intending to express an idea." *Id.* at 1058–59. A reviewing court must first determine whether the activity in question is "(1) *purely expressive activity*" (like writing) "or (2) *conduct* that merely contains an expressive component" (like burning a draft card). *Id.* at 1059. "[C]onduct with an expressive component"—which is to say, activity like food distribution that "can be done for reasons having nothing to do with any expression"—is "entitled to constitutional protection *only* if it is sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Id.* at 1059, 1061 (emphasis added) (citation modified); *see Rumsfeld v. F. for Acad. & Institutional Rts., Inc.* ("*FAIR*"), 547 U.S. 47, 66 (2006) (conduct must generally be "so inherently expressive that it warrants protection"). The Ninth Circuit has made clear that there must be "an intent to convey a particularized message" and "the likelihood [must be] great that the message will be understood by those who view it." *Anderson*, 621 F.3d at 1058 (citation modified). Common "[e]xamples of expressive conduct include burning the American flag, burning a draft card, affixing a peace sign to the American flag, and wearing a military medal." *Imperial Sovereign Ct. of Mont. v. Knudsen*, 170 F.4th 820, 847 (9th Cir. 2026) (citations omitted).

Plaintiffs fail to demonstrate that they engage in expressive conduct. They neither identify the "particularized message" they allegedly communicate by passing out food nor attempt to show that this message "will be understood" by those receiving the food. Instead, Plaintiffs describe numerous *other* activities that are unquestionably expressive but unregulated by the Ordinance: prayer, wearing religious insignia, passing out pictures of saints, and so on. *See* Doc. 2-2 ¶¶ 13–18. But nowhere do they argue, much less demonstrate for purposes of securing a permanent injunction, that the only conduct they engage in that is regulated by the Ordinance—food distribution—both conveys a particular message *and* that the message is understood by their intended audience. Indeed, the fact that the distribution of food is merely a prelude for the ultimate message Plaintiffs seek to convey confirms the *food itself* is not expression. *See id.* ¶ 16 ("We tend to engage in these prayers towards the end of the evening once everyone has eaten and there are more conversations happening."). Plaintiffs "feed the needy … as a religious offering and out of Christian love for our neighbor." *Id.* ¶ 53. Plaintiffs' distribution of food is an act of faith personal to them, not itself the communication of a message to an outside audience.[7]

**Particularized message.** Plaintiffs have all but conceded there is no particularized message here because they themselves do not seem to know what their purported message actually is. Their Complaint and initial TRO Application identified no message, *see generally* Docs. 1, 2, and in later filings and discovery, Plaintiffs have been unable to land on a consistent, coherent, and particularized message. Sometimes Plaintiffs merely explain their own personal goal, which is *not* a message because it is internally felt rather than externally communicated. *See, e.g.*, Doc. 2-2 ¶ 33 ("Ultimately, St. Herman's goal is

---

[7] Conduct does not gain constitutional protection because of its temporal or physical proximity to protected speech like prayer. *See FAIR*, 547 U.S. at 66 (where accompanying "explanatory speech is necessary" to give rise to "expressive component of" conduct, this "is strong evidence" that conduct is unprotected).

to be used by God to bring His love to these individuals, and the others whom St. Herman's serves, and to see them embrace the Gospel as taught by the Orthodox Church."). Other purported messages have varied:

- "Plaintiffs' food distribution has a religious message: it demonstrates as well as audibly shares the love of Christ for 'the least of these His brothers and sisters.'" Doc. 14 at 7 (citation modified) (quoting Matthew 25:40).
- "So the message is that we're all welcome at God's table and that we're all equal in the eyes of God. All humans are created as an image of God. We're icons of Christ, as we would say in the Church." Brace Dep. 24:15–25:2.
- "That we love [the hungry] and Christ loves them." *Id.* at 111:2–21.
- "[T]he message [is] that we are all welcome at God's table." Doc. 33-1 ¶ 10.

These broad, vague, and varied descriptions—no matter how heartfelt and genuinely believed—are not a particularized message for First Amendment purposes. To be clear, the City neither doubts nor criticizes that Plaintiffs engage in food distribution and other activities with the sincere purposes of "assist[ing] one's neighbor, … demonstrat[ing] Christ-like love, … combat[ting] one's own greed," and "introduc[ing] Jesus Christ to the people [they] serve[]." Doc. 1 at 2. But engaging in conduct with a particular *motivation* or *goal* does not mean the conduct conveys a particularized *message*. Plaintiffs have made no attempt to demonstrate the latter.

**Audience understanding.** Nor do Plaintiffs show that any message is actually understood. Instead, Mr. Brace's supplemental declaration states only this:

> We know that the neighbors we serve receive our message-from their thanks, their sharing, their religious questions, their acceptance of our Bibles and literature, even some accepting our invitations and joining us at church. One time, I ran into someone that we had served at St. Herman's Table on the street. He recognized me as the "God people." I took this as the highest compliment. I seek to be a witness of God's love to all of those I encounter, and I was humbled but happy to hear that he associated me with Christ.

Doc. 33-1 ¶ 12. Again, and critically, Mr. Brace does *not* explain whether or how the distribution of food communicates their "message." And the fact that Plaintiffs concurrently engage in additional, inherently expressive conduct, *see id.* ¶ 11, makes it

overwhelmingly likely that *that* conduct, not food distribution, communicates any message Plaintiffs' audience receives. Plaintiffs certainly have not proved otherwise.

In sum, "[b]ecause [P]laintiffs have not demonstrated a 'great likelihood' that their intended messages … will be understood by those who view them," their food distribution "is not sufficiently communicative to merit First Amendment protection." *Edge v. City of Everett*, 929 F.3d 657, 669 (9th Cir. 2019); *see Circle the City v. City of Phoenix*, No. CV-26-04222-PHX-DJH, 2026 WL 2321463, at *3–5 (D. Ariz. Aug. 11, 2026) (rejecting First Amendment challenge to Ordinance because "provision of … food to the unhoused is [not] inherently expressive conduct under the First Amendment" and "nothing in the record suggests that [plaintiffs' purported] message is conveyed to a passerby or would be understood by onlookers"). The Ordinance therefore need only be "rationally related to a legitimate governmental interest." *Anderson*, 621 F.3d at 1059 (citation modified). It is, *see supra* p.15—and Plaintiffs nowhere argue otherwise. The Court need go no further; Plaintiffs' First Amendment claims fail for this reason alone.

### C. Plaintiffs' prior-restraint claim further fails because the Ordinance is a valid time, place, and manner regulation.

Even if Plaintiffs' food distribution were expressive conduct—and it is not—the Ordinance would still be constitutional as a "reasonable time, place, or manner restriction." *Anderson*, 621 F.3d at 1059 (citation modified). "Regulations of the use of a public forum that ensure the safety and convenience of the people are not inconsistent with civil liberties but are one of the means of safeguarding the good order upon which civil liberties ultimately depend." *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 323 (2002) (citation modified). Such "time, place, and manner" restrictions are constitutional so long as they (1) do "not delegate overly broad discretion to a government official," (2) are not "based on the content of the message," (3) are "narrowly tailored to serve a significant governmental interest," and (4) "leave open ample alternatives for communication."

*SMFNB*, 450 F.3d at 1037.

Here, the Ordinance satisfies each of these requirements.[8]

**1. The Ordinance does not delegate overly broad discretion.**

The Ordinance and the accompanying Rules promulgated by the Director "contain adequate standards to guide the [Director's] decision and render it subject to effective judicial review." *Thomas*, 534 U.S. at 323. The Ordinance empowers the Director to "adopt rules and procedures for the issuance of permits" and specifically directs that such rules be designed "to minimize disruption to other park uses, ensure the safety of park guests, and maintain parks in a clean and sanitary condition." Doc. 1-4 § E(2). The Ordinance further specifies the number of permits the Director may issue (up to two per park in any calendar month), the specific parks for which permits may be issued, and several specific terms the Director must require. *See id.* § E(3)(ii)(2).

The Director, in turn, has done as directed and adopted a detailed set of Rules governing the permit process, designed to implement the Ordinance's instruction to minimize disruption, ensure the safety of park users, and maintain clean parks. Those Rules are publicly available and specify in detail the circumstances under which the Director will issue (or deny) permits, as well as the criteria for resolution of competing requests. Under the Rules, "[a]ll applicants" who submit a properly completed application that comports with the Parks Code of Conduct "will receive a permit," with only six, specifically enumerated exceptions. Rules 2, 6. The criteria are specific, objective, and readily available. *Contra* Doc. 33 at 8 (wrongly suggesting Ordinance "impermissibly grants the Director discretion to determine whether an organization or individual must get a permit at all"). Any person or group—irrespective of their viewpoint, religion, or anything else—*will* be issued a permit if their request complies with the Ordinance and

[8] Though Plaintiffs challenge only the content-neutrality and narrow-tailoring prongs, *see* Doc. 33 at 15–19, the City addresses all four in turn.

the Director's objective, publicly posted rules. *See* Rules 2. If a permit is denied, then the person or group will receive a written explanation of the reasons and will be "offer[ed] an alternative time, place, or manner if one is available." *United States v. Linick*, 195 F.3d 538, 543 (9th Cir. 1999); *see* Rules 7. And the applicant will have an opportunity to appeal the denial of a permit, first to the Director and then to the City Manager—each of whom will provide a written explanation for the decision. Rules 7–8. "These limits objectively constrain the governing body's discretion," foreclosing any argument that an official possesses "unbridled discretion" to grant or deny permits under the Ordinance. *S. Or. Barter Fair v. Jackson County*, 372 F.3d 1128, 1140–41 (9th Cir. 2004).[9]

Ultimately, "[t]he [Parks] Department makes no judgments about, and extends no preferences or priority to, applicants based on their identity, affiliation, viewpoint, religion, or the content of any speech in which they might engage during their event." Rules 6. The Ordinance is thus "limited by its terms, [and] by nondiscriminatory practice, to considerations of public safety and the like." *Thomas*, 534 U.S. at 322–23 (citation modified). And the Ordinance and its implementing Rules more than adequately cabin official discretion. *See SMFNB*, 450 F.3d at 1035 (reviewing ordinance "in light of" rules adopted by city manager because such rules were "properly viewed as [the city's] authoritative interpretation of the … [o]rdinance").

**2. The Ordinance is content neutral.**

Plaintiffs claim the Ordinance is not content neutral because it "expressly conditions a Parks Service Permit on motive, which is 'obvious[ly]' content-based." Doc. 33 at 15 (alteration in original) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163

---

[9] Throughout their Motion, Plaintiffs claim the Director is "the sole arbiter as to which organizations and individuals are required to seek a Parks Services Permit" and has "determined" that Plaintiffs need a permit "because they are a religious organization." *E.g.*, Doc. 33 at 4, 13. These claims are groundless and offensive, as even a cursory reading of how permit applications are processed under the Ordinance and Rules confirms.

(2015)). That too is false. Nothing in the Ordinance says anything about communication of *any* message (let alone the content thereof); it regulates only conduct. *See generally* Doc. 1-4 (regulating "act[s]" of medical treatment, "distribution" of needles, and "conduct[ing]" food-distribution events). As for food distribution specifically, the Ordinance *does not regulate content*. It requires permits to distribute food "for charitable or similar humanitarian *purposes*," *id.* § B(6) (emphasis added), and charitable *motivation* is not itself an expressive message, as confirmed by cases where courts declined to extend First Amendment protection to purportedly expressive conduct that did not articulate a clear message notwithstanding the actor's stated motivation, *see, e.g.*, *Damon v. Hukowicz*, 964 F. Supp. 2d 120, 149 (D. Mass. 2013) ("The simple act of riding a bicycle, without anything more, cannot reasonably be understood to convey Plaintiff's particularized and overwrought message …. Plaintiff might have been expressing his 'world view' by riding his bicycle, but that does not exempt him from having to comply with the state's traffic laws."). Because the Ordinance "does not distinguish *among* [] expressive events based on their content"—it applies equally to *all* charitable food-distribution events, regardless of the message actually conveyed—it "satisfies the content-neutrality requirement for valid[] time, place, and manner regulations." *SMFNB*, 450 F.3d at 1037.[10]

Grasping at straws, Plaintiffs nevertheless cry foul because, they suggest, some "favor[ed]" organizations conducted nonpermitted events. Doc. 33 at 16–17. Each instance is readily explainable:

---

[10] For this reason, Plaintiffs' suggestion that "[i]f the message at the park is 'happy birthday' or 'mazel tov' the event is unregulated; but if the message, in word and deed, is 'We are all welcome at God's table,' it is heavily regulated and confined," Doc. 33 at 15–16 (citation omitted), is strikingly off base. *Nothing* in the Ordinance expressly or implicitly distinguishes between messages in this way. The only classifications at issue here do not relate to speech at all and are content-neutral regardless: public, charitable food-distribution events versus other food-distribution events.

- The Norton Vista Neighborhood Association received a *special-activity permit* well before the Ordinance took effect, and it is far from clear that it needed a permit under the Ordinance. *See* Whitfield Decl. ¶ 31(a); Doc. 1-4 § B(6) (permit only required if event is for charitable purposes and to distribute food).

- The organizers of the Divas of Da Desert event applied for and obtained a food-distribution permit; Parks Department staff expressed their concerns and educated the organizers regarding their confusion over the timeframe of the permit. *See* Whitfield Decl. ¶ 31(b).

- Billy's Way Home has been granted every food-distribution permit it has applied for other than one it requested on a blackout date. *Id.* ¶ 31(c).

These are, in short, hardly the smoking guns Plaintiffs suggest they are. Instead, they show the City and its Parks Department have worked hard to implement the Ordinance in a consistent and objective manner and have successfully done so with minimal hiccups, even in the first few months since the Ordinance took effect.

**3. The Ordinance is narrowly tailored.**

The Ordinance furthers substantial government interests and is narrowly tailored to those interests. "The requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *SMFNB*, 450 F.3d at 1038 (citation modified). And it is well established that, even when it comes to "traditional public fora," "local governments can exercise their substantial interest in regulating competing uses … by imposing permitting requirements for certain uses." *Id.*

Here, the face of the Ordinance identifies several substantial government interests unrelated to the regulation of free expression. The Ordinance balances the City's interest in "provid[ing] supportive care to vulnerable populations that frequently take place in parks" against concerns that "these activities … strain the parks and [C]ity resources, frequently creating large crowds, increased noise, obstruction of public spaces, litter, and the accumulation of trash, debris, and food waste"; "damage public property"; and "limit others' ability to access, share, and enjoy the parks." Doc. 1-4 at 2. These interests are

robust and, critically, *uniquely associated with charitable food-distribution events*. *See supra* pp. 10–12. And they are indisputably substantial and well within the City's regulatory power. *See, e.g.*, *Clark*, 468 U.S. at 296 (confirming "[g]overnment's substantial interest in maintaining the parks … in an attractive and intact condition").[11]

The Ordinance also "promotes" the City's substantial interests, which "would be achieved less effectively absent the" Ordinance. *SMFNB*, 450 F.3d at 1038 (citation modified); *see* Stark Decl. ¶¶ 10, 14; Ramirez Decl. ¶¶ 13–21. Indeed, "without the Ordinance," it was "almost impossible for [Parks Department staff] to maintain the parks in a clean, safe, and accessible condition for all residents to enjoy." Ramirez Decl. ¶ 21. By requiring permits for certain food-distribution events and limiting the number of such events to two per month at each park, the Ordinance furthers the City's interests in ensuring that others can also access, share, and enjoy parks; reducing strain on City resources; and controlling noise, crowds, obstruction, and the accumulation of trash.

The Ordinance does not "burden substantially more speech than necessary to achieve [the permitting] scheme's important goals." *SMFNB*, 450 F.3d at 1038. Indeed, the Ordinance does not burden Plaintiffs' speech or expression *at all*. *See supra* pp. 15–19. And the Ordinance is not "hopelessly underinclusive," *contra* Doc. 33 at 18 (quoting *Hubbard v. City of San Diego*, 139 F.4th 843, 852 (9th Cir. 2025)), because it is directed to those activities that were disproportionately responsible for the issues the City intended to address. The City's elected officials are empowered to select a legislative solution that

---

[11] Another Judge of this Court previously concluded that a different "food sharing ordinance is reasonably related to a legitimate state objective: namely, the ordinance was put into effect to reduce food sharing events in the park that had become an area of community concern for various reasons, including protecting the public from sickness due to unregulated food service; allowing all members of the public to enjoy the park … ; and reducing large gatherings of homeless people, which can sometimes create a public nuisance." Order at 13, *Thornton v. Bullhead City*, No. CV-22-08195-PCT-SMB (MTM) (D. Ariz. Sept. 23, 2024).

"promotes a substantial government interest that would be achieved less effectively absent the regulation." *SMFNB*, 450 F.3d at 1038 (citation modified). That test is satisfied here.

**4. The Ordinance leaves open ample alternatives.**

Lastly, the Ordinance leaves open ample alternative opportunities for food distribution and expression—both generally and as applied to Plaintiffs especially. "[I]n the 'ample alternatives' context, the Supreme Court has made clear that the First Amendment requires only that the government refrain from denying a 'reasonable opportunity' for communication." *SMFNB*, 450 F.3d at 1045 (citation omitted); *see, e.g.*, *Edwards v. City of Coeur d'Alene*, 262 F.3d 856, 866 (9th Cir. 2001) ("If an ordinance effectively *prevents* a speaker from reaching his intended audience, it fails to leave open ample alternative means of communication." (emphasis added)).

Far from preventing Plaintiffs from performing their almsgiving and evangelism, the Ordinance only regulates food distribution, which is just one of Plaintiffs' activities. *See supra* p. 8. Plaintiffs identify alternative means of almsgiving wholly unaffected by the Ordinance, *see* Doc. 2-2 ¶¶ 14–18, which they can continue *at Cave Creek Park*. Distributing items other than food, engaging in prayer and meaningful conversation, and displaying religious symbols and icons are not regulated by the Ordinance in any way. As Mr. Brace acknowledges, "St. Herman's purpose is ultimately to see God work within those with whom we come into contact [] and to welcome them to our Church." *Id.* ¶ 28. That ultimate purpose is not regulated by the Ordinance and can be achieved through alternative means, in terms of both activities and locations. *Cf. Otyang v. City & County of San Francisco*, No. C 12-00577, 2013 WL 843565, at *4 (N.D. Cal. Mar. 6, 2013) ("While [challenged regulation] requires an individual to obtain a permit to set up a table in a San Francisco park, it does not prevent or impede an individual from conveying information."), *aff'd*, 608 F. App'x 541 (9th Cir. 2015).

Moreover, the Ordinance allows Plaintiffs to distribute food more than twice per

month at parks *other* than Cave Creek Park at Cactus. If a permit for food distribution is not available at a particular park on a particular day, the Ordinance leaves open alternatives at over 100 other parks—including more than 20 parks within 5 miles of Cave Creek Park at Cactus. Whitfield Decl. ¶¶ 19, 28, 39–40. It is undisputed that, where a permit cannot be issued at a particular time for a particular park, the Director "can and would always offer a permit for *another* park to all qualified applicants." *Id.* ¶ 20; *see, e.g.*, *Josephine Havlak Photographer, Inc. v. Vill. of Twin Oaks*, 195 F. Supp. 3d 1065, 1078–79 (E.D. Mo. 2016) (availability of "other public parks" for expressive activity satisfied alternative-channel requirement (citing *Kaahumanu v. Hawaii*, 682 F.3d 789, 805 (9th Cir. 2012))), *aff'd*, 864 F.3d 905 (8th Cir. 2017). Plaintiffs might *prefer* to pass out food without limitation at Cave Creek Park at Cactus, but "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981). "An alternative channel is one that is adequate to provide a reasonable means for … communicat[ion]"; it "need not be a perfect substitute for the means of communication that were foreclosed by the regulation." *Muhlrad v. City of San Marino*, No. LA CV21-05491 JAK (JPRx), 2024 WL 5349935, at *2 (C.D. Cal. Jan. 3, 2024).

### D. Plaintiffs' equal-access claim further fails because the Ordinance is content neutral.

Plaintiffs' equal-access claim fails not only because their food distribution is not "expressive religious activit[y]" regulated by the Ordinance, *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523 (2022); *see supra* pp. 15–19, but also because the Ordinance does *not* impose "disparate treatment in a public forum based on the religious content of a group's intended speech or activity," *contra* Doc. 33 at 19–20; *see supra* pp. 9–14. Again, *all* charitable food-distribution events, secular and nonsecular, are subject to the same rules and restrictions. Plaintiffs claim this is no defense because "[t]he City does not cure

a Free-Speech violation by also violating the rights of secular people," Doc. 33 at 21, but there is no free-speech violation here—and an equal-access claim fails when a law satisfies the requirements of a valid time, place, and manner restriction, including content neutrality, *see Faith Ctr. Church Evangelistic Ministries v. Glover*, 480 F.3d 891, 896 (9th Cir. 2007) (Bybee, J., dissenting from the denial of rehearing en banc) (acknowledging that "the government can exclude religious speech … if the expressive activity violates standard time, place, and manner restrictions on the forum's use" (citing *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 839 (1995))).

**E. Plaintiffs' expressive-association claim (Count IV) fails because their protected right to associate is not burdened by the Ordinance.**

Plaintiffs suggest their right to "expressive association" is violated by the Ordinance. Doc. 33 at 21–24 (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984)). Setting aside that their regulated food distribution is not expression, *see supra* pp. 15–19; *see also Youth 71Five Ministries v. Williams*, 160 F.4th 964, 984 (9th Cir. 2025) ("To establish [a] burden[ on the] expressive associational right, [the plaintiff] first must show that, as a group, it engages in some form of expression." (citation modified)), and that they remain free to gather together, worship, and engage in almsgiving notwithstanding the Ordinance, *see supra* pp. 25–26; *see also Youth 71Five Ministries*, 160 F.4th at 984 (plaintiff "must show that compliance with the [challenged law] would likely affect that expression in a *significant* way" (emphasis added) (citation modified)), Plaintiffs have a more fundamental doctrinal problem: "Not all interactions with other people that might be described as associational in common parlance involve the sort of expressive association that the First Amendment has been held to protect," *Crowe v. Or. State Bar*, 112 F.4th 1218, 1234 (9th Cir. 2024). Plaintiffs identify no authority extending the expressive-association right to the circumstances here.[12] This claim is, ultimately, simply

[12] Generally, the First Amendment's protections for expressive association mean

a rehash of Plaintiffs' free-speech claims and likewise fails for the reasons above.

### F. Plaintiffs' vagueness claim (Count V) fails because the Ordinance is sufficiently clear and limits arbitrary discretion.

Plaintiffs briefly argue the Ordinance is unconstitutionally vague because it "fails to provide a person of ordinary intelligence fair notice of what is prohibited" and "authorizes or even encourages arbitrary and discriminatory enforcement." Doc. 33 at 28 (citation modified). Both arguments fail as a matter of law.

*First*, Plaintiffs claim that the terms "family," "family friend," and "public" are unclear. *Id.* at 28–29. But they do not dispute that *their own food distribution* requires a permit—and "a plaintiff whose [conduct] is clearly proscribed cannot raise a successful vagueness claim … for lack of notice." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 20 (2010). Moreover, "a litigant must make a high showing before [courts] will strike down a regulation as void for vagueness. That some smidgen of ambiguity remains is no reason to find a statute unconstitutionally vague." *Platt v. Mansfield*, 162 F.4th 430, 445 (4th Cir. 2025) (citation modified). Mr. Brace testified that *he understands the meanings of these terms*. *See* Brace Dep. 103:20–104:2 ("I can understand the difference between public and private[.]"); *id.* at 108:8–18 (admitting he understands section of Ordinance containing "family" and "friends"). Each "has a common, readily understandable meaning"—Plaintiffs cannot suggest otherwise—and the Ordinance thus "gives reasonable notice of the proscribed conduct" and passes constitutional muster. *Id.* (citation modified); *see Edge*, 929 F.3d at 665 (no vagueness where "the meanings of [challenged terms] are easily discerned through recourse to a common dictionary").

---

only that the government cannot "impos[e] penalties or withold[] [sic] benefits from individuals because of their membership in a disfavored group" or "interfer[e] with the internal organization or affairs of the group." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 861 (7th Cir. 2006) (quoting *Roberts*, 468 U.S. at 623); *see Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000) (considering whether state can "force[] inclusion of an unwanted person in a group"). And here, the Ordinance applies to all groups equally, as discussed above.

*Second*, Plaintiffs argue that the Director's discretion allows for arbitrary and discriminatory enforcement. But as discussed above, *supra* pp. 20–21, the Director's discretion is significantly limited by the Ordinance and the Rules implementing it. And, in any event, "the presence of enforcement discretion alone does not render a statutory scheme unconstitutionally vague"; instead, "[t]he key question is … whether the [Ordinance] gives a … fair warning that … conduct is, in fact, unlawful." *United States v. Michel*, No. 19-148-1 (CKK), 2022 WL 4182342, at *6 (D.D.C. Sept. 13, 2022) (citation modified). Because the Ordinance "clearly proscribe[s]" the charitable distribution of food in City parks without a permit, "any vagueness challenge must fail." *Id.*

## II. The remaining factors weigh against injunctive relief.

Though it is Plaintiffs' burden to satisfy every element, their Motion does not address any factor for injunctive relief other than the merits, instead relying on the Court's TRO order. *See* Doc. 33 at 2 n.1. That was a different motion raising limited claims on a different posture and record, and the Court's prior ruling does not excuse Plaintiffs' burden to "establish" all five permanent-injunction factors. *Luxury Auto Collection*, 2022 WL 17361292, at *7. And though Plaintiffs purport to "reserve their right to pursue those arguments," Doc. 33 at 2 n.1, it's too late: Plaintiffs had an affirmative obligation to demonstrate their entitlement to relief *in their Motion*, and they cannot rectify that failing on reply, *see Magnotti v. Comm'r of Soc. Sec. Admin.*, No. CV-20-00760-PHX-DWL, 2021 WL 4025959, at *3 (D. Ariz. Sept. 3, 2021) (issue waived if not raised until reply).

Briefly, though, the City addresses two critical points.

### A. The public interest and balance of harms favor enforcing the Ordinance overwhelmingly passed by the City's elected officials.

Governments have a "substantial interest" in maintaining their parks "in an attractive and intact condition, readily available to … people who wish to see and enjoy them by their presence." *Clark*, 468 U.S. at 296; *see Thomas*, 534 U.S. at 322 (affirming

city's need to "coordinate multiple uses of limited space [and] to assure preservation of the park facilities"); *SMFNB*, 450 F.3d at 1043 (similar). It is equally clear that "the public interest necessarily weighs against enjoining a duly enacted statute." *Priorities USA v. Nessel*, 860 F. App'x 419, 423 (6th Cir. 2021); *see, e.g.*, *K.C. v. Individual Members of Med. Licensing Bd. of Ind.*, 121 F.4th 604, 633 (7th Cir. 2024) ("substantial interest" in enforcement of laws enacted by elected representatives).

The Ordinance does exactly what the law permits; what the Parks Department, the majority of the City Council, and others confirm is sorely needed; and what Plaintiffs nowhere dispute must be done: "coordinate multiple uses of limited space." *Thomas*, 534 U.S. at 322. Since Plaintiffs are not "prevented from expressing their religion and taking part in a religious activity" or otherwise engaging in First Amendment activity, Doc. 18 at 8, the public interest favors enforcement of the Ordinance.

**B. Plaintiffs will not be irreparably harmed.**

Plaintiffs waived any attempt to establish irreparable harm by failing to address this fundamental requirement in their Motion. Worth emphasizing, however, is that only the distribution of food and medical treatment are regulated under the Ordinance, which says nothing about speech or ministry. Plaintiffs remain free to minister to the homeless at Cave Creek Park however else they see fit, without any need for permanent injunctive relief from this Court. All that has changed is that Plaintiffs must obtain a permit if they wish to charitably distribute food to the public in a City park. And the mere inconvenience of a permit to engage in nonspeech activity is not irreparable harm. *See Montoya v. City of San Diego*, No. 19cv0054 JM(BGS), 2021 WL 1056594, at *6 (S.D. Cal. Mar. 19, 2021) ("potential inconveniences" are not irreparable harm).

**CONCLUSION**

Permanent injunctive and declaratory relief should be denied; the Complaint should be dismissed in its entirety; and judgment should be entered for the City.

Dated: September 22, 2026

**ASHURST PERKINS COIE US LLP**

By: */s/ Jean-Jacques Cabou*

Jean-Jacques Cabou (#022835)
Margo R. Casselman (#034963)
2525 E. Camelback Road, Suite 500
Phoenix, Arizona 85016-4227
J.Cabou@ashurstperkins.com
Margo.Casselman@ashurstperkins.com

Jonathan P. Hawley (WA#56297)*
1301 Second Avenue, Suite 4200
Seattle, Washington 98101-3804
Jonathan.Hawley@ashurstperkins.com
*Admitted Pro Hac Vice

*Attorneys for Defendant*

**CERTIFICATE OF CONSULTATION**

Pursuant to LRCiv 12.1(c), I certify that, before filing the foregoing Motion to Dismiss, I notified Plaintiffs' counsel of the issues asserted in the Motion and the parties were unable to resolve the issues.

*/s/ Jean-Jacques Cabou*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 22, 2026, I electronically transmitted the attached documents to the Clerk's Office using the CM/ECF System for filing.

*/s/ Indy LaFever*